

FILED
AUG 27 2015
Clerk, U S District Court
District Of Montana
Billings

Christine Collier, Victoria Collier, and Nathan Collier, *Pro Se*
827 Starlight Circle
Billings, MT 59101
406-252-8324

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

---

| | |
|---|---|
| CHRISTINE COLLIER (PARKINSON), VICTORIA "VICKI" COLLIER, and NATHAN COLLIER, <br><br> Plaintiffs, <br><br> v. <br><br> TIM FOX, in his official capacity as Attorney General of Montana; STEVE BULLOCK, in his official capacity as Governor of Montana; SCOTT TWITO, in his official capacity as Yellowstone County Attorney, and KRISTIE LEE BOELTER in her official capacity as Clerk of the Yellowstone County District Court, <br><br> Defendants. | **CIVIL RIGHTS COMPLAINT** <br><br><br><br> Case #  *CV-15-83-BIG-SPW-CSO* <br><br><br> Judge: _____ |

---

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Christine Collier (Parkinson), Victoria or "Vicki" Collier, and Nathan Collier (hereinafter

"Plaintiffs" or "Collier family") complain and allege of Defendants as follows:

## PARTIES

1.  Plaintiffs Christine Collier (Parkinson), Vicki Collier, and Nathan Collier live together and

    are residents in Billings, Montana.

2. Defendant Tim Fox, in his official capacity as Attorney General of Montana, resides in Helena, Montana and has his office in Billings, Montana. It is his responsibility as the chief legal officer of the State of Montana to ensure that the laws of the State are uniformly and adequately enforced.

3. Steve Bullock, in his official capacity as Governor of Montana, resides in Helena, Montana and has his office in Billings, Montana. It is his responsibility to ensure that the laws of the State are properly enforced.

4. Scott Twito, in his official capacity as Yellowstone County Attorney, resides in Billings, Montana and has his office in Billings, Montana. It is his responsibility as the chief legal officer for Yellowstone County to ensure that the laws of the State are uniformly and adequately enforced in Yellowstone County.

5. Kristie Lee Boelter, in her official capacity as the Clerk of the Yellowstone County District Court, resides in Billings, Montana and has an office in Billings, Montana. It is her responsibility as Clerk of the Court to process all marriage licenses and records.

6. The Defendants, and those subject to their supervision, direction, and control, are responsible for enforcing Montana's criminalization of polygamy and the ban on allowing consenting adults to enter legally recognized plural families. The relief requested in this action is sought against each of the Defendants, their officers, employees, agents, and anyone else acting in cooperation with the Defendants or acting under their supervision, direction, or control.

## JURISDICTION AND VENUE

7. This court has subject matter jurisdiction over this case under:

    a.   28 U.S.C. §1331 (Federal Question) because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983, an Act of Congress;

    b.   28 U.S.C. §1343(a)(3) because this action is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and

    c.   28 U.S.C. Sec. 1343(a)(4) because this action seeks equitable relief under 42 U.S.C. §1983, an Act of Congress.

8.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all of the Defendants reside within this district and within the State of Montana.  Venue is also proper in this Court because a substantial part of the events giving rise to the claim occurred in this district, including but not limited to the Plaintiffs' application for a marriage license in Billings, Montana.

## INTRODUCTION

9.  Vicki and Nathan Collier were legally married on April 29, 2000 and are currently married.

10. Christine desires to legally marry Nathan.

11. Vicki consents to and supports Christine's desire to marry Nathan.

12. Nathan desires to legally marry Christine.

13. Christine does not desire to legally marry Vicki.

14. Like thousands of women across the country in similar situations, Christine is denied the right to legally marry the man of her choice.

15. Christine is denied the right to marry under the color of law because plural families are a disfavored minority.

16. In 2007, Christine Collier had a religious ceremony with Nathan wherein she was "spiritually" married to Nathan.

17. However, fearing Montana's criminal bigamy laws, the Collier family hid their relationship for years.

18. Nathan and Vicki want Christine to have the same legal protections that Vicki enjoys as a legally recognized spouse.

19. In *Loving v. Virginia*, 388 U.S. 1, 12 (1967), the United States Supreme Court noted that Americans have a Constitutional right to marriage, which is "one of the vital personal rights essential to the orderly pursuit of happiness by free men."

20. In *Zablocki v. Redhail*, 434 U.S. 374, at 386 (1978), the United States Supreme Court noted that it is contradictory for government "to recognize a right of privacy with respect to other matters of family life and not with respect to the *decision to enter the relationship* that is the foundation of the family in our society."

21. In *Obergefell v. Hodges*, the United States Supreme Court further noted that when "new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. … The *limitation of marriage to* opposite-sex *couples* may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest." 576 U.S. ___ (35 S. Ct. 1039; 192 L. Ed. 2d 609).

22. Plaintiffs and, by extension, thousands of non-traditional families throughout the State of Montana and the United States are demeaned and disgraced by society because they "are

denied the constellation of benefits that the States have linked to marriage and are consigned to an instability many [monogamous] couples would find intolerable." *Id.*

23. This "works a grave and continuing harm, serving to disrespect and subordinate" plural families like the Plaintiffs "who want[] to affirm their commitment to one another before their children, their family, their friends, and their community." *Id.*

24. Montana's bigamy statute (§45-5-611) criminalizes a person who publicly commits to love, protect, care for, and financially provide for a plural family by requesting a marriage license:

> (1) A person commits the offense of bigamy if, while married, the person knowingly contracts or *purports to contract* another marriage unless at the time of the subsequent marriage:
>
> > (a) the offender believes on reasonable grounds that the prior spouse is dead;
> >
> > (b) the offender and the prior spouse have been living apart for 5 consecutive years throughout which the prior spouse was not known by the offender to be alive;
> >
> > (c) a court has entered a judgment purporting to terminate or annul any prior disqualifying marriage and the offender does not know that judgment to be invalid; or
> >
> > (d) the offender reasonably believes that the offender is legally eligible to remarry.

25. Montana's bigamy statute (§45-5-612) criminalizes a person who publicly commits to share in the love, protection, care, and financial commitment within a plural family by accepting a proposal of marriage by a man even when his legally recognized wife consents to said proposal of marriage:

> (1) A person commits the offense of marrying a bigamist if the person contracts or purports to contract a marriage with another knowing that the other is committing bigamy.

      (2) A person convicted of the offense of marrying a bigamist shall be fined not to exceed $500 or be imprisoned in the county jail for any period not to exceed 6 months, or both.

26. Montana's criminal bigamy law criminalizes not only consensual plural marriages like the Plaintiffs who *only* seek a marriage license between Christine and Nathan, it criminalizes an array of consensual, intimate, plural relationships.

27. Montana's criminal bigamy law contravenes the right of consenting adults to create a legally recognized family environment of their choosing.

28. By criminalizing said intimate relationships, Montana officials prosecute private conduct between consenting adults without requiring law enforcement officials to show harm to society or those involved.

29. The State of Montana does not (and presumptively cannot) criminalize consensual intimate (including sexual) relationships between unmarried adults.

30. Like officials in all states, Montana officials deal routinely with adults living together in consensual, intimate (including sexual) relationships without marriage licenses, including individuals who produce children out of wedlock or through adulterous affairs.

31. Adults are allowed to live openly in said intimate relationships so long as they do not commit the collateral crime of pursuing a marriage license to publicly proclaim their commitment to love, protect, care for, and financially provide for any children resulting from said relationships.

32. This disparate treatment of plural families denies them basic liberties, due process, and equal protection under the law as guaranteed by the First and Fourteenth Amendments of the United States Constitution.

33. For these reasons, Plaintiffs ask this court to enjoin, preliminarily and permanently, all

enforcement of Montana's laws banning and criminalizing polygamy.

### NATURE OF THE ACTION

34. Through this action, pursuant to 42 U.S.C. §1983, the Collier family seeks a declaration that

Montana Code §§45-5-611 and 45-5-612 are unconstitutional under the Due Process and

Equal Protection clauses of the Fourteenth Amendment of the United States, and are

unconstitutional under the Free Exercise, Establishment, Free Speech, and Freedom of

Association Clauses of the First Amendment to the United States Constitution, applicable to

the states through the Fourteenth Amendment to the United States Constitution.  The Colliers

further seek a preliminary and permanent injunction preventing the Defendants from

enforcing the aforementioned Montana bigamy statutes against the Colliers.

35. To the extent that any other Montana law is or could be used[1] as the basis for the

criminalization of plural families, the Collier family seeks a declaration that these laws are

unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth

Amendment to the Untied States Constitution and the Free Exercise, Establishment, Free

Speech, and Freedom of Association Clauses of the First Amendment to the United States

Constitution, applicable to the states through the Fourteenth Amendment to the United States

Constitution.  The Collier family further seeks a preliminary and permanent injunction

preventing the Defendants from enforcing the aforementioned Montana bigamy statute

against the Colliers.

---

[1] For instance, it appears that a finding of a common law marriage (see Montana Code §40-1-403) between Christine and Nathan could be used as evidence that Nathan had "purported" to marry Christine under the Montana bigamy statute.

36. The Montana bigamy statute does not make any distinction between plural families where each parent/spouse/partner *consents* to the relationship and bigamy where one spouse is *unaware* of another spouse's effort to obtain an additional marriage.

37. The Collier family does not seek any relief from the Montana bigamy statute to the extent that it is used to criminalize *non-consensual* and/or *fraudulent* behaviors as in the case of individuals seeking an additional marriage license without their spouse being offered the opportunity to (1) receive notice of or (2) give their consent to said additional marriage.

38. The Montana bigamy statute does not make any distinction between polygamist marriages wherein *one party* is married to multiple individuals (Nathan would be married to Vicki and Christine) and group marriages wherein *each* party is married to *each* other (as in a partnership).

39. To enforce their rights afforded by the United States Constitution, the Collier family brings this action pursuant to 42 U.S.C. §1983 for declaratory and injunctive relief against enforcement of Montana's laws banning and criminalizing polygamy.  The Collier family also seeks to recover all of their attorneys fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. §1983, and any other relief that this Court may order.

40. As stressed by the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), "The State cannot demean their [Plaintiffs'] existence or control their destiny by making their private sexual conduct a crime."

41. *Obergefell* essentially extended *Lawrence's* holding to state that the "State cannot demean their [Plaintiffs'] existence" by favoring monogamist couples over plural families by giving monogamists marriage licenses while forbidding plural families that same right.

## CONSTITUTIONAL PROVISIONS

42. The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. Amend. I.

43. The Fourteenth Amendment to the United States Constitution provides in part: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, §1.

## FACTS

### PLURAL FAMILIES (RELIGIOUS BACKGROUND)

44.  Plural families within Montana cover a wide range of religious and non-religious relations that include polygyny, polyandry, and other forms of group marriages.

45. The Collier family is founded upon polygyny, meaning that multiple women are spiritually married to one man but none of the women are spiritually married to each other; this is commonly referred to as a polygamous marriage but technically, the terms *polygamy, polygamous,* and *polygamist* include polyandrous marriages (one woman with multiple husbands) as well as polygynous marriages.

46. Polygamous marriages where multiple women are spiritually married to one man are sometimes explained as "V" marriages or marriages based upon a wagon wheel concept where each wife forms a spoke around the husband (the hub).

47. The Collier family does not practice group marriage (which term suggests that each parent is "married" to each other parent, forming a "triad" or "quad," etc.).

48. Polyandry and group marriages are more frequently found in non-religious settings. Polyandrous families (and polyamorist relationships) were not uncommon in the San Francisco area in the 1960s and group families were found throughout the United States and Canada during that decade.

49. Polygamy is currently practiced by millions of people around the world and remains common in some countries.

50. Historically speaking, polygamy was found on virtually every continent at one point in time.

51. Polygamy is one of the oldest religious-based practices in the world.

52. In the Old Testament of the Bible, considered as the literal word of God by Jewish, Christian, and Mormon faiths, God shows his approval of polygamist men. See Genesis 16:1, 3; 25:1 (Abraham had three wives); Exodus 2:21; 18:1-6; Numbers 12:1 (Moses had two wives); and 1 Samuel 18:27; 25:39-44; 2 Samuel 3:3-5; 5:13; 12:7-8; 12:24; 16:21-23 (David had eighteen wives).

53. Many Muslims believe that polygyny is an important part of their faith.

54. While the exact number of wives is in dispute, the Prophet Muhammad was a polygamist with at least four wives.

55. Sharia law generally enforces a limit of four wives for a Muslim man under Sura 4:3 and recognizes the right to plural marriages.

56. Passages in the Jewish Talmud make estate planning references to polygamy.  See Babylonian Talmud, Tractate Kethuboth 93a-93b.

57. Polygamy is known to be practiced in Israel despite criminal provisions against it. Polyamory is also practiced among Jews in the United States.

58. Some Protestants described polygamy as the "ideal form of marriage."

59. The preference for polygamy, for example, can be found in Europe among the Anabaptsits in Munster in 1535-36.

60. Martin Luther publicly stated that his reading of the Bible affirmed polygamy, noting that the authorities should leave such questions to the personal choices of the citizens:

> "I confess that I cannot forbid a person to marry several wives, for it does not contradict the Scripture.  If a man wishes to marry more than one wife he should be asked whether he is satisfied in his conscience that he may do so in accordance with the word of God. In such a case the civil authority has nothing to do in the matter."  See De Wette II, 459.

61. Some Protestants continue to form polygamous families as part of their Christian faith.  See http://www.christianpolygamy.info/movement/ (last visited on 8/20/2015); http://www.truthbearer.org/polygamy/ (last visited on 8/20/2015).

62. Joseph Smith, the founder of the Church of Jesus Christ of Latter-day Saints a.k.a. "Mormonism," published a revelation about polygamy (Doctrine and Covenants Section 132) and was a polygamist.

63. Brigham Young (Joseph Smith's successor) taught that only through polygyny could men become gods.  See Journal of Discourses 11:269.

64. Joseph F. Smith, the sixth president of the LDS or "Mormon" church continued to emphasize the importance of polygamous marriages:

Some people have supposed that the doctrine of plural marriage was a sort of superfluity, or non-essential to the salvation or exaltation of mankind.  In other words, some of the Saints have said, and believe, that a man with one wife, sealed [married] to him by the authority of the Priesthood for time and eternity, will receive an exaltation as great and glorious, if he is faithful, as he possibly could with more than one.  I want here to enter my solemn protest against this idea, for I know it is false.

65. Sometime after the LDS church publically abandoned polygamy in 1890, many Mormons found the rejection of polygamy to be so contrary to the founding principles of the Mormon church that they subsequently left the congregation.

66. Many of these disaffected Mormons created their own religious groups.

67. Some Montana citizens are part of these religious groups.

68. The Colliers were Mormons until they were excommunicated for their belief in creating and maintaining a plural family.

69. The Colliers now live as a plural family because of their desire to love, protect, care, and financially provide for one another and for all of their children.

70. The Colliers are no longer affiliated with any religious group.


### PLURAL FAMILIES (CULTURAL BACKGROUND)

71. For many polygamists, the practice of plural marriage is integral to both their religion and their culture.

72. Many plural families structure their cultural practices around long standing cultural norms that center on plural marriage.

73. Polygamists often structure their families and cultural practices around their belief in plural families and associations.

74. Many Native American tribes or nations practiced forms of polygamy, particularly polygyny, and many early Europeans in the frontier adopted the same practices.

75. Polygamy was particularly common among southeastern and Plains Native American tribes or nations. Notably, many of these tribes or nations were also communal and matrilineal, where descent is traced through the female line.

76. While polygyny is more common than polyandry, the latter has also been long practiced and is particularly present in both the United States and Canada.

77. Polyandrous families have been given legal protection in Canada. *Winik v. Wilson* Estate, [1999] 1999 Sask. R. LEXIS 424, *21.

78. The practice of polygamy is also a political and associational right, as characterized under domestic law and international norms.

79. Cultural traditions and practices are promised protection under international law. See, e.g., International Covenant on Economic, Social and Cultural Rights, art. 15, adopted Dec. 16, 1966, 993 U.N.T.S. 3 (entered into force Jan. 3, 1976)(guaranteeing "the right of everyone … to take part in cultural life.").

80. International law specifically reaches minority cultural groups and practices. For example, Article 27 of the International Covenant on Civil and Political Rights guarantees that insular minorities "not be denied the right, in community with the other members of their group, to enjoy their own culture." International Covenant on Civil and Political Rights, art. 27, *adopted* Dec. 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976). *See also Lovelace v. Canada,* (19810 HRC 36 U.N. GOAR Supp. (no. 40) Annex XVIII; U.N. Doc.

A/36/440 (1981)(Human Rights Committee upholding minority right to culture over enforcement of the Indian Act).

81. As noted above, there are many polygamists and polyamorists who participate in plural unions because of deep philosophical beliefs.

82. For example, each Plaintiff has lived in a monogamous marriage and yet they have each spoken publicly about how they prefer living in a plural family.

83. Christine has publicly stated that plural marriage "strengthens family values and brings out the strengths in each other" and that it "takes a high level of commitment to ensure that each relationship is nurtured."

84. Christine has publicly stated that plural families allows "more eyes for the kids, more hands for the daily chores, more love for the family, more income to cope in an ever demanding society."

85. Other women have noted that it is better to share a good man than to have none at all.

86. Many people believe strongly that monogamous unions are artificially restrictive and run counter to the biological and emotional needs of human beings.

87. Unlike casual encounters or "swingers," polygamous and polyamorous families maintain stable plural unions that are neither confined to nor defined by sexual relationships.

**MONTANA'S BAN ON PLURAL FAMILIES**

88. Despite this long history of polygamy, majoritarian religious groups, including Christians, Jews, and Mormons, are vehemently opposed on moral grounds to the practice of polygamy in any form.

89. Montana's decision to criminalize and ban the religious and cultural practice of polygamy is based upon the moral disapproval of majoritarian religious groups and beliefs.

90. Montana's decision to criminalize and ban the religious and cultural practice of polygamy is not founded upon legitimate state interests demonstrating any harm allegedly caused by the various forms of polygamous families.

91. Montana has never proven any harm allegedly caused by the practice of the various forms of polygamist families.

92. Montana's bigamy statute violates the Establishment Clause of the First Amendment.

93. The Montana criminal bigamy statutes use the term *bigamy* as opposed to polygamy.  See Montana Code §§45-5-611 and 45-5-612.

94. Bigamy is generally the act of marrying one person while still legally married to another. Black's Law Dictionary 69 (3rd pocket ed. 2006).

95. Unlike polygamy, bigamy is often done without the knowledge of one or more spouses, representing plural marriage without the *consent* of the first spouse.

96. While only a handful of states outlaw polygamy per se, many prohibit bigamy generally.  See Ariz. Const. art. 20 para. 2; Me. Rev. Stat. Ann. Titl. 17-A, §551; Mass. Gen. Laws ch. 272, §13; Mich. Comp. Laws Ann. §750.441; Miss. Code Ann. §97-27-43; N.M. Cons. Art. 21, §1; OK Const. art. 1; Utah Code Ann. §76-7-101; Va. Code Ann. §18.2-363.

97. While Montana has not prosecuted any polygamists under this theory, it could do so because Montana statute similarly acknowledges common law marriages.  Montana Code §40-1-403.

98. Montana bigamy statutes criminalize the private conduct of adults exercising their liberty under the Due Process Clause.

99. It further denies due process by branding consenting adults as criminals on account of their private choices as to how they arrange their intimate familial relationships.

100.    Making plural marriages a crime has a pronounced effect on plural families as it presumptively labels them as criminals because of: (1) the sexual orientation of the parents; (2) the family structure the parents desire to create; (3) the choice of the parents to associate one with another as parents; (4) sincerely held religious beliefs; (5) sincerely held cultural practices; (6) plural wives' desires to claim their spouse as their husband on many government forms; and (7) their family structure, which is not based upon majoritarian religious values endorsed by the State of Montana.

101.    They specifically deny individuals the protected right to freely make personal decisions relating to procreation, contraception, family relationships, and child rearing.

102.    They further deny individuals the protected rights of freedom of association, of free speech, of the free exercise of their religious beliefs, and of the right not to be discriminated against on the basis of their sexual orientation.

103.    Montana's ban on plural marriage results in many polygamists being afraid of the law.

104.    Many polygamous families live in fear and secrecy.

105.    Those families are afraid of the law because of public raids like the one in Colorado City in 1953 and the one in Texas in 2012.

106.    This fear of the law creates insular societies where abuses are not reported, where children are born without social security numbers, and where abuses can be perpetuated

because victims fear that reporting will harm innocent third parties that they love and care for.[2]

107.    If Montana's bans on plural marriage were stricken, hundreds of plural wives and their children would have legal legitimacy and be empowered to avoid and/or report these abuses.

108.    If Montana's bans on plural marriage were stricken, hundreds of plural wives and their children would have legal rights and privileges that would allow them to become flourishing citizens of the United States of America and the State of Montana instead of living lives where they feel oppressed and shamed by their own government.


## THE COLLIER FAMILY

109.    The Collier family has eight children from past and present relationships.

110.    Five of those children live at home.

111.    Nathan is an entrepreneur and runs a refrigeration business.

112.    Vicki has a BSN degree, has almost finished her master's degree, and works in the healthcare industry.

113.    Christine is working on her bachelor's degree in accounting.

114.    Christine was raised to believe polygamy was immoral and wrong.

115.    Christine and Vicki dated Nathan at the same time.

116.    Nathan married Vicki in 2000.

117.    Christine didn't feel ready to create a plural family so she quit dating Nathan and subsequently married a third party.

---

[2] Some religious groups, like the FLDS (Fundamentalist Church of Jesus Christ of Latter Day Saints) are known to be havens for domestic abuses.  Other groups, like AUB (Apostolic United

118. After Christine's marriage to the third party failed, she and Nathan began dating again.

119. Christine spiritually married Nathan in 2007 because they fell in love.

120. Initially, Christine and Vicki lived in separate homes but they now prefer to live in the same home.

121. Christine is injured by Montana State laws because these laws deny her over 1,000 rights and protections provided strictly on the basis of marital status.

122. Many of those protections extend to her children and are similarly denied by Montana State laws.

123. Christine's children from her first marriage could be taken from the only family they have ever known (the Collier family) and be placed with third parties if Christine suffered an untimely death.

124. Other plural wives in similar circumstances are also denied these same rights and suffer similar injuries.

125. The Collier family has never been accused of fraud, child abuse, or spousal abuse.

126. The Collier family was tired of living their lives in secrecy so they decided to publicly acknowledge their plural family life.

127. The Collier family appeared on the popular *Sister Wives* show on January 18, 2015 to discuss their family life with the Brown family and they openly discussed their interest in adding another wife to the family.

128. On June 30, 2015, Plaintiffs presented themselves to the Yellowstone County Clerk of District Court Marriage License Division in order to apply for a marriage license between Christine and Nathan.

Brethren) are known by civil authorities for reporting abuses when they occur.  Non-religious

129.    On July 14, 2015, the Yellowstone County Attorney's office sent a letter formally

denying said request for a marriage license.

130.    Said letter informed Plaintiffs that their request for a marriage license "would be

considered bigamy in Montana. … In addition, Montana … makes criminal one who enters

into a marriage with another knowing that the other is legally married to another."

131.    Said letter did not *explicitly* say that the State of Montana would be prosecuting members

of the Collier family.

132.    Said letter was unclear as to whether or not the County Attorney properly understood that

Nathan and Christine were not applying for a three-way license.

133.    Said letter referred to the *Obergefell* ruling, noting that said ruling "did not expand the

number of persons involved in a marriage; the ruling only acknowledged fundamental rights

of a person who wishes to marry another person."

134.    That portion of the letter is precisely the heart of this complaint: Christine has a

fundamental right to marry whomever she wishes.

135.    Christine has the choice to marry millions of individuals across the world.

136.    Christine desires to marry Nathan.

137.    Montana's ban on polygamy denies her the fundamental right to marry the person of her

choice.


### FIRST CLAIM FOR RELIEF: DUE PROCESS

138.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth

herein.

polygamous families generally fall somewhere in between these two points of view.

139.   Montana Code §§45-5-611 and 45-5-612 violate fundamental liberties that are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

140.   The fundamental liberties protected by the Fourteenth Amendment's Due Process Clause extend to certain personal choices central to individual dignity and autonomy, including intimate choices defining personal identity and beliefs.

141.   The right to marry is a fundamental right protected by the United States Constitution.

142.   Individuals have the right to personal choice regarding whom they will marry.

143.   Both Christine and Nathan Collier have been denied this personal choice by the enforcement of Montana Code §§45-5-611 and 45-5-612.

144.   Marriage is a union unlike any other in its importance to the committed individuals.

145.   Protecting the right to marry is fundamentally important because it protects and safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education.

146.   Without state recognition, children born in plural families suffer the stigma of believing their families are somehow lesser.  They also suffer the significant costs of being raised by unmarried parents and are thusly relegated to a more difficult and uncertain family life.

147.   Montana's marriage laws harm and humiliate the children of plural families, including the children of the Collier family.

148.   Marriage is the keystone of this nation's social order.

149.   Montana has contributed to the fundamental character of marriage by placing it at the center of many facets of the legal and social order.

150.    There is no difference between plural and monogamous families with respect to this principle.

151.    Montana's denial of the ability of plural families to have legal recognition denies them a constellation of benefits that consign plural families to an instability many monogamous families would find intolerable.

152.    Montana's ban on plural marriage is demeaning to plural families who are unable to aspire to the transcendent purposes of marriage.

153.    Montana Code Ann. §§45-5-611 and 45-5-612, both as written and as applied in this case, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.


## SECOND CLAIM FOR RELIEF: EQUAL PROTECTION

154.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth herein.

155.    Montana Code Ann. §§45-5-611 and 45-5-612 violate fundamental liberties that are protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied to the Plaintiffs.

156.    Montana Code Ann. §§45-5-611 and 45-5-612 threaten plural families with criminal prosecution when they commit to love and support multiple partners (and their children) while other Montana citizens are routinely allowed to have children by multiple sexual partners in both adulterous and non-adulterous relations without any threat of criminal prosecution.

157.    Monogamists are allowed an infinite number of sexual partners, and consequently have

the right to bear children with multiple partners, so long as they do not claim to be committed

to such partners in a union or family.

158.    Montana Code Ann. §§45-5-611 and 45-5-612 similarly treat plural families differently

than other citizens based upon the sincerely held religious beliefs of plural families.

159.    When plural families call each parent a "spouse" because of their private religious

beliefs, they are under threat of prosecution while they would not be under that threat if they

claimed no religious obligation and merely engaged in casual sexual associations.

160.    Even as a non-religious distinction, there is no rational basis for the disparate treatment

given plural families and other citizens with multiple sexual partners.

161.    The disparate treatment given polygamists is based on historical and religious animus

toward polygamists, who are an insular minority in both the State of Montana and nationally.

162.    Montana Code Ann. §§45-5-611 and 45-5-612, both as written and as applied in this

case, violate the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution.


### THIRD CLAIM FOR RELIEF:  FREE EXERCISE

163.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth

herein.

164.    Montana Code Ann. §§45-5-611 and 45-5-612 violate fundamental liberties that are

protected by the Free Exercise Clause of the First Amendment to the United States

Constitution, both on its face and as applied to the Plaintiffs.

165.    Montana Code Ann. §§45-5-611 and 45-5-612 are not neutral and generally applicable.

166.    Montana Code Ann. §§45-5-611 and 45-5-612 are not supported by a compelling state

interest and are not narrowly tailored in pursuit of state interests to deter fraudulent bigamous

marriages.

167.    Montana Code Ann. §§45-5-611 and 45-5-612 further violate fundamental liberties by

denying religious polygamists the right to organize their private relations in conformity with

their long-established and sincerely held religious beliefs.

168.    By branding plural families as criminals, the law forces those who have engaged in

polygamy for spiritual purposes to suppress the open practice of their faith.

169.    Montana Code Ann. §§45-5-611 and 45-5-612, both as written and as applied in this

case, violate the Free Exercise Clause of the First Amendment to the United States

Constitution.


## FOURTH CLAIM FOR RELIEF:  ESTABLISHMENT OF RELIGION

170.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth

herein.

171.    Montana Code Ann. §§45-5-611 and 45-5-612 violate fundamental liberties protected by

the Establishment Clause of the First Amendment to the United States Constitution, both on

its face and as applied to the Plaintiffs.

172.    Montana Code Ann. §§45-5-611 and 45-5-612 impose majoritarian religious beliefs

concerning private unions on minority groups like plural families.

173.    The Plaintiffs represent an insular minority of both religious and cultural polygynists who

are viewed as immoral under majoritarian Judeo-Christian beliefs.

174.    The criminalization of the private associations of plural families constitutes an effort to force compliance with majoritarian moral beliefs.

175.    The isolation, criminalization, and demeaning of plural families (as opposed to plural *relations* or *associations* without any commitment one to another) reflects hostility toward their belief structure and the imposition of a majoritarian moral code.

176.    The Judeo-Christian basis for the criminalization of plural families has been expressed in prior cases as well as public commentary.

177.    The Judeo-Christian insistence on monogamy contradicts the deeply held moral beliefs of fundamentalist Mormon polygamists, many Muslims, and other minority religious groups who live in the State of Montana.

178.    The Judeo-Christian insistence on monogamy contradicts the deeply held moral and religious beliefs of the Collier family who has determined that living as a plural family helps them to live closer to God.

179.    Montana Code Ann. §§45-5-611 and 45-5-612, both as written and as applied in this case, violate the Establishment Clause of the First Amendment to the United States Constitution.

## FIFTH CLAIM FOR RELIEF:  FREE SPEECH

180.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth herein.

181.    The county attorney's letter to Plaintiffs calling their request for a marriage license "criminal" had a chilling effect on Plaintiffs' rights to free speech under the United States Constitution.

182.    Montana Code Ann. §§45-5-611 and 45-5-612 function as a vehicle to threaten, deter, or

chill the speech of any polygamist or plural family that publicly discusses its faith, cultural,

familial, or religious practices.

183.    Montana Code Ann. §§45-5-611 and 45-5-612, as applied in this case and as interpreted

by the Defendants, violate the Free Speech Clause to the First Amendment to the United

States Constitution.


**SIXTH CLAIM FOR RELIEF:  FREEDOM OF ASSOCIATION**

184.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth

herein.

185.    Montana Code Ann. §§45-5-611 and 45-5-612 violate the right of association protected

under the First Amendment to the United States Constitution.

186.    The letter from the county attorney's office hinting that it could prosecute the Collier

family for having requested a marriage license has chilled and denied the Plaintiffs the right

to associate with other like-minded citizens who believe that consenting adults should be able

to maintain private relations and unions without interference from the state.

187.    Montana Code Ann. §§45-5-611 and 45-5-612, both as written and as applied in this

case, violate the Freedom of Association Clause to the First Amendment to the United States

Constitution.


**SEVENTH CLAIM FOR RELIEF:  42 U.S.C. §1983**

188.    Plaintiffs hereby incorporate by reference every paragraph above as if fully set forth

herein.

189.   Insofar as they are enforcing the terms of Montana Code Ann. §§45-5-611 and 45-5-612, the Defendants, acting under color of state law, are depriving and will continue to deprive the Plaintiffs of numerous rights secured by the First and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

1.   Enter an order that Montana Code Ann. §§45-5-611 and 45-5-612 violate (1) the Due Process and Equal Protection Clauses of the Fourteenth Amendment; (2) the Free Exercise, Free Speech, Establishment, and Freedom of Association Clauses of the First Amendment; and (3) 42 U.S.C. §1983.

2.   Order a preliminary and permanent injunction enjoining enforcement or application of Montana Code Ann. §§45-5-611 and 45-5-612 against the Collier family on the basis of their consensual plural family association.

3.   Award the Plaintiffs reasonable fees and costs incurred in maintaining this action pursuant to 42 U.S.C. §1983.

4.   Award such other relief as it may deem just and proper.

…

…

Dated this _27_ day of August, 2015.

Respectfully submitted,

_Christine Collier (Parkinson)_
Christine Collier (Parkinson), Plaintiff

_Victoria Collier_
Victoria (Vicki) Collier, Plaintiff

_Nathan W. Collier_
Nathan Collier, Plaintiff