PAUL WARREN LAW, PLLC
Elinor Swanson, Associate Attorney
ellie@paulwarrenlaw.com
490 North 31st Street, Suite 101
Billings, Montana 59101
(406) 294-2300
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

CHRISTINE COLLIER, VICTORIA
COLLIER, and NATHAN COLLIER,

                              Plaintiffs,

        v.                                          Cause No. 1:15-CV-00083-SPW

TIM FOX, in his official capacity as
Attorney General of Montana; STEVE
BULLOCK, in his official capacity as                PLAINTIFFS' AMENDED
Governor of Montana; SCOTT TWITO,                   COMPLAINT
in his official capacity as Yellowstone
County Attorney, and KRISTIE LEE
BOELTER in her official capacity as
Clerk of the Yellowstone County
District Court,

                              Defendants.

## Plaintiffs' Amended Complaint

        Plaintiffs Christine Collier, Victoria Collier, and Nathan Collier, by and

through their counsel, Elinor A. Swanson, of the law firm of Paul Warren Law,

PLLC, 490 North 31 Street, Suite 101, Billings, Montana 59101, allege Defendants enforced unConstitutional State criminal laws to unlawfully deny them equal treatment under State law, infringing both freedom of conscience and freedom from violence, and ask the Court for relief, as follows.

<u>TABLE OF CONTENTS</u>

I.      PARTIES .................................................................................. 3

II.     JURISDICTION AND VENUE ............................................... 4

III.    FACTUAL BACKGROUND ................................................... 5

IV.     STANDING—STATE ANTI-POLYGAMY LAWS .............. 13

V.      NATURE OF THE ACTION .................................................. 16

VI.     INTRODUCTION TO CLAIMS FOR RELIEF ..................... 17

        A.      The Law and the Prohibition Against Physical Violence ............ 17

        B.      Sovereignty, Justice, and Freedom From Physical Violence ....... 22

        C.      American Freedom Includes Freedom From Physical Violence ... 24

                1.      The Development of Freedom in America ............... 26

                2.      The United States Constitution and Freedom ......... 34

                3.      Freedom to Contract Familial Relationships .......... 36

VII.    FIRST CLAIM FOR RELIEF: FREE EXERCISE ................ 43

VIII.   SECOND CLAIM FOR RELIEF: DUE PROCESS .............. 51

IX.     THIRD CLAIM FOR RELIEF: ESTABLISHMENT OF RELIGION   53

X.      FOURTH CLAIM FOR RELIEF: FREE SPEECH ................................ 55

XI.    FIFTH CLAIM FOR RELIEF: EQUAL PROTECTION ...................... 57

XII.   SIXTH CLAIM FOR RELIEF: FREEDOM OF ASSOCIATION ........ 59

XIII.  SEVENTH CLAIM FOR RELIEF: 42 U.S.C. § 1983 ......................... 60

XIV.  PRAYER FOR RELIEF ................................................................ 60

I.      PARTIES

1.      Plaintiffs Christine Collier, Victoria Collier, and Nathan Collier are residents of Yellowstone County, residing in Billings, Montana.

2.      Defendant Tim Fox, in his official capacity as the State of Montana Attorney General, resides in Helena, Montana, and has his office in Billings, Montana.  It is his responsibility as the chief legal officer of the State of Montana to ensure that State laws are uniformly and adequately enforced throughout the State.

3.      Defendant Steve Bullock, in his official capacity as Governor of Montana, resides in Helena, Montana, and has his office in Billings, Montana.  It is his responsibility to ensure that State laws are properly enforced throughout the State.

4.      Defendant Scott Twito, in his official capacity as Yellowstone County Attorney, resides in Billings, Montana, and has his office in Billings, Montana.  It

is his responsibility as the chief legal officer for Yellowstone County to ensure that State laws are uniformly and adequately enforced in Yellowstone County.

5.      Defendant Kristie Lee Boelter, in her official capacity as the Clerk of the Yellowstone County District Court, resides in Billings, Montana, and has an office in Billings, Montana.  It is her responsibility as Clerk of the Court to process marriage licenses and records.

6.      Defendants, collectively, and those subject to their supervision, direction, and control, are responsible for enforcing the State's criminalization of polygamy and for the State's refusal, because of that criminalization of polygamy, to issue a marriage license or otherwise legally recognize Christine Collier's and Nathan Collier's marriage contract.

7.      The relief requested in this action is sought against each of the Defendants, their officers, employees, agents, and anyone else acting in cooperation with Defendants or acting under their supervision, direction, or control.

II.     JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case under: 28 U.S.C. § 1331 (federal question) because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983, an Act of Congress; 28 U.S.C. § 1343(a)(3) because this action is brought to

redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and 28 U.S.C. Sec. 1343(a)(4) because this action seeks equitable relief under 42 U.S.C. § 1983, an Act of Congress.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside within this district and within the State of Montana, and because a substantial part of the events giving rise to the claim occurred in this district.

III.    FACTUAL BACKGROUND

10.    At all times relevant to this case, Christine, Victoria ("Vicki"), and Nathan Collier are, and have been, peaceful and honest adults of sound mind who are fully capable of mutually voluntary consent.

11.    In the 1990s, Christine and Vicki simultaneously dated Nathan Collier, openly and voluntarily.

12.    In 2000, Vicki and Nathan Collier had a wedding ceremony and voluntarily entered into a mutually binding contract, wherein they committed to share their lives, cohabitate, mingle their finances, make joint decisions about major life events, care for one another in sickness and in health, and remain in a loving relationship, until death do them part.  The contract was also of a sexual and spiritual nature.  Vicki and Nathan Collier thus knowingly purported to contract a marital familial relationship, and publically proclaimed their marriage contract.

They continue to abide by their commitment.

13.     Also in 2000, Vicki and Nathan Collier requested State recognition of their contract of marriage.  The State recognized their contract as worthy of State recognition by providing them with a marriage license.

14.     Nathan and Vicki Colliers' marriage is not annulled, they are not divorced, and they remain committed to living together as husband and wife.

15.     After Nathan and Vicki Collier contracted a marriage, Christine quit dating Nathan, because she was raised to believe that polygamy was immoral and did not feel ready to create a plural family.

16.     Christine subsequently contracted a monogamous marriage and had children with a third party man.  He later committed serious crimes of violence; he was, and remains, incarcerated.

17.     After Christine's ex-husband abandoned his contractual commitments to her and their children, Christine and Nathan Collier began courting one another again.

18.     Nathan Collier remained married to his first wife, Vicki, and dated Christine with Vicki's knowledge and blessing, and without violating the terms of Vicki and Nathan Colliers' contract of marriage, i.e., without dishonesty, subterfuge, coercion, fraud, or surprise.

19.     During this time, when Nathan was permanently committed to Vicki

and their children, but only temporarily committed to Christine and her children, neither Nathan nor Christine Collier had violated any State law.

20.     In 2007, Christine and Nathan Collier had a wedding ceremony and voluntarily entered into a mutually binding contract, wherein they committed to share their lives, cohabitate, mingle their finances, make joint decisions about major life events, care for one another in sickness and in health, and remain in a loving relationship, until death do them part.  The contract was also of a sexual and spiritual nature.  Christine and Nathan Collier thus knowingly purported to contract a marriage, and they publically proclaimed their marriage contract.

21.     Nathan Collier voluntarily entered into a binding parental contract, with Christine Collier's consent, wherein he committed to raise, support, nurture, and care for Christine's children, not only as their step-father, but as their adoptive father, in the event of Christine's incapacity to care for them.

22.     Christine and Vicki Collier voluntarily entered into mutually binding parental contracts, wherein each committed to raise, support, nurture, and care for one another's children, and to adopt them in the event of the other's incapacity to care for them.

23.     Fearing the State's criminal laws against polygamy, the Collier family hid their familial commitments for many years.

24.     In 2015, Christine and Nathan Collier requested State recognition of

their contract of marriage, with Vicki Collier's knowledge and blessing.  The State refused to recognize Christine and Nathan Colliers' contract as worthy of State recognition, and denied them a marriage license because of the State's criminal anti-polygamy laws.

25.     Christine and Nathan Collier nonetheless remain committed to living together as husband and wife.  They continue to share a home, together with Nathan's first wife, Vicki, and all of their children.  Christine and Nathan Collier continue to knowingly purport to have contracted a marriage, and continue to publically proclaim their marriage contract.

26.     Throughout this family's history, Christine and Vicki Collier have maintained a mutually affirming, positive relationship with each another and with one another's children.  For nearly a decade, Christine and Vicki Collier have shared a household and a husband, both happily dedicating themselves to their eight children and to being Nathan Collier's coequal spouses.

27.     For nearly a decade, the Colliers' eight children have been parented by all three of Christine, Vicki, and Nathan Collier.

28.     Christine Collier is working on her bachelor's degree in accounting.

29.     Vicki Collier has a BSN degree, has almost finished her master's degree, and works in the healthcare industry.

30.     Nathan Collier is an entrepreneur and runs a refrigeration business.

31.     Christine, Vicki, and Nathan Collier have experienced personal and professional discrimination because they went public regarding their contracts of polygamous marriage, in national print and video media.  For example, because of their polygamous marriage contracts: Nathan lost approximately half of his business in 2015 compared to the previous year; Vicki has been denied work opportunities; and some members of Christine's extended family no longer speak to her or recognize her as family.

32.     Christine, Vicki, and Nathan Collier have struggled to find legal counsel willing to represent them regarding any family law matter, including obtaining State recognition of their parental rights and obligations towards their eight children, because of their contracts of polygamous marriage.

33.     Christine and Nathan Collier would like the State to deem their contract of marriage as worthy of State recognition, with a State-issued marriage license, which indicates that State law will uphold their contractual commitments to one another with accompanying alterations in their personal and property rights as to one another.

34.     Vicki Collier continues to support Christine and Nathan Colliers' contract of marriage, and still consents to State recognition of that marriage.

35.     Christine, Vicki, and Nathan Collier would like reassurance that the State will not otherwise arbitrarily discriminate against them or treat them

unequally because of their polygamous familial arrangement.  Christine and

Nathan Collier would like reassurance that the State will not: deny either one of

them visitation if the other is in a hospital intensive care unit; deny either one of

them the right to sue a third person for wrongful death of the other; fail to

recognize their evidentiary marital communications privilege; refuse to apply legal

presumptions ordinarily applied to married couples; or otherwise subject them to

unequal State treatment by denying them the over 1,000 rights and protections

available on the basis of marital status.

36.     Christine and Nathan Collier would like the Defendants to be

prohibited from continuing to enforce the State's criminal polygamy statutes, either

by denying polygamous families equal protection and application of civil laws and

procedures, as in this case, or by imprisoning or fining members of polygamous

families.

37.     One of Montana's anti-polygamy statutes, MCA § 45-5-611 (entitled

"Bigamy"), criminalizes a public, marital commitment to more than one person, as

follows:

> (1) A person commits the offense of bigamy if, while married, the
> person knowingly contracts or purports to contract another marriage
> unless at the time of the subsequent marriage:
>
>> (a) the offender believes on reasonable grounds that the prior
>> spouse is dead;
>
>> (b) the offender and the prior spouse have been living apart for

5 consecutive years throughout which the prior spouse was not known by the offender to be alive;

(c) a court has entered a judgment purporting to terminate or annul any prior disqualifying marriage and the offender does not know that judgment to be invalid; or

(d) the offender reasonably believes that the offender is legally eligible to remarry.

(2) A person convicted of the offense of bigamy shall be fined not to exceed $500 or be imprisoned in the county jail for any period not to exceed 6 months, or both.

38.     Nathan Collier has committed, and continues to commit, the offense of bigamy under State law, MCA § 45-5-611, because he has knowingly contracted marriage between himself and more than one wife, and also because he has knowingly purported, and continues to purport, to contract marriage between himself and more than one wife.

39.     Another of Montana's anti-polygamy statutes, MCA § 45-5-612 (entitled "Marrying a bigamist"), criminalizes a public, marital commitment to a person who has already made a similar public, marital commitment to another, as follows:

(1) A person commits the offense of marrying a bigamist if the person contracts or purports to contract a marriage with another knowing that the other is committing bigamy.

(2) A person convicted of the offense of marrying a bigamist shall be fined not to exceed $500 or be imprisoned in the county jail for any period not to exceed 6 months, or both.

40.     Christine Collier has committed, and continues to commit, the offense of marrying a bigamist under State law, MCA § 45-5-612, because she has knowingly contracted marriage with Nathan Collier, and also because she has purported, and continues to purport, to contract marriage with Nathan Collier, despite knowing that he was and is committing bigamy.

41.     For the offense of contracting a marital familial commitment to love and care for one another, State law threatens to fine Nathan and Christine Collier $500, imprison them for up to 6 months, or both—the same penalty the State gives to persons convicted of committing sexual assault, MCA § 45-5-502(2).

42.     If Nathan and Christine Collier were imprisoned and/or fined, Vicki Collier's finances, marriage, family life, and other aspects of her household would also be negatively affected.

43.     Christine, Vicki, and Nathan Collier would like reassurance that State criminal laws against polygamy will not be enforced as the reason for State fines or imprisonment of any member of the Collier family.

44.     Christine, Vicki, and Nathan Collier would like reassurance that State criminal laws against polygamy will not be enforced by the State as the reason for State denial of any of their parental rights.

45.     Christine, Vicki, and Nathan Collier would like reassurance that Christine's children from her first marriage would not be removed from Vicki's or

Nathan's care in the event of Christine's incapacity to care for them.

46.     Christine, Vicki, and Nathan Collier would like State recognition of Nathan's parental contracts as to Christine's children from her previous marriage, with formal State recognition of his adoption of those children.

47.     Christine, Vicki, and Nathan Collier would like reassurance that State criminal laws against polygamy will not be enforced by the State as the reason for State refusal to recognize Nathan Collier's adoption of Christine's children.

48.     Christine, Vicki, and Nathan Collier further do not want State criminal laws against polygamy to be enforced in other unforeseen ways that would harm their family's liberty or property interests, or to deny them equal protection of law.

49.     Christine, Vicki, and Nathan Collier pray that the Court will enjoin, preliminarily and permanently, all enforcement and application of State laws banning and criminalizing polygamy, and will guarantee their family equal legal treatment under all State laws, regulations, and procedures.

IV.     STANDING—STATE ANTI-POLYGAMY LAWS

50.     Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

51.     A criminal statute need not be criminally prosecuted in order to be enforced in a manner that causes a citizen justiciable harm, fairly traceable to the criminal statute.

52.     A criminal statute aimed specifically at one group of citizens, the

enforcement of which has not been disavowed by the State, creates a fear of

prosecution sufficient to confer standing unless there are other circumstances

which make that fear "imaginary" or "wholly speculative." *Babbitt v. United

Farm Workers*, 442 U.S. 289, 302 (1979) (a union and its members had standing to

challenge a statute imposing criminal penalties for certain types of union publicity

despite the State's argument that the criminal penalties had never been and might

never be applied).  *See also Epperson v. Arkansas*, 393 U.S. 97, 100-02 (1968)

(high school science teacher had standing to challenge constitutionality of 1928

criminal law prohibiting the teaching of evolution without any record of

prosecutions under the law, because the teacher was directly affected by the law);

*Doe v. Bolton*, 410 U.S. 179 (1973) (doctors challenging certain provisions of

Georgia's abortion laws found to have standing without arrest because they were

the ones against whom the criminal statutes directly operated); *Virginia v.

American Booksellers Assn*, 484 U.S. 383 (1988) (booksellers had standing to

bring a pre-enforcement challenge to a statute making it unlawful to knowingly

display sexually explicit material in a manner accessible to juveniles because the

law was aimed directly at the booksellers).

53.     Defendants enforced State anti-polygamy criminal statutes by using

them to justify the State's denial of a State-issued marriage license to Christine and

Nathan Collier, which also affected Vicki Collier's economic and familial interests.

54.     The Colliers reasonably fear that the State will imminently enforce State anti-polygamy criminal statutes, whether by prosecution, by further denial of equal protection of State law, or otherwise.

55.     The Colliers have been, and continue to be, injured by the mere existence of State anti-polygamy criminal statutes, which label them criminals, do damage to their dignity, encourage discrimination against them by persons in the community (which in turn causes damage to their livelihood), and causes the Colliers to live in constant fear of prosecution or unequal protection of State law because of their criminal status under State law.

56.     The Colliers have a genuine interest in the outcome of this case.

57.     Christine, Vicki, and Nathan Collier have all suffered, and continue to suffer, injuries that are distinguishable from those of the general public.

58.     Such injuries may be redressed with this Court's decision prohibiting Defendants from enforcing the State's criminal anti-polygamy laws, either by prosecution or as justification for denial of equal legal treatment.

59.     The Colliers are precisely the type of people that the State's criminal anti-polygamy statutes were designed to affect.

60.     To deny the Colliers standing to challenge enforcement of State

criminal anti-polygamy laws would be to immunize those criminal statutes from review.

V.     NATURE OF THE ACTION

61.     Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

62.     Through this action, pursuant to 42 U.S.C. § 1983, Christine, Vicki, and Nathan Collier seek a declaration that Montana Code §§ 45-5-611 and 45-5-612 are unConstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, and are unConstitutional under the Free Exercise, Establishment, Free Speech, and Freedom of Association Clauses of the First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment to the United States Constitution.

63.     The Colliers further seek a preliminary and permanent injunction preventing Defendants from either prosecuting them under the aforementioned State criminal anti-polygamy statutes or from otherwise enforcing those statutes.

64.     To the extent that any other Montana law is or could be used as the basis for the criminalization of peaceful polygamous families, the Collier family seeks a declaration that these laws are similarly unConstitutional and unenforceable.

65.     To enforce their rights afforded by the United States Constitution, Nathan and Christine Collier bring this action pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief against enforcement of Montana State's laws banning and criminalizing polygamy, and against Montana State unequal treatment of, and discrimination against, polygamous families.  The Collier family also seeks to recover all of their attorney fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1983, and any other relief that this Court may order.

## VI.    INTRODUCTION TO CLAIMS FOR RELIEF

66.     Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

### A.     The Law and the Prohibition Against Physical Violence

67.     If there is any single moral principle upon which all religions and people of good conscience agree, it is the Golden Rule (the "Law"); an "ethic of reciprocity"; "du et des" ("I give and you give"); "do unto others as you would have others do unto you"; and "love thy neighbor as yourself" are all different methods of phrasing that Law.

68.     The Law may also be expressed in the reverse format: "do not do unto others as you would not have others do unto you."

69.     Listed in order of the number of worldwide adherents, proponents of the Law include: Jesus of Nazareth of Christianity (Matthew 7:12, Luke 6:31, Luke

10:25-28, Leviticus 19:18, Leviticus 19:34); Muhammed and Ali ibn Abi Talib of Islam; Thales and great philosophers of Secular Humanism; Vidura, Tiruvalluvar, and Brihaspati of Hinduism; Confucius, Buddha, Tao The Ching, T'ai Shang Kan Ying P'ien, Mozi, and Laozi of traditional Chinese religion, and the Dalai Lama of Tibetan Buddhism; Guru Aranj Devji and Guru Granth Sahib of Sikhism; Hillel the Elder, Rabbi Akiva, Tobit 4:15, and Sirach 31:15 of Judaism; Bahá'u'lláh of Baha'i; The Way to Happiness of Scientology, and The Book of Ways of Wicca. Exclusion from that list does not indicate a lack of faith in the Law.

70.    People of vastly different belief systems all agree the Law exists, but have wildly diverse ideas about how to obey the Law, with different levels of willingness to fully submit to it.  Even where people agree that particular virtues are worthy of pursuit, they disagree about how to pursue them; even where people agree that particular vices are worthy of avoidance, they disagree about how to avoid them.

71.    One expression of the Law that is both universally valued and fairly easy to define, recognize, and enforce, however, is the prohibition against violence: "let peaceful people live in peace"; "live and let live"; "live peaceably with all"; "first, do no harm; then, do good"; "turn from evil and do good; seek peace and pursue it"; "not violent but gentle"; "bid love, forbid violence"; "the ideal society is a house of peace"; "if they incline to peace, you also incline to it, and trust in

God"; and "do not initiate, or threaten to initiate, physical force against another's person or property."

72.     There is no more universal human desire than the desire to be free from physical violence.  Every culture tells stories of heroes who defend the innocents' right to be free from wicked, villainous violence.

73.     By definition, all people of good will want peace; many religions prophesy of a less violent future, where voices joined together to speak of peace rebuild the city of Babylon, and where the meek will inherit the rapture of peace on Earth.

74.     Nonviolence may be motivated by concern for others, by self-interest, or both.  One need not be particularly religious or moral in order to recognize the necessity of agreeing to abstain from violence in exchange for an equal, reciprocal agreement from all others; reason, and a self-preservation instinct, are sufficient.

75.     Freedom from violence protects freedom of conscience and religion, so that each individual may follow the Law in thought, speech, and nonviolent action, as dictated by reason and conviction.

76.     Freedom of conscience, synonymous with personal autonomy, permits free expression and exploration of scientific and moral doubt, which requires an intellectual courage that is far more difficult than succumbing to orthodoxy.

77.     All peaceful people may be equally free from physical violence.  A

pledge to protect and defend every person's right to freedom from violence is a pledge to live peacefully with diverse, peaceful peoples.

78.   Humanity is a teeming, infinitely complex ecosystem of interests; a core, guiding principle of "freedom from violence" helps un-muddy the waters.

79.   Social norms naturally adapt to changing societal situations and needs, and the diversity of social norms permitted by freedom allows for better, more efficient societal adaptation.

80.   Firm rules against violence provide predictability and a shield of strong principle, emboldening people to accept the unpleasant duty of defending even the most unpopular persons from violence.

81.   When people fail to firmly commit to the prohibition against violence, there is great risk of human suffering and death.  In the past century alone, hundreds of millions of people have died because of violence: approximately 10 million people have been killed by homicide (a very rough estimate); over 100 million people have died in wars between nations; and over 250 million people have been killed by their own governments, excluding battle deaths, capital punishment, actions taken against armed civilians during mob action or riot, and the deaths of noncombatants killed during attacks on military targets.  *See* worldwide homicide statistics; R.J. Rummel, *Democide Vs. Other Causes of Death* (2005); R.J. Rummel, *Statistics of Democide: Genocide and Mass Murder since*

*1900* (1988).

82.    There is nothing that causes more dismay, anger, suffering, and discord than physical violence, and fear of such violence.

83.    An individual's self-sacrifice on behalf of another, with voluntarily given love, is the greatest good, a living embodiment of the Law; involuntary sacrifice of an individual in the name of another, however, with involuntarily received violence, is the greatest evil, and is a direct violation of the Law.

84.    Prosperity and generosity increase, and basic needs are more likely to be met, in the absence of the physical violence.

85.    The road to hell is paved with good intentions: there are moral values other than freedom from physical violence that can, and should be, pursued; humans are often tempted to commit violence in the name of these moral values. Violence, however, is far more likely to cause peaceful people to suffer and die than the mere existence of peaceful people who do not wish to pursue a particular moral value in a particular way.

86.    There are tools other than violence to increase morality, and to reduce nonviolent immorality, such as leading by example, rational discussion, and boycotting.  Except for those with the very strongest moral beliefs, moral disagreement can seem almost physically painful; when conclusions of conscience differ, humans on both sides will verbally spar and attempt to discern what is

moral.  Unlike physical violence, nonviolent methods of resolving moral disagreements may peacefully and properly resolve them; to the extent moral disagreements remain, at least such disagreements remain peaceful.

87.     Under criminal law, individuals may not respond to nonphysical insult or abuse by retaliating with physical violence; the majoritarian sovereign should be held to that same, bright-line standard.

88.     The sovereign is not trustworthy to determine which nonphysical insult or abuse justifies infliction of physical violence, as demonstrated by history and international comparison.

89.     Obedience to the Law requires complete abstention from violence.  To commit violence in the name of any moral value is to disobey the Law in a purported attempt to submit to it.  The Law commands not only a conscientious struggle towards mutual reciprocity and love, but also a devout commitment to avoiding nonconsensual harm and physical violence.

B.     Sovereignty, Justice, and Freedom From Physical Violence

90.     The basic, core, universal human right to be free from violence is the foundational principle from which all justice may be derived and measured.

91.     Freedom from violence requires granting even one's moral enemies equal freedom from violence.

92.     Violence is easiest to discern in certain circumstances: when it is

committed against an admittedly peaceful individual, not accused of violence; and when it is committed against another's person, rather than property.

93.    A sovereign is any entity with authority: to determine what justice should be done if violence has occurred; to use physical force after the immediate threat of violence has passed in order to bring the violent to justice; to determine whether physical force has been initiated or threatened; and to determine property rights.

94.    A sovereign's use of physical force is Lawful only if it is restricted to keeping the peace, and does not violate the prohibition against violence.  The sovereign may *respond* to alleged violence with physical force, but must not *initiate* (or threaten to initiate) violence.

95.    If a sovereign's determination of property rights expresses partiality, in other words, an unjust preference for or discrimination against any peaceful individual or group of individuals, then the sovereign unjustly authorizes violence against property.

96.    Whenever a sovereign commits or authorizes violence under the sovereign's laws, the sovereign's power has been corrupted.

97.    Unfortunately, corruption commonly follows sovereignty: violence is far more common by, and between, sovereigns than between individuals; sovereign partiality often authorizes injustice.

98.     Sovereign corruption may reside in: the sovereign's legislative power to enact laws defining and prohibiting violence; the sovereign's executive power to physically defend against and respond to violence; or the sovereign's judicial power to determine whether violence has been committed, and if so, by what entity.

99.     A sovereign's violence is particularly corrupt and indefensible when the sovereign initiates or threatens to initiate physical force against an individual's person, rather than property, and when the State's violence is knowing and intentional, because the individual is admittedly peaceful.

100.    To bring a sovereign's justice into accordance with the Law, the sovereign's authority must be carefully restricted, so that the sovereign does not commit the very violence that it exists to defend against.

101.    The judiciary is often the last line of defense against legislative or executive majoritarian violence against unpopular viewpoints and individuals.

C.      American Freedom Includes Freedom From Physical Violence

102.    The United States of America ("America") was founded on the principle of individual freedom from violence and tyranny (sovereign violence).

103.    America has never, of course, lived up to that ideal.  Like all countries, America was imperfectly founded by imperfect people living in an imperfect culture, and continues to be inhabited by imperfect people living in an

imperfect culture.

104.   When America commits violence against the innocent—as when, for example, America upheld slavery, removed indigenous people from their homelands and removed indigenous children to "civilize" and "Christianize" them, and required segregation—it is deeply hypocritical and shameful.  (Particularly abominable examples of sovereign violence are utilized to demonstrate how far majoritarian opinion can stray from justice, and not to compare them to the case at hand.)

105.   Majoritarian sovereign violence in America not only tarnishes the country's name, but is also an egregious departure from America's supposed principles, casting doubt on the feasibility of commitment to the principle of equal freedom from violence for *all*.

106.   In every instance where America permits majoritarian violence to target innocents, accused of no violence, the clarity of hindsight has, and will, reveal injustice.

107.   America's failure to justly and equally defend freedom from violence is hypocrisy, but the message should not be judged by the messenger's flaws.

108.   Despite its failings, America was the first country in all of human history to even attempt to recognize an individual right to freedom, and has valiantly and tenaciously struggled to define, obtain, and defend it.

109.   The great philosophical contribution of America's Founders was their faith in inviolable natural, individual rights—not merely rule by a different, majoritarian type of sovereign tyranny.

### 1.    The Development of Freedom in America

110.   The Thirteen Colonies of Britain in America were settled by people of deep religious convictions, who had fled sovereign violence against them so that they could be free to live according to conscience, openly practicing their faith, by speech and by peaceful conduct.

111.   America was thus born as a sanctuary to the persecuted, whose homes afforded neither friendship nor safety.

112.   At first, many of the settlers attempted to create a theocracy; attempts to legislate and enforce the "Law of God," however, led to lack of tolerance and religious persecution.  *See gen*. S. COBB, THE RISE OF RELIGIOUS LIBERTY IN AMERICA (1902).

113.   In the early 1600s, the Massachusetts Puritans prohibited toleration of religious diversity; according to the preacher John Cotton, "it was Toleration that made the world anti-Christian."  *Id*., at 68, *quoting* N. WARD, THE SIMPLE COBLER OF AGGAWAM IN AMERICA (4th Ed. 1647).

114.   In the mid-1600s, the colonies of Maryland, Rhode Island, Pennsylvania, Delaware, and Carolina were founded specifically as havens for

religious dissenters; free exercise of religion emerged as an articulated legal

principle, following Enlightenment principles of toleration. *Id*., at 115-26; 422-41.

115.  In 1670, William Penn published a widely-read work, *The Great Case*

*of Liberty of Conscience*, which defined such liberty as extending to conduct:

> [B]y Liberty of Conscience, we understand not only a meer Liberty of
> the Mind, in disbelieving or disbelieving . . . but the exercise of
> ourselves in a visible way[.]

116.  Rhode Island, Carolina, and New Jersey adopted provisions regarding

free exercise of religion, which encompassed all "judgments and contiences in

matters of religion," limited only for the prevention of the injury or "outward

disturbance of others," and which expressly trumped any law to the contrary. *Id*.,

at 117.

117.  In 1689, John Locke wrote *A Letter Concerning Toleration*,

concluding that the sovereign attempt to enforce unity by reducing disputes of

conscience was a source of violence and bloodshed, rather than peace:

> It is not the diversity of opinions, which cannot be avoided; but the
> refusal of toleration to those that are of different opinions, which
> might have been granted, that has produced all the bustles and wars,
> that have been . . . on account of religion.
>
> Nobody . . . [has] any just title to invade the civil rights and worldly
> goods of [another], . . . . Those that are of another opinion, would do
> well to consider with themselves how pernicious a seed of discord and
> war, how powerful a provocation to endless hatreds, rapines, and
> slaughters, they thereby furnish unto mankind.

118.  Leading up to the Revolution, and in its aftermath, American colonists

explored the nature of justice, sovereignty, freedom, and violence, drawing on their religious faith and also on their experiences of religious persecution.  As the colonists needed to peacefully coexist with one another in a pluralist, mixed-religion society, they tentatively explored adopting a new, radical, extreme concept: Freedom.

119.   Even the idea of freedom was, at that time, relatively untested beyond the pages of ethics and philosophy books; the American attempt to obtain it was, at first, internationally mocked as naïve.

120.   By the time the Bill of Rights was ratified in 1791, America had 150 years of a higher degree of religious diversity than had existed anywhere else in the world, and a long-standing belief in freedom of conscience.

121.   The Founders' views are, to a certain extent, irrelevant; the ideal of freedom—freedom from violence, to permit free exercise of conscience—exists and is worthy of pursuit regardless of any Founder's failure to acknowledge it.

122.   Nonetheless, the Founders were, in fact, attempting to pursue both freedom of conscience and freedom from violence; they recognized that a sovereign of Law should defend those freedoms, and that no individual or majority should infringe them.

123.   James Madison played a larger role than another Founder in America's birth: he drafted the U.S. Constitution, including the Bill of Rights; he

provided the idea that there should be separation of powers in three branches of federal government; and he wrote 29 of 85 of *The Federalist* essays published in 1788.

124.   To James Madison, freedom of conscience was the centerpiece of American values.  In his 1785 *Memorial and Remonstrance against Religious Assessments*, Madison called freedom of conscience "precedent, both in order of time and in degree of obligation, to the claims of Civil Society."  At the 1776 Virginia Constitutional Convention, Madison recommended: "no man or class of men ought, on account of religion to be invested with any peculiar emoluments or privileges" and that freedom of conscience should only be curtailed "if the preservation of equal liberty, and the existence of State be manifestly endangered."

125.   James Madison wrote to an acquaintance: "I observe with particular pleasure the view you have taken of the immunity of Religion from civil jurisdiction, in every case where it does not trespass on private rights or the public peace."  James Madison to Edward Livingston, 10 July, 1822, in *James Madison on Religious Liberty*, ed. Robert S. Alley, 82 (1985).

126.   Madison intentionally placed freedom of conscience prior to and superior to all other rights in the Bill of Rights, giving it the strongest political foundation possible.

127.   Thomas Jefferson, who drafted the Declaration of Independence and

who served as Delegate to the Congress of the Confederation from Virginia, First United States Secretary of State, and Third President of the United States, asserted in letters to acquaintances that "[although t]he inquisition of public opinion overwhelms in practice the freedom asserted by the laws in theory", nonetheless, "[t]he policy of the American government is to leave its citizens free, neither restraining them nor aiding them in their pursuits."

128.   According to Thomas Jefferson, "to suffer the civil magistrate to intrude his powers into the field of opinion . . . at once destroys all religious liberty," and government may only prevent "overt acts against peace and good order."  (What type of order is "good," however, is a matter of opinion, and should have been omitted.)

129.   In another letter, Thomas Jefferson stated that "the legislative powers of government reach actions only, and not opinions"; some have interpreted this as drawing a distinction between speech, which is protected from governmental control, and conduct, which is not.  More plausibly, it draws a distinction between speech, which is always protected from government control, and conduct, which is only protected to the extent it is nonviolent.  Thomas Jefferson elsewhere asserts that "the legitimate powers of government extend to such acts only as are injurious to others."

130.   John Adams, who assisted Thomas Jefferson in drafting the

Declaration of Independence and who served as Delegate to the Second

Continental Congress from Massachusetts and as Second President of the United

States, wrote the 1780 Massachusetts Bill of Rights, which states:

> It is the duty of all men in society, . . . to worship . . . And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping . . . in the manner most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship."

John Adams further wrote: "Human nature itself is evermore an advocate for

liberty"; and "human nature [has] a resentment of injury, and indignation against

wrong."

131.   Thomas Paine, who authored the influential pamphlet *Common Sense*

at the start of the American Revolution, compared sovereign violence to individual

violence, defending the right to defend oneself against both.  Thomas Paine also

wrote: "He that would make his own liberty secure, must guard even his enemy

from oppression; for if he violates this duty, he establishes a precedent that will

reach to himself."

132.   James Wilson, a signatory of the United States Declaration of

Independence, who twice served as Pennsylvania Delegate to the Continental

Congress and who was a major force in drafting the United States Constitution,

and was one of the original Supreme Court Justices appointed by George

Washington, wrote:

> The opinion has been very general, that, in order to obtain the blessings of a good government, a sacrifice must be made of a part of our natural liberty. I am much inclined to believe, that, upon examination, this opinion will prove to be fallacious.

James Wilson also expressed his views as follows: "In the enjoyment of their persons and of their property, the common law protects all."; "By the law, life is protected not only from immediate destruction, but from every degree of actual violence, and, in some cases, from every degree of danger."; "Without liberty, law loses its nature and its name, and becomes oppression."

133.   Fisher Ames, who served as a Representative in the United States Congress from Massachusetts in the First, Second, Third, and Fourth Congresses, wrote in a letter to acquaintance: "I would guard it [liberty] by making the laws strong enough to protect it."  In another letter, Fisher Ames defined liberty as freedom from violence: "it [liberty] consists, not so much in removing all restraint from the orderly, as in imposing it on the violent."

134.   St. George Tucker, who James Madison appointed to serve as the United States District Court judge for Virginia, and who wrote a commentary on the Constitution discussing the meaning of the free exercise clause, wrote in 1803 that "Liberty of conscience . . . consists in the absolute and unrestrained exercise of our . . . opinions, and duties, in that mode which our own reason and conviction dictate."  ST. GEORGE TUCKER, VIEW OF THE CONSTITUTION OF THE UNITED STATES (Indianapolis: Liberty Fund, 1999).

135.   John Leland, a well-known Baptist minister who preached in Massachusetts and Virginia, wrote: "The legitimate powers of government extend only to punish men for working ill to their neighbors . . . ." J. LELAND, *The Virginia Chronicle*, in THE WRITINGS OF THE LATE ELDER JOHN LELAND 91, 118 (L. Greene ed. 1845).

136.   The State of Georgia's religious liberty clause read: "All persons whatever shall have the free exercise of their religion; provided it be not repugnant to the peace and safety of the State." GA. CONST. of 1777, art. LVI.

137.   The State of Virginia's Bill of Rights, VA. CONST. of 1776, read as follows:

> That all men are by nature equally free and independent, and have certain rights, of which, when they enter into a state of society, they cannot by any compact deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.

138.   The States of Virginia, North Carolina, and Rhode Island all proposed the following language for the First Congress to consider in drafting the Bill of Rights, to establish freedom of conscience:

> That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men have an equal, natural, and unalienable right to the free exercise of religion, according to the dictates of conscience; [and that no particular religious sect or society ought to be favored or established, by law, in preference to others.]

139.   In 1788, New York proposed the following language:

> That the people have an equal, natural, and unalienable right freely and peaceably to exercise their religion, according to the dictates of conscience; and that no religious sect or society ought to be favored or established by law in preference to others.

### 2.   The United States Constitution and Freedom

140.   The Founders explored an uncharted terrain: they wanted to carefully protect freedom from violence, including majoritarian sovereign violence, so that freedom of conscience, as expressed in speech and peaceful conduct, could flourish.

141.   Within the context of the historical development of American freedom, and in light of the Founders' beliefs, the United States Constitution secures the blessings of liberty by protecting and defending each individual's freedom from violence.

142.   The Founders envisioned that the federal Constitution would predominantly protect individual freedom from international and State violence, while State Constitutions and laws would focus on protecting individual freedom from individual violence.

143.   The Constitution of the United States protects individual freedom with the Bill of Rights, as stated by Albert Gallatin, who served as Fourth United States Secretary of the Treasury, Congressman, Senator, and United States Ambassador, stated: "The whole of that Bill [of Rights] is a declaration of the right of the people

at large or considered as individuals. . . it establishes the rights of the individual as

unalienable and which consequently, no majority has a right to deprive them of."

144.   The human right to freedom of conscience, free from violence, is

specifically recognized and enshrined in the United States Constitution in the

enumeration of an inviolable individual right to Freedom of Conscience in the First

Amendment of the Bill of Rights, U.S. CONST. AMEND. I:

> First Amendment—Religion and Expression.  Congress shall make no
> law respecting an establishment of religion, or prohibiting the free
> exercise thereof; or abridging the freedom of speech, or of the press;
> or the right of the people peaceably to assemble, and to petition the
> Government for a redress of grievances.

145.   "Religion" meant "the practice of any duty" in obedience to free

conscience.  J. BUCHANAN, LINGUAE BRITANNICAE VERA PRONUNCIATIO (R. Alson

ed. 1967) (London 1757) (defined as "Piety, godliness, the worship of God, and the

practice of any duty in obedience to his commands.").

146.   The word "exercise" was defined in dictionaries of the day to mean

"action."  SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (1805);

NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (New

Haven 1806); James Buchanan (1757).

147.   The Free Exercise Clause thus asserts that no legislature shall prohibit

free action in obedience to conscience.

148.   The First Amendment entirely insulates freedom of conscience from

majoritarian infringement; freedom of conscience includes freedom of speech and freedom of peaceful conduct, in obedience to the dictates of conscience.

149.   Subsequent enactment of the Fourteenth Amendment to the United States Constitution further protected freedom from violence, by prohibiting unjust deprivation of life, liberty, or property under the Due Process Clause, and by guaranteeing all peaceful peoples equal, nondiscriminatory legal treatment under the Equal Protection Clause.

150.   The Fourteenth Amendment to the United States Constitution provides, in part: "No State shall . . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. AMEND. XIV, § 1.

151.   The judiciary, as well as the populace, errs when it fails to protect the full diversity of peaceful individual viewpoints and lifestyles from majoritarian tyranny.

152.   To the extent the United States Constitution does not fully protect and defend a peaceful individual's right to freedom from violence, that right should nonetheless be acknowledged by the judiciary as a right necessarily guaranteed by a country that calls itself, "The Land of the Free."

### 3.     Freedom to Contract Familial Relationships

153.   Freedom of conscience includes the freedom to commit to a lifelong,

reciprocal, loving relationship between consenting adults, which is an unmitigated good; as demonstrated by the Book of Ruth, such familial commitments need not relate to bloodlines, sexuality, or procreation.

154.   Freedom of conscience also includes the freedom of a consenting adult to commit to a lifelong, loving parental relationship with a child, with all associated parental obligations, and, so long as the child's other parent/s consent, with all associated parental rights.

155.   Adult familial commitments are often established prior to procreative sex or adoption, because of the widely-held belief that new life is best nurtured, protected, and elevated when it is welcomed with intention and preparation into a pre-established, loving family.

156.   Social mores emphasize, encourage, and celebrate strong commitment to deep, stable family bonds, particularly when adults have familial commitments both to one another and to offspring.

157.   The beautiful, life-giving nexus that commonly exists between familial commitment, procreative sex, and child-rearing is perpetually affirmed in majoritarian American society.

158.   The difference between a marriage contract and a familial contract is nebulous and poorly-defined; it often, but not always, includes a sexual or romantic relationship.

159.   The State may rightfully impose majoritarian presumptions about the nature of contracts, including familial contracts, in the absence of an agreement to the contrary.

160.   Marriage law is based on contract law: State-issued marriage licensure provides a lengthy list of presumptions about a marital couple's personal and property commitments, based on majoritarian experience, and people adopt those presumptions by obtaining the State-issued marriage license, in the absence of an agreement to the contrary.

161.   When a familial contract is of a sexual, spiritual, marital nature, the State inappropriately grants special rights and privileges, unavailable to other types of familial contracts.

162.   In the absence of an agreement to the contrary, the State may rightfully presume that a marriage contract prohibits additional marriage to anyone else, although such a presumption would likely be superfluous in light of modern, no-fault divorce laws.

163.   The State-issued marriage license and its attendant rights and privileges has, in many ways, become a vehicle by which the State exercises improper control over peaceful citizenry.  Through unequal State recognition of familial commitments, the State improperly discriminates in favor of popular, majoritarian familial commitments, and against less common ones.

164.   Consenting adult individuals have the right to freely contract peaceful familial relationships between one another, and to the extent those relationships alter those individuals' personal and property rights, the State commits violence when it fails to recognize those altered rights.

165.   The judiciary has, increasingly, recognized the right of consenting adult individuals to freely contract such peaceful familial relationships.

166.   In *Loving v. Virginia,* 388 U.S. 1 (1967), the United States Supreme Court noted that Americans have a Constitutional right to marriage, which is "one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id.*, at 12.

167.   In *Zablocki v. Redhail*, 434 U.S. 374 (1978), the United States Supreme Court noted that it is contradictory for government "to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society." *Id.*, at 386.

168.   In *Lawrence v. Texas*, 539 U.S. 558 (2003), the United States Supreme Court recognized that "[l]iberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct." *Id.*, at 558.

169.   In *Brown et al. v. Buhman*, 947 F.Supp.2d 1170, (D. Utah 2013), a

federal district court struck down the religious cohabitation prong of Utah State's bigamy statute as facially unConstitutional, concluding that it violated the Free Exercise Clause of the First Amendment and was without a rational basis under the Due Process Clause of the Fourteenth Amendment.  The polygamist family at issue had not sought State recognition of marriage or contested the State's ability to prosecute citizens who secure multiple marriage licenses from the state.  *Id.*, at 1195.  The court determined that, under the Due Process Clause, individuals could religiously cohabitate, and use religious terminology to describe their relationship, *id.*, at 1197-98.

170.   In *Obergefell v. Hodges*, 576 U.S. ___ (2015), the United States Supreme Court further noted that when "new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. . . . The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its consistency with the central meaning of the fundamental right to marry is now manifest."

171.   Non-traditional families should not be "denied the constellation of benefits that the States have linked to marriage" or "consigned to an instability many . . . would find intolerable", as that "works a grave and continuing harm, serving to disrespect and subordinate" such families, "who want[] to affirm their commitment to one another before their children, their family, their friends, and

their community." *Id.*

172.   Polygamy does not initiate, or threaten to initiate, physical force against another's person or property; mere polygamy, without more, is admittedly peaceful conduct.

173.   Polygamy may be statistically associated with violence; such violence, however, is already prohibited by law; legislation against entirely peaceful polygamy is overbroad, and unConstitutionally permits majoritarian sovereign violence against admittedly peaceful individuals.

174.   Polygamous marriage may involve risks that are not present in monogamous marriages, but freedom and peace require permitting different people to accept different risks.

175.   If certain peaceful conduct is more likely than not to cause serious injury or death to the person who engages in that conduct, one can perhaps begin to consider whether such an individual lacks the requisite capacity to make rational, voluntary decisions; polygamous marriage is not, however, more likely than not to cause serious injury or death to its participants.

176.   Further, there is a dangerous tendency to prohibit risky conduct, not when it poses the statistically highest risk, but instead primarily when a particular majority has little desire to engage in such conduct, and thus weighs only the risks, and not the benefits.  The spirit of liberty requires great humility and caution.

177.    The Colliers wish to live and let live, each according to personal conscience.  They have not physically harmed anyone's person or property, nor have they threatened such harm; neither do they present an unordinary or unreasonable future risk of such harm.  They would like to continue to live in peace, without fear of criminal prosecution, and with equal treatment under the law.

178.    Despite the Colliers' peaceful citizenry, the State threatens to remove them from their home, take them from their children, impose fines, and involuntarily imprison them; the State has deprived them of personal and property rights by refusing to recognize the ways that they have contractually altered those rights.

179.    There is no other State "crime" that prohibits peaceful conduct, without initiation, or threat of initiation, of physical force against another's person or property; or, if there is, it should also be struck down.

180.    The validity of a contract should not be determined by its topic: If the Colliers' nonviolent personal and property contractual agreements with one another occurred entirely in the realm of business, without touching on familial commitment, sexuality, the home, and other topics intimate to the human heart, the State would not refuse to recognize their contracts.

181.    The role of the judiciary is to protect every individual's right to be

free from violence, whether committed by a fellow citizen, or by the State.

182.    As Joseph Story noted in his Commentaries on the Constitution in 1833, "personal security and private property rest entirely upon the wisdom, the stability, and the integrity of the courts of justice."

183.    Also in Joseph Story's Commentaries: "the danger is not, that the judges will be too firm in resisting public opinion, and in defense of private rights or public liberties; but, that they will be ready to yield themselves to the passions, and politics, and prejudices of the day."

VII.    FIRST CLAIM FOR RELIEF: FREE EXERCISE

184.    Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

185.    State anti-polygamy statutes, MCA §§ 45-5-611 and 45-5-612, violate fundamental liberties that are protected by the Free Exercise Clause of the First Amendment to the United States Constitution, both facially and as applied.

186.    State anti-polygamy statues, MCA §§ 45-5-611 and 45-5-612, are not neutral and generally applicable.

187.    State anti-polygamy statues, MCA §§ 45-5-611 and 45-5-612, are not supported by a compelling state interest and are not narrowly tailored in pursuit of State interests.

188.    State anti-polygamy statues, MCA §§ 45-5-611 and 45-5-612, further

violate fundamental liberties by denying religious polygamists the right to freedom of peaceful conduct, particularly in relation to their private family life, in conformity with their long-established and sincerely held religious beliefs.

189.   As previously asserted herein, although the judiciary has not recognized this rule, State law violates the Free Exercise Clause whenever it authorizes State violence against peaceful conduct.

190.   State violence includes unjust State determination of property rights because of the State's improper preference for, or discrimination against, such peaceful conduct.

191.   Polygamy is currently practiced by millions of people, including at least 100,000 polygamous households in America, and is legal in approximately 50 countries.

192.   The United Kingdom, Australia, and New Zealand permit some benefits for spouses of polygamous marriages performed in other countries.

193.   India and Sri Lanka permit polygamous marriage among Muslims; many Indians have converted to Islam in order to contract a polygamous marriage.

194.   Sweden recognizes polygamous marriages performed abroad.

195.   The predominantly Christian nations of the Republic of the Congo, Uganda, and Zambia permit polygamy.

196.   The predominantly Buddhist nation of Myanmar (formerly known as

Burma) allows civil polygamous marriages.

197.   Polygamy is the *de facto* norm in rural Tibet, although it is illegal under Chinese family law.

198.   The king of Swaziland has 13 spouses.

199.   Approximately 85% of peoples throughout history have practiced polygamy; it is one of the oldest religious-based practices in the world.

200.   It does not matter if only one individual's conscience dictates a particular, peaceful path, or if millions have come to that same conclusion; equality of freedom dictates that if conduct is peaceful, it must be permitted.

201.   It is nonetheless worth noting that polygamy has a long history of widespread religious acceptance, including within the biblical Middle East.

202.   Many polygamists base their practice in religion, including the Old Testament of the Bible, wherein God shows approval of polygamists such as Abraham, Moses, and David, and the Quran, wherein Prophet Muhammed was a polygamist.

203.   Muslim Sharia law generally enforces a limit of four wives for a Muslim man under Sura 4:3, and recognizes the right to plural marriages.

204.   Passages in the Jewish Talmud make estate-planning references to polygamy, and polygamy is practiced among Jews both in Israel and in the United States, despite criminal prohibitions against it in both countries.

205.    Martin Luther publicly stated that his reading of the Bible affirmed polygamy in *De Wette II*, 459, noting that the authorities should leave such questions to the personal choices of the citizens:

> I confess that I cannot forbid a person to marry several wives, for it does not contradict the Scripture.  If a man wishes to marry more than one wife he should be asked whether he is satisfied in his conscience that he may do so in accordance with the word of God.  In such a case the civil authority has nothing to do in the matter.

206.    Some Protestants have described polygamy as the "ideal form of marriage" and continue to form polygamous families as part of their Christian faith.

207.    Joseph Smith, the founder of the Mormon Church, was a polygamist and published a revelation about polygamy.  *See Doctrine and Covenants*, Section 132.

208.    Joseph Smith's successor, Brigham Young, taught that only through polygamy could men become gods.  *See Journal of Discourses*, 11:269.

209.    Joseph F. Smith, the sixth president of the Mormon Church, continued to emphasize the importance of polygamous marriage, even asserting that it was essential to the salvation of mankind.

210.    Although it does not matter why the majoritarian sovereign has criminalized and refused to recognize the peaceful practice of polygamy, it is worth noting that religious and racial discrimination, and possibly also economic

discrimination, animated that decision.

211.   In America, polygamy was common among indigenous populations, particularly among southeastern and Plains tribes and nations.

212.   In early cases involving indigenous Americans who had entered into polygamous marriages under tribal law, American courts recognized all widows, and granted all children of such polygamous marriages the right to inherit property.

213.   In the 1800s, polygamy was referred to as a "non-Caucasian" practice; polygamy was, and remains, negatively associated with Africans and Arabs.

214.   Beginning in 1830, polygamy was regarded as a principal tenet of the Church of Jesus Christ of Latter-Day Saints ("LDS Church" or "Mormon Church"), derived from Old Testament practices; 20-30% of 19th century Mormon families practiced polygamy.

215.   The key plank of the Republican platform of 1856 was firm opposition to slavery and polygamy:  "It is the duty of Congress to prohibit in the territories those twin relics of barbarism, polygamy and slavery."

216.   The first substantial exploration into the meaning of the Free Exercise Clause, *Reynolds v. United States*, 98 U.S. 145 (1878), related to polygamy.  In that case, George Reynolds, secretary to Mormon church leader Brigham Young, challenged the Morrill Anti-Bigamy Act, 37th U.S. Congress, Sess. 2., ch. 126, 12 Stat. 501, which criminalized the Mormon practice of plural marriage and also

limited Mormon church and Mormon nonprofit property rights. *Id*.

217.   Chief Justice Morrison Waite, who decided *Reynolds*, concluded that it was within the rightful power of Congress to ban polygamy, since it "has always been odious among the northern and western nations of Europe," and was "almost exclusively a feature of the life of Asiatic and of African people", *id.*, at 161-62, and, further, in order to protect "pure-minded women" and "innocent children", *id*., at 167-88.

218.   According to Justice Waite, "Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order." *Id*., at 165-67.  To exclude compliance with the law because of religious belief, Waite warned, would "permit every citizen to become a law unto himself," creating a state of anarchy in which citizens would justify human sacrifice in the name of religion, and government would exist only in name. *Id*.

219.   In *Reynolds*, Chief Justice Waite rejected the right of peaceful people to live freely according to the dictates of their own conscience, merely—and explicitly—because those conclusions differed from his own, as shared by his cultural and religious in-group.

220.   Under *Reynolds*, there is no moral, philosophical defense against violently imposed Sharia law, or any other local majoritarian conclusion of

conscience imposed by force upon a peaceful populace.

221.    Under *Reynolds*, Americans were left to politically battle their own, peaceful countrymen for the "right" to physically force their own moral preferences on one another, by means of State violence and discrimination.

222.    *Reynolds* seriously misinterpreted the Free Exercise Clause.  George Cannon, arrested for polygamy in 1874, interpreted the Free Exercise Clause in a way that far better reflects its intent:

> Liberty, then, not of mere opinion alone, but religious liberty of practice, is my natural and indefeasible right. . . . our actions do not injure others.  We do not trespass on private right or the public peace.

223.    Congress later enacted the Edmunds Anti-Polygamy Act of 1882, amended by the Edmunds-Tucker Act of 1887, in U.S. Code Title 48 & 1461, (repealed in 1978), which: declared polygamy a felony; declared unlawful cohabitation a misdemeanor; disincorporated the LDS Church (U.S. Marshals confiscated its property), on the grounds that it fostered polygamy; required an anti-polygamy oath for prospective voters, jurors, and public officials; annulled territorial laws allowing illegitimate children to inherit; required civil marriage licenses (to aid in the prosecution of polygamy); abrogated common law spousal privilege for polygamists; and replaced local judges with federally appointed judges.

224.    In *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v.*

*U.S.*, 136 U.S. 1 (1890), the U.S. Supreme Court upheld both the Edmunds-Tucker Act and the seizure of LDS property.  Chief Justice Fuller's dissent asserted that, although Congress had the power to criminalize polygamy, "it is not authorized under the cover of that power to seize and confiscate the property of persons, individuals, or corporations, without office found, because they *may* have been guilty of criminal [polygamous] practices."  *Id.*, at 67 (emphasis added).

225.   In *Cleveland v. United States*, 329 U.S. 14 (1946), the Supreme Court upheld the convictions of six Mormon men for transporting their plural wives across state lines.  Justice Douglas described polygamy as "a return to barbarism" and "a notorious example of promiscuity" that is "contrary to the spirit of Christianity, and of the civilization which Christianity has produced in the Western world."  *Id.*, at 19.  The decision did not cite any policy justification, other than the claim that polygamy is immoral according to (Justice Douglas's interpretation of) Christian religious belief.

226.   In *In re Black*, 283 P.2d 887 (Utah 1955), Utah State had filed a neglect petition against polygamous parents, *id.*, at 888-89, and the Utah Supreme Court affirmed removal of the children on the grounds that the parents violated anti-polygamy law and presented a favorable view of polygamy to their children. *Id.*, at 891-92.

227.   Laws criminalizing peaceful polygamous conduct remain on the

books in all 50 States.

228.   Modern laws criminalizing polygamy may not be a continuation of the federal government's nineteenth-century persecution of the Mormon Church; such laws are nonetheless unConstitutional.

229.   Freedom from violence thoroughly, and equitably, protects freedom of conscience, and the judiciary should adopt nonviolence as a core, guiding principle when interpreting the Free Exercise Clause (and all laws), to help determine whether peaceful (and therefore protected) conduct is unConstitutionally infringed.

230.   Careful adherence to nonviolence might not be easy in every instance, as no jurisprudence has been developed under that standard, but the analysis is clear-cut in the case at hand: the State threatens to infringe both the personal liberty and property rights of peaceful people, who have not been accused of any violence.

## VIII.  SECOND CLAIM FOR RELIEF: DUE PROCESS

231.   Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

232.   The State has denied, and threatens to deny, fundamental liberties protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both on its face and as applied.

233.   State anti-polygamy laws, MCA §§ 45-5-611 and 45-5-612,

criminalize the exercise of fundamental liberty interests protected under the Due

Process Clause of the Fourteenth Amendment to the United States Constitution.

234. State failure to recognize the Colliers' familial commitments,

including Christine and Nathan Colliers' contract of marriage, denies the Colliers

personal and property rights on the basis of their exercise of fundamental liberty

interests protected under the Due Process Clause of the Fourteenth Amendment to

the United States Constitution.

235. As all three of Christine, Vicki, and Nathan Collier have parented

their eight children for nearly a decade, in a single, stable, nurturing household, it

would be detrimental to those childrens' best interests to force separation from any

one of those adults.

236. The Fourteenth Amendment's Due Process Clause incorporates both

procedural and substantive due process: procedural due process prohibits any State

from taking an allegedly violent individual's life, liberty, or property without due

process of law; substantive due process should prohibit any State from violently

taking any peaceful individual's life, liberty, or property, as a matter of law.

237. The Fourteenth Amendment's Due Process Clause protects

"fundamental liberties," including personal choices central to individual dignity

and autonomy, and intimate choices defining personal identity and beliefs.

238. The right to marry is a fundamental right protected by the United

States Constitution.

239.   By threatening violence against Christine and Nathan, who are admittedly peaceful persons, the State has violated the substantive Due Process Clause.

240.   By denying State recognition of the ways Christine, Vicki, and Nathan Collier have voluntarily altered their personal and property rights in their contracts of marriage, the State has unConstitutionally committed violence against their personal and property rights.

## IX.   THIRD CLAIM FOR RELIEF: ESTABLISHMENT OF RELIGION

241.   Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

242.   State anti-polygamy criminal statutes, and State unequal legal treatment of polygamous marriage, violate the Establishment Clause of the First Amendment to the United States Constitution, both facially and as applied.

243.   State criminalization and unequal legal treatment of polygamy is grounded in religious discrimination and the majoritarian desire to physically force compliance with majoritarian morals.

244.   The majoritarian sovereign's concerns that polygamy might be personally unwise, or detrimental to society, are irrelevant to the question of whether polygamy should be criminalized or otherwise subjected to sovereign

violence; the sovereign may not violently impose its conclusions of conscience on any peaceful individual.

245.   Even so, the majoritarian sovereign's concerns about polygamy may be unfounded.

246.   As Christine Collier has publicly stated, polygamy may mean "more eyes for the kids, more hands for the daily chores, more love for the family, more income to cope in an ever-demanding society."

247.   State failure to recognize polygamous marriage contracts creates less stable, secure family commitment structures for children born into polygamous households.

248.   Fear of State violence against peaceful polygamists creates insular polygamous societies where abuses are not reported, children are born without social security numbers, and victims fear that reporting will harm innocent third parties.

249.   The failure to legally recognize contracts of polygamous marriage increases, rather than decreases, violence: victims of domestic violence are routinely denied entry to America merely because they are in polygamous marriages; spousal property rights are denied to plural spouses in case of divorce, which may coerce some spouses to remain in abusive relationships; and decreased trust in the law may reduce reports of violence.

250.    If there is an association between polygamy and certain problems, that does not prove a causal relationship between polygamy and those problems.

251.    If polygamy and violence are associated, there is no evidence that polygamy and violence are associated more so than monogamy and violence, particularly controlling for other factors such as living in an insular society where violence is culturally condoned.

252.    If any one of poverty, sexism, or violence is associated with polygamy, it might be because one of the former causes the latter.  In communities with few resources, where women are discouraged from economic participation, or where one gender is unavailable for marriage due to early death, imprisonment, or high unemployment, polygamy might unexpectedly improve peoples' lives, for example, by permitting economy of scale in group cohabitation, by assisting widows with children, or by artificially evening out the gender ratio.

253.    According to one law review article, "Philadelphia has the highest density of polygamy, due to a combination of conversions to Islam, currents of racial nationalism, and the demographic effects of male incarceration and unemployment."  Adrienne D. Davis, *Regulating Polygamy: Intimacy, Default Rules, and Bargaining for Equality*, 110 COLUM. L. REV. 1955, 1974 (2010).

X.    FOURTH CLAIM FOR RELIEF: FREE SPEECH

254.    Christine, Vicki, and Nathan Collier hereby incorporate by reference

every paragraph above as if fully set forth herein.

255.   State anti-polygamy criminal statutes, and unequal treatment of polygamous marriages, violate the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

256.   Individuals in a polygamous marriage are under threat of criminal prosecution only when they publicly hold themselves out to be "married," rather than simply in a temporary, sexually active, cohabitating relationship.

257.   By criminalizing polygamy, but not sexually active cohabation, the State requires those who have spiritually and conscientiously committed themselves to one another to suppress the open expression of their beliefs and announcement of that conscientious commitment.

258.   The language "purports to marry" in the State's criminal anti-polygamy statutes is unConstitutionally vague, as it is unclear: whether it includes common law marriage due to mere cohabitation; whether it is restricted to an unlicensed, solemnized ceremony; whether it is restricted to persons who verbally purport to be married; or whether some element of fraud is required.

259.   In *Utah v. Holm*, 137 P.3d 726 (2006), applying heightened scrutiny, the Utah Supreme Court affirmed a bigamy conviction by construing the phrase "purports to marry" to include either cohabitation, alone, or an unlicensed, solemnized marriage.  *Id*., at 19, n. 5; 26.

## XI.   FIFTH CLAIM FOR RELIEF: EQUAL PROTECTION

260.   Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

261.   State anti-polygamy statutes, MCA **§§** 45-5-611 and 45-5-612, violate fundamental liberties protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both facially and as applied.

262.   When conduct is criminalized by State law, "that declaration in and of itself is an invitation" to subject persons who engage in that conduct "to discrimination both in the public and in the private spheres. *Lawrence v. Texas*, 539 U.S. 558, 583 (2003).

263.   Further, State denial of marriage licensure to polygamous marriage contracts denies equal protection of the law, contrary to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

264.   State laws criminalizing and refusing to acknowledge polygamous marriage contracts impermissibly treats peaceful individuals unequally, merely because their conclusions of conscience differ from those of the majority.

265.   There is no rational basis for the disparate treatment of polygamous households and multiple cohabitating individuals without committed familial relationships.

266.   The State's disparate treatment of polygamists is grounded in racial

and religious animus.

267.   The State takes a permissive approach to sexual relationships and cohabitation, including between more than two adults, but prohibits such relationships if they are accompanied by a long-term familial commitment.

268.   Of Nathan Collier's two wives, only Christine Collier is denied the privileges, protections, and obligations of legal recognition of her marriage to her husband.  Only Christine is threatened with criminal prosecution and discriminatory application of civil laws and procedures at the State's whim.  Both of Nathan Collier's two wives have voluntarily chosen a polygamous marriage; only Christine Collier is relegated to non-primary, subordinate, and unequal status under the law.

269.   Nathan and Christine Colliers' adult, consensual, sexual intimacy is criminalized solely because they hold themselves out to be lovingly committed to one another as husband and wife.  Identical sexual conduct between a married man and any woman who does not purport to be his wife (i.e., extramarital adultery) is not criminalized, even where it involves dishonesty and betrayal.

270.   The State has not shown, and cannot show, that honest intramarital sexual intimacy in accordance with a prior marriage contract is a greater societal harm more worthy of criminalization than dishonest extramarital adultery that violates a prior marriage contract.

271.   Nathan, Christine, and Vicki Colliers' household situation involving a man, two women, and all of their children is criminalized solely because Nathan has contractually committed to treat each woman, and her children, as family. Identical household situations involving a man, two women, and their children are not criminalized if the man's relationship with one of the women and her children is only temporary.

272.   In comparing households with multiple adults and children, the State has not shown, and cannot show, that when the adults have long-term familial commitments to care for one another and their children, that is a greater societal harm more worthy of criminalization than if those same relationships were only temporary.

## XII.   SIXTH CLAIM FOR RELIEF: FREEDOM OF ASSOCIATION

273.   Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

274.   State anti-polygamy laws, and State unequal legal treatment of polygamous marriage, violates the right of association protected under the First Amendment to the United States Constitution, both as written and as applied.

275.   The Colliers should be free to peacefully associate with one another, and to define the parameters of that association, without being subjected to State violence.

XIII.  SEVENTH CLAIM FOR RELIEF: 42 U.S.C. § 1983

276.   Christine, Vicki, and Nathan Collier hereby incorporate by reference every paragraph above as if fully set forth herein.

277.   Insofar as they are enforcing the terms of MCA §§ 45-5-611 and 45-5-612, the Defendants, acting under color of State law, are depriving and will continue to deprive the Colliers of numerous rights secured by the First and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Christine, Vicki, and Nathan Collier pray that this Court:

278.   Enter an order that MCA §§ 45-5-611 and 45-5-612 violate: the Free Exercise, Free Speech, Establishment, and Freedom of Association Clauses of the First Amendment; the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and 42 U.S.C. § 1983.

279.   Order a preliminary and permanent injunction enjoining prosecution of MCA §§ 45-5-611 and 45-5-612 against the Collier family.

280.   Order a preliminary and permanent injunction enjoining non-prosecutorial enforcement of MCA §§ 45-5-611 and 45-5-612 against the Collier family.

281.   Order Defendants to recognize the Christine, Vicki, and Nathan Colliers' contracts to alter personal and property rights in relation to one another and to their children.

282.   Order Defendants to recognize Christine and Nathan Colliers' contract to alter personal and property rights in relation to one another equal to State recognized contracts of marriage.

283.   Order Defendants to issue a State-issued marriage license to Christine and Nathan Collier.

284.   Award the Colliers reasonable fees and costs incurred in maintaining this action pursuant to 42 U.S.C. § 1983.

285.   Award such other relief as it may deem just and proper.

Dated this 17th day of March, 2016.

Respectfully submitted,

PAUL WARREN LAW, PLLC


By: s/s Elinor Swanson
Elinor Swanson, Associate Attorney
ellie@paulwarrenlaw.com
490 North 31st Street, Suite 101
Billings, Montana 59101
(406) 294-2300
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

Plaintiffs hereby certify that on this 17th day of March, 2016, a copy of the

foregoing was served upon the following counsel of record by way of electronic

mail, as per mutual party written agreement:


TIMOTHY C. FOX                         KEVIN GILLEN
Montana Attorney General               MARK A. ENGLISH
DALE  SCHOWENGERDT                     Deputy Yellowstone County Attorneys
Solicitor General                      Yellowstone County Courthouse Room 701
PATRICK M. RISKEN                      P.O. Box 35025
MELISSA SCHLICHTING                    Billings, MT 59107
Assistant Attorney General             (406) 256-2870
215 North Sanders                      *Attorney for Defendants Yellowstone County*
P.O. Box 201401                        *Attorney and Clerk of District Court*
Helena, MT 59620-1401
(406) 444-2026
*Attorney for Defendants Attorney General and Governor*


                                       PAUL WARREN LAW, PLLC



                                       By: s/s Elinor Swanson
                                       Elinor Swanson, Associate Attorney
                                       ellie@paulwarrenlaw.com
                                       490 North 31st Street, Suite 101
                                       Billings, Montana 59101
                                       (406) 294-2300
                                       *Attorney for Plaintiffs*