Elinor Swanson
PAUL WARREN LAW, PLLC
490 North 31st Street, Suite 101
Billings, Montana 59101
Phone: (406) 294-2300
Email: ellie@paulwarrenlaw.com
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

CHRISTINE COLLIER, VICTORIA
COLLIER, and NATHAN COLLIER,

                            Plaintiffs,

        v.

                                                    Cause No. CV-15-83-SPW-CSO

TIM FOX, in his official capacity as
Attorney General of Montana; STEVE
BULLOCK, in his official capacity as                **PLAINTIFFS' PRELIMINARY**
Governor of Montana; SCOTT TWITO,                      **PRETRIAL STATEMENT**
in his official capacity as Yellowstone
County Attorney, and KRISTIE LEE
BOELTER in her official capacity as
Clerk of the Yellowstone County
District Court,

                            Defendants.


## Plaintiffs' Preliminary Pretrial Statement

I.    Introduction

        Pursuant to this Court's Initial Conference Order dated April 29, 2016,

Plaintiffs in the above-captioned case, Christine Collier, Victoria Collier, and

Nathan Collier, by and through their counsel of record, have prepared this Preliminary Pretrial Statement. As the parties have not yet completed discovery, this Statement will be updated and finalized as soon as possible after completion of discovery. The Preliminary Pre-trial Conference in this matter is scheduled for June 15, 2016 at 10 a.m. by telephone before United States Magistrate Judge Carolyn S. Ostby. Plaintiffs consent to trial of the case before a Magistrate Judge and without a jury.

II.     Brief Factual Outline of the Case

This case is an action brought by Plaintiffs Christine, Victoria ("Vicki"), and Nathan Collier. Plaintiffs submit that this is an action under the Free Exercise, Free Speech, Establishment, and Freedom of Association Clauses of the First Amendment of the United States Constitution; the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution; and 42 U.S.C. § 1983 to correct and prohibit Defendants' civil and criminal enforcement of unConstitutional State criminal anti-polygamy laws, MCA §§ 45-5-611 and 45-5-612, to prohibit Defendants' civil enforcement of unConstitutional State civil anti-polygamy law, and further to make the Colliers whole.

Christine, Vicki, and Nathan Collier have voluntarily cohabitated together for almost a decade. Throughout that time, Christine and Vicki Collier have had a

romantic relationship with Nathan Collier. Christine and Vicki each had a marriage ceremony with Nathan Collier and continue to describe their relationship with him using marital terminology. At all relevant times, Christine, Vicki, and Nathan Collier were consenting adults of sound mind. Vicki and Nathan Collier have a State-issued marriage license. Christine and Nathan Collier sought a State-issued marriage license, but Defendants denied issuance. Rather than citing to State *civil* family law prohibiting polygamy, MCA § 40-1-401(1)(a), Defendants denied issuance of Christine and Nathan Colliers' marriage license pursuant to State *criminal* laws prohibiting polygamy, MCA §§ 45-4-611 and 45-4-612.

Defendants' reference to criminal State anti-criminal polygamy laws in their denial of Christine and Nathan Colliers' marriage license has been widely publicized in the Colliers' community. Defendants' civil enforcement of State criminal anti-polygamy laws in that manner formally and officially labeled polygamy as criminal conduct. Defendants' use of State criminal anti-polygamy laws to justify denial of Christine and Nathan Colliers' marriage license strongly indicates that Defendants do not consider those laws to be anachronisms.

The Colliers reasonably fear that Defendants will deny them other Constitutional and/or civil rights and privileges pursuant to those State criminal anti-polygamy laws. The Colliers reasonably believe that Defendants have enforced those State criminal anti-polygamy laws against other persons, in both

civil and criminal matters, although discovery is needed to provide evidence of such enforcement. The Colliers also reasonably fear that Defendants will continue to enforce State criminal anti-polygamy laws against their family again in the future. Defendants have not disavowed the natural legal repercussions of Defendants' apparent commitment to continue to define polygamy as criminal conduct, such as denial of parenting rights due to the Colliers' criminal behavior, or automatic disqualification for certain State employment opportunities due to criminal conduct. Nor have Defendants disavowed criminal prosecution of non-violent, non-fraudulent polygamous persons, including the Colliers.

Being labeled as criminals under State law has deprived Plaintiffs of business contracts and employment opportunities. Public and private actors routinely discriminate on the basis of criminal conduct (whether prosecuted or not) when making employment decisions. The Colliers have lost, and continue to lose, business contracts and employment opportunities, with corresponding economic damages, because of Defendants' enforcement of State criminal anti-polygamy laws.

The Colliers further reasonably believe that even if the Court were to strike down State criminal anti-polygamy laws, Defendants would then enforce civil anti-polygamy laws to continue to deny Christine and Nathan Collier a State-issued marriage license. Such an Order would redress the Colliers' lost business and

employment opportunities, reasonable fear of denial of parental (and other) rights, and reasonable fear of criminal prosecution, imprisonment, and fines pursuant to State criminal anti-polygamy laws. A Court Order prohibiting Defendants from enforcing State civil anti-polygamy laws is necessary to fully and adequately protect Christine and Nathan Colliers' Constitutional right to marry.

III.    Basis for Federal Jurisdiction and Venue

Plaintiffs submit that venue is proper and that this Court has subject matter jurisdiction pursuant to U.S.C. § 1331 (federal question) because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983; 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations, under color of State law, of rights, privileges, and immunities secured by the United States Constitution; and 28 U.S.C. § 1343(a)(4) because this action seeks equitable relief under 42 U.S.C. § 1983. The parties agree that venue is proper; jurisdiction, however, is contested. The basis of Defendants' objection is unclear, but may relate to standing.

As detailed herein and in Plaintiffs' Complaint, the Colliers have suffered justiciable harm fairly traceable to Defendants' enforcement of State criminal anti-polygamy laws, and distinguishable from those of the general public. The Colliers reasonably fear Defendants' continued civil and criminal enforcement of those State laws, as well as of State civil anti-polygamy laws. The Colliers are precisely

the type of people that State criminal anti-polygamy statutes were designed to affect. State anti-polygamy statutes are aimed specifically at one group of citizens, the State has not disavowed enforcement, and as members of that group, the Colliers reasonably fear prosecution.

The majority of the Colliers' injuries may be redressed with this Court's decision prohibiting Defendants from enforcing State criminal anti-polygamy laws, either by prosecution or as justification for denial of equal legal treatment. Their injuries would be more fully redressed by an opinion that further prohibited Defendants from enforcing State civil anti-polygamy laws. To deny the Colliers standing to challenge enforcement of State anti-polygamy laws would be to immunize those laws from review, and to deny the Colliers' redress and relief.

IV.    Factual Basis of Each Claim

      a.  Generally Applicable Introduction

Christine, Vicki, and Nathan Collier have all abided by familial commitments to one another and to their children, parenting their eight children for nearly a decade. Fearing Defendants' enforcement of State criminal anti-polygamy laws, the Colliers hid those commitments for many years. When Christine and Nathan Collier sought a State-issued marriage license in 2015, they did so with Vicki Collier's knowledge and blessing. Vicki Collier continues to support Christine and Nathan Colliers' marriage contract and still consents to State

recognition of that marriage. The Colliers have lost business contracts and employment opportunities because Defendants' categorized polygamy as "criminal" rather than merely "prohibited under civil law."

Christine and Vicki Collier continue to knowingly purport to have contracted a marriage with Nathan Collier, and continue to publically proclaim that marriage contract, and vice versa. Nathan Collier was and is guilty of bigamy and Christine Collier was and is guilty of marrying a bigamist, pursuant to MCA §§ 45-5-611 and 45-5-612, respectively. The Colliers wish to live and let live, each according to personal conscience. They have not physically harmed anyone's person or property, nor have they threatened such harm; neither do they present an unordinary or unreasonable future risk of such harm. They would like to continue to live in peace, without fear of criminal prosecution, and with equal treatment under the law.

Defendants' refusal to grant Christine and Nathan Collier a State-issued marriage license denies the Colliers the full panoply of rights, privileges, benefits, and responsibilities that regularly and ordinarily accompany State-recognized marriage contracts. Further, because Defendants refused to issue such marriage license pursuant to State *criminal* anti-polygamy laws, the Colliers reasonably fear additional civil enforcement, as well as criminal enforcement, of those laws. The Colliers further reasonably fear enforcement of State civil anti-polygamy laws.

Defendants takes a permissive approach to sexual relationships and cohabitation under State law, including between more than two adults. Similar sexual conduct outside of State-recognized marriage is not criminalized – even where such conduct constitutes extramarital adultery and involves dishonesty, betrayal, and familial instability. The State prohibits and criminalizes cohabitation and sexual relationships among more than two adults only if such relationships involve a long-term familial commitment described using marital terminology.

Religious and racial discrimination were, and are, the animus driving the existence and enforcement of State's anti-polygamy laws, which is a continuation of the sentiment expressed by the Supreme Court in *Reynolds v. United States*, 98 U.S. 145 (1878): Congress could rightfully ban polygamy as "it has always been odious among the northern and western nations of Europe" and was "almost exclusively a feature of the life of Asiatic and of African people." *Id.*, at 161-62.

b. Free Exercise

Defendants' civil and criminal enforcement of State criminal anti-polygamy laws targets the Colliers for describing their relationship in marital terminology and for celebrating their relationships with solemn ceremonies, all of which is protected by the Free Exercise Clause. Others who engage in the same cohabitating, sexual relationships, but absent such protected conduct, are not similarly threatened with jail time, fines, and unequal treatment under State law.

c. Due Process

Defendants refused to recognize the Colliers' familial commitments and denied the Colliers' personal and property rights, including the right to marry, because of State *criminal* anti-polygamy laws. Defendants' use of State criminal anti-polygamy laws as the reason to deny the Colliers' civil right to marry was reasonably interpreted as threatening further civil and criminal action under those laws, and also under State civil anti-polygamy laws.

d. Establishment of Religion

Defendants' criminalization and unequal treatment of polygamy pursuant to State anti-polygamy laws is grounded in religious discrimination. There is no Constitutionally-valid State justification for prohibiting or criminalizing polygamy, which is a key tenet of many minority religious faiths. The State violates the Establishment Clause by inappropriately granting special rights and privileges to familial contracts that are of a sexual, spiritual, and/or marital nature, which are intimately related to fundamental liberties and religious beliefs, as compared to other types of familial contracts.

e. Free Speech

Individuals in polygamous relationships, like the Colliers, are under threat of criminal prosecution only when they publicly hold themselves out to be "married" and use marital terminology, rather than publicly holding themselves out to have

sexually active, cohabitating relationships that are merely temporary. State criminal anti-polygamy laws require only those who have spiritually, conscientiously, and religiously committed themselves to one another to suppress the open expression of their beliefs and the nature of their commitments.

### f. Equal Protection

Pursuant to unConstitutional State anti-polygamy laws, Defendants treat Colliers' contractual commitments to each other and to their children unequally compared to other families' similar contractual commitments. Further, of Nathan Collier's two wives, only Christine Collier is threatened with criminal prosecution and denied the privileges, protections, and obligations of legal recognition of her marriage to her husband.

### g. Freedom of Association

Defendants' enforcement of State anti-polygamy laws deprives the Colliers of their right to peacefully associate with one another and to define the parameters of that association by the threat of violence against their persons and property.

### h. 42 U.S.C. § 1983

As enumerated herein, Defendants, acting under color of State law, have deprived the Colliers of rights secured by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

### V. Legal Theory Underlying Each Claim

a. Generally Applicable Introduction

The Colliers' claims are based on the First and Fourteenth Amendments of the United States Constitution and Defendants' enforcement of Montana State's prohibition against, and criminalization of, polygamy. The human right to freedom of conscience, free from physical violence, is specifically recognized and enshrined in the United States Constitution in the enumeration of an inviolable individual right to Freedom of Conscience in the First Amendment of the Bill of Rights, U.S. CONST. AMEND. I:

> First Amendment—Religion and Expression. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

"Religion" meant "the practice of any duty" in obedience to free conscience. J. BUCHANAN, LINGUAE BRITANNICAE VERA PRONUNCIATIO (R. Alson ed. 1967) (London 1757) (defined as "Piety, godliness, the worship of God, and the practice of any duty in obedience to his commands."). The word "exercise" was defined in dictionaries of the day to mean "action." SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (1805); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (New Haven 1806); James Buchanan (1757).

The Free Exercise Clause thus asserts that no legislature shall prohibit free action in obedience to conscience. The First Amendment entirely insulates freedom

of conscience from majoritarian infringement; freedom of conscience includes freedom of speech and freedom of peaceful conduct, in obedience to the dictates of conscience.

Subsequent enactment of the Fourteenth Amendment to the United States Constitution further protected freedom from violence, by prohibiting unjust deprivation of life, liberty, or property under the Due Process Clause, and by guaranteeing all peaceful peoples equal, nondiscriminatory legal treatment under the Equal Protection Clause. The Fourteenth Amendment to the United States Constitution provides, in part: "No State shall . . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Constitution thereby protects the full diversity of peaceful individual viewpoints and lifestyles from majoritarian tyranny.

Despite early racially- and religiously- discriminatory legal precedent, the trend of recent Supreme Court decisions and relevant legal precedent is to recognize the Constitutionally-protected right to personal autonomy and to freedom from physical violence, including a right to marry and to engage in consensual intimate sexual relationships.

In *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court noted that U.S. citizens have a Constitutional right to marry, regardless of racial heritage, which is

"one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id*., at 12. In *Zablocki v. Redhail*, 434 U.S. 374 (1978), the United States Supreme Court noted that it is contradictory "to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society." *Id*., at 386.

In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court struck down laws criminalizing sodomy, finding a substantive due process right to intimate consensual sexual conduct under the Fourteenth Amendment. The Supreme Court recognized that "[l]iberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct." *Id*., at 558.

In *Brown et al. v. Buhman*, 947 F.Supp.2d 1170, (D. Utah 2013), a federal district court struck down the religious cohabitation prong of Utah State's bigamy statute as facially unConstitutional, concluding that it violated the Free Exercise Clause of the First Amendment and was without a rational basis under the Due Process Clause of the Fourteenth Amendment. The polygamist family at issue had not sought State recognition of marriage or contested the State's ability to prosecute citizens who secure multiple marriage licenses from the state. *Id*., at 1195. The court determined that, under the Due Process Clause, individuals could religiously cohabitate and use religious terminology to describe their relationship, *id*., at 1197-98. (The case was subsequently dismissed by the Tenth Circuit on

standing grounds; appeal is now pending.)

In *Obergefell v. Hodges*, 576 US __ (2015), the Supreme Court recognized the Constitutional right of consenting adults to marry, regardless of gender. "[When] new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed." *Id*., at 11. "The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its consistency with the central meaning of the fundamental right to marry is now manifest." *Id*., at 17. Non-traditional families who want "to affirm their commitment to one another before their children, their family, their friends, and their community", *id*., at 9, should not be "denied the constellation of benefits that the States have linked to marriage" or "consigned to an instability many . . . would find intolerable", *id*., at 17, as that "works a grave and continuing harm. . . . [that] serves to disrespect and subordinate" such families, *id*., at 22.

According to Chief Justice John Roberts, the Constitutional "right to marry" logically extends to plural unions:

> [The majority] offers no reason at all why the two-person element of the core definition of marriage may be preserved while the man-woman element may not. Indeed, from the standpoint of history and tradition, a leap from opposite-sex marriage to same-sex marriage is much greater than one from a two-person union to plural unions, which have deep roots in some cultures around the world. If the majority is willing to take the big leap, it is hard to see how it can say no to the shorter one. It is striking how much of the majority's reasoning would apply with equal force to the claim of a fundamental right to plural marriage.

*Id.* (1, 20-21 Roberts, C.J., dissenting).

   b.  Free Exercise

Defendants' enforcement of civil and/or criminal State anti-polygamy laws

unConstitutionally interferes with the Colliers' right to peacefully exercise their

freedom of conscience. State anti-polygamy laws violate fundamental liberties,

both facially and as applied. Such laws are not neutral and generally applicable.

Such laws deny religious polygamists the right to freely conform with peaceful,

long-established, and sincerely-held religious beliefs. These laws are not supported

by any compelling, important, or valid State government interest, nor are they

narrowly-tailored or substantially related to any State government interest.

   c.  Due Process

Defendants' conduct denies the Colliers personal and property rights related

to the Colliers' exercise of fundamental liberty interests.

   d.  Establishment of Religion

Defendants' conduct pursuant to unConstitutional State anti-polygamy laws

impermissibly establishes a State definition of "marriage" that interferes with

individuals' right to freely engage in consenting intimate sexual relationships and

arrange family relationships according to personal preference and conscience.

   e.  Free Speech

The language of State criminal anti-polygamy laws is unConstitutionally

vague, as it is unclear what qualifies as criminal conduct: mere cohabitation; sexual intimacy; a second wedding ceremony; verbally purporting to be married; seeking a State-issued marriage license; or some other factor(s). To the extent the Colliers are penalized for verbally purporting to be married, such laws are unConstitutional.

### f. Equal Protection

State laws criminalizing and refusing to acknowledge polygamous marriage contracts impermissibly treat peaceful individuals unequally, merely because their conclusions of conscience differ from those of the majority. When polygamous conduct is criminalized by State law, "that declaration in and of itself is an invitation . . . [to subject persons who engage in that conduct] to discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 583 (2003). Defendants' denial of marriage licensure to polygamous marriage contracts denies the Colliers equal protection of the law. There is no rational basis for the disparate treatment of polygamous households as compared to multiple cohabitating individuals without committed familial relationships. Nor is there any rational basis for the disparate treatment of Christine Collier's marriage to Nathan Collier as compared to Vicki Collier's marriage to Nathan Collier.

### g. Freedom of Association

Defendants' enforcement of State anti-polygamy laws unconstitutionally interferes with the Colliers' individual and collective rights: to join, create, or leave

a familial group of their own choosing; to take action to pursue the interests of members; and to freely assemble as a family in both public and private realms.

### h.  42 U.S.C. § 1983

For the reasons enumerated above, Defendants have deprived the Colliers' of Constitutional rights and are liable to them pursuant to 42 U.S.C. § 1983.

### i.  Generally Applicable Conclusion

The Colliers have harmed no one; they are peaceful people. To the extent legal precedent interpreting the Constitution does not fully protect, defend, and recognize peaceful individuals' human right to freedom from violence, including State violence, that right nonetheless should be acknowledged.

## VI.  Computation of Damages

As a result of Defendants' conduct, the Colliers have suffered and continue to suffer monetary damages, including but not limited to a decline in revenue from Nathan Collier's business contracts, a loss in Vicki Collier's employment opportunities, immense emotional and mental distress, and costs incurred in maintaining this action. Damages to be further computed during discovery.

## VII.  Pendency or Disposition of Any Related State or Federal Litigation

None.

## VIII.  Proposed Additional Stipulations of Fact

None at this time.

IX.	Proposed Deadlines Relating to Joinder of Parties or Amendment of Pleadings

Plaintiffs do not anticipate additional parties or amendments to pleadings and leave proposed deadlines to the Court's discretion. Plaintiffs may move to amend their complaint to specifically name additional individuals whose conduct is revealed during the course of discovery.

X.	Identification of Controlling Issues of Law Suitable for Pretrial Disposition

Do State civil or criminal anti-polygamy laws violate the Constitution of the United States in any of the ways described?

XI.	Name, City, and State of Current Residence of Each Individual Known or Believed to have Information That May Be Used in Proving or Denying Any Party's Claims or Defenses, and a Summary of That Information

Plaintiffs submit that the following disclosures are made based on information known at this stage of the proceedings without the benefit of formal discovery. Plaintiffs may supplement with additional witnesses whose identities become known as discovery continues, as well as with expert witnesses in accordance with this Court's scheduling order. Plaintiffs do not waive their right to disclose witnesses who later become relevant to this litigation.

| Name of Individual Likely to have Discoverable Information | Contact Information | Subject Matter of Discoverable Information |
|---|---|---|
| Plaintiff Christine Collier | c/o Elinor Swanson, | The Colliers have |

| | Counsel of Record | specific information regarding their claims in the above-captioned litigation, including their family history; fear of prosecution; experiences of discrimination; and damages. |
|---|---|---|
| Plaintiff Victoria Collier | c/o Elinor Swanson, Counsel of Record | |
| Plaintiff Nathan Collier | c/o Elinor Swanson, Counsel of Record | |
| Defendant Tim Fox | c/o Patrick Risken, Counsel of Record | Defendants have specific information regarding this litigation, including the history of enforcement of, and discrimination under, State criminal and civil anti-polygamy laws. |
| Defendant Steve Bullock | c/o Patrick Risken, Counsel of Record | |
| Defendant Scott Twito | c/o Kevin Gillen, Counsel of Record | |
| Defendant Kristie Lee Boelter | c/o Kevin Gillen, Counsel of Record | |
| Defendants' Spokespersons and Media Contact Persons | Unknown without further discovery. | Such persons may have specific information regarding Plaintiffs' claims in the above-captioned litigation, including but not limited to Defendant/s' position on polygamy, Defendant/s' history of enforcement of, and discrimination under, State criminal and civil anti-polygamy laws, and private discrimination occurring because of Defendant/s' conduct. |
| Jane and John Does Either Acting in Cooperation with Defendant/s and/or Subject to Defendant/s' Supervision, Direction, and/or Control, to Enforce State Criminalization of, and/or State Discrimination Against, those who Practice Polygamy | Unknown without further discovery. | |
| Jane and John Does Engaging in Private Discrimination Against Those Who Practice Polygamy Because Defendants Define Such Practice as "Criminal" and "Illegal" Conduct | Unknown without further discovery. | |
| Any and All Witnesses Identified by Any and All Defendants in Disclosures and in the Course of Discovery | Unknown without further discovery. | Unknown without further discovery. |

| Any and All Individuals Identified by Deponents During Depositions | Unknown without further discovery. | Unknown without further discovery. |
| Any and All Individuals Needed to Authenticate Documents or Other Evidence | Unknown without further discovery. | Unknown without further discovery. |
| Any and All Individuals Necessary for Rebuttal | Unknown without further discovery. | Unknown without further discovery. |

XII.  Substance of Any Insurance Agreement That May Cover Any Resulting Judgment

    None known at this time.

XIII.  Status of Any Settlement Discussions and Prospects for Compromise

    No attempts at this time. The Colliers are not opposed to settlement.

XIV.  Suitability of Special Procedures

    None known at this time.

XV.  Other Court Orders:

    The parties anticipate that responses to discovery requests will require entry of a Stipulation and Order of Confidentiality with respect to the Colliers' private records, including their income and tax records. The parties have agreed that a protective order is reasonable for such discovery material.

    Dated this 8th day of June, 2016.

        Respectfully submitted,

        PAUL WARREN LAW, PLLC

        By: s/s Elinor Swanson
        *Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June, 2016, I served a copy of the

attached Preliminary Pretrial Statement on the following people by the following

means:

| | |
|---|---|
| <u>1, 2, 3</u> CM/ECF | 1. |
| _____ Hand Delivery | |
| _____ Mail | Clerk, U.S. District Court |
| _____ Overnight Delivery Service | |
| _____ Fax | |
| _____ Email | |

2.                                        3.

TIMOTHY C. FOX                  KEVIN GILLEN
Montana Attorney General        Deputy Yellowstone County Attorney
DALE SCHOWENGERDT            MARK A. ENGLISH
Solicitor General                    Deputy Yellowstone County Attorney
PATRICK M. RISKEN              Yellowstone County Courthouse Room 701
Assistant Attorney General        P.O. Box 35025
MELISSA SCHLICHTING           Billings, MT 59107
Assistant Attorney General        Phone: (406) 256-2870
215 North Sanders                 Email: kgillen@co.yellowstone.mt.gov
P.O. Box 201401                   *Attorney for Defendants Twito and Boelter*
Helena, MT 59620-1401
Phone: (406) 444-2026
Email: prisken@mt.gov
*Attorney for Defendants Fox and Bullock*

PAUL WARREN LAW, PLLC

By: <u>s/s Elinor Swanson</u>
*Attorney for Plaintiffs*