TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
PATRICK M. RISKEN
MELISSA SCHLICHTING
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone:  406-444-2026
Fax:  406-444-3549
dales@mt.gov
prisken@mt.gov
mschlichting@mt.gov

COUNSEL FOR DEFENDANTS ATTORNEY GENERAL AND GOVERNOR

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| CHRISTINE COLLIER (PARKINSON), VICTORIA "VICKI" COLLIER, and NATHAN COLLIER,<br><br>Plaintiffs,<br>v.<br><br>TIM FOX, in his official capacity as Attorney General of Montana; STEVE BULLOCK, in his official capacity as Governor of Montana; SCOTT TWITO, in his official capacity as Yellowstone County Attorney, and KRISTIE LEE BOELTER, in her official capacity as Clerk of Yellowstone County District Court,<br><br>Defendants. | Cause No. CV-15-83-BLG-SPW-CSO<br><br>**DEFENDANTS FOX AND BULLOCK'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT—Fed. R. Civ. P. 56(a)** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

I.    SUMMARY OF ARGUMENT .......................................................1

II.   FACTS ...........................................................................................2

      A.    History of the Collier family and this suit.............................2

      B.    Fact admissions common to all claims. .................................7

III.  ARGUMENT AND AUTHORITIES .................................................9

      A.    The Summary Judgment Standard. ........................................9

      B.    The Colliers lack standing to challenge Montana
            bigamy laws—Fed. R. Civ. P. 12(b)(1). ...............................10

            1.    Plaintiffs' claims are purely hypothetical...................11

            2.    The Colliers' claims are not ripe. ...............................15

      C.    The Colliers' constitutional claims are meritless. ...............16

            1.    Longstanding United States Supreme Court
                  Precedent Controls This Case......................................18

            2.    There is no "fundamental right" to multiple
                  marriage licenses:  all claims......................................20

            3.    The Montana bigamy and marriage laws
                  are facially and operationally neutral:  all claims. ......25

            4.    Establishment and free exercise claims: First and
                  Third Causes of Action.................................................27

            5.    Freedom of speech and freedom of association:
                  Fourth and Sixth claims. ..............................................31

IV.   CONCLUSION ................................................................................ 34

CERTIFICATE OF SERVICE ................................................................. 36

CERTIFICATE OF COMPLIANCE ......................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Agostino v. Felton,*
   521 U.S. 203 (1997)....................................................................20, 28

*Aleman v. Glickman,*
   217 F.3d 1191 (9th Cir. 2000)............................................................23

*Allen v. State,*
   87 S.E. 681 (Ga. App. 1916)..............................................................14

*Allen v. Wright,*
   468 U.S. 737 (1984)...........................................................................11

*Am. Family Ass'n. v. City & County of San Francisco,*
   277 F.3d 1114 (9th Cir. 2002)......................................................28, 32

*Bosse v. Oklahoma,*
   2016 U.S. LEXIS 6030, *3 (Oct. 11, 2016)........................................20

*Brown v. Buhman,*
   947 F.Supp.2d 1170 (C.D. Utah 2013).....................................passim

*Chandler v. State Farm Mut. Auto Ins.,*
   598 F.3d 1115 (9th Cir. 2010)......................................................11, 15

*Church of Lukumi Babalu Aye v. Hialeah,*
   508 U.S. 520 (1003)...........................................................................29

*Citizens for Equal Prot. v. Bruning,*
   455 F.3d 859 (8th Cir. 2006)..............................................................24

*Clapper v. Amnesty Int'l USA,*
   568 U.S. ___, 133 S. Ct. 1138 (2013).................................................11

*Davis v. Beason,*
   133 U.S. 333 (1890)...........................................................................18

*FCC v. Beach Communications,*
   508 U.S. 307 (1993)...........................................................................23

TABLE OF AUTHORITIES—Cont.

*Gonzalez-Martinez v. Landon,*
    203 F.2d 196 (9th Cir. 1953) ............................................................ 18

*Heffron v. Int'l Soc. for Krishna Consciousness,*
    452 U.S. 640 (1981) ...................................................................... 32

*High Tech Gays v. Defense Indus. Sec. Clearance Office,*
    895 F.2d 563 (9th Cir. 1990) ........................................................ 10

*Hohn v. United States,*
    524 U.S. 236 (1998) ...................................................................... 20

*Illinois ex rel. Madigan v. Telemarketing Assocs.,*
    538 U.S. 600 (2003) ...................................................................... 33

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ...................................................................... 28

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ........................................................ 12

*Loving v. Virginia,*
    388 U.S. 1 (1967) .......................................................................... 21

*Lujan v. Defenders of the Wildlife,*
    504 U.S. 555, 560 (1992) .............................................................. 12

*Massachusetts Bd. Of Retirement v. Murgia,*
    427 U.S. 307 (1976) ...................................................................... 23

*Matthews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................................... 24

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ...................................................... 30

*Nissan Fire & Marine v. Fritz Cos.,*
    210 F.3d 1099 (9th Cir. 2000) ...................................................... 10

TABLE OF AUTHORITIES—Cont.

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ....................................................................... 6, 20

*Portman v. County of Santa Clara*,
    995 F.2d 898 (9th Cir. 1993) ................................................................. 15

*Reno v. Flores*,
    507 U.S. 292 (1993) ................................................................................ 22

*Reynolds v. United States*,
    98 U.S. 145 (1879) ........................................................... 18, 19, 20, 30

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ..................................................................... 6, 20, 33

*Rolando v. Fox*,
    23 F.Supp.3d 1227 (D. Mont. 2014) ................................................... 26

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................................ 18

*Shaw v. Oregon Public Employees' Retirement Bd.*
    887 F.2d 947 (9th Cir. 1989) ................................................................. 23

*State v. Clements*,
    832 N.W.2d 485 (S.D. 2013) ................................................................. 14

*State v. Fitzgerald*,
    240 Kan. 187, 726 P.2d 1344 (Kan. 1986) ........................................ 19

*State v. Holm*,
    137 P.3d 726 (2006) ......................................................................... 14, 31

*State v. Patterson*,
    24 N.C. 346, 38 Am.Dec. 699 (1842) ................................................. 19

*Susan B. Anthony List v. Dreihaus*,
    134 S. Ct. 2334 (2014) ........................................................................... 11

TABLE OF AUTHORITIES—Cont.

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ................................................. 13, 15, 16

*Thomas v. Review Bd. of Ind. Employment Sec. Div.,*
    450 U.S. 707 (1981) ................................................................................ 28

*United States v. Ali,*
    557 F.3d 715 (6th Cir. 2009) ............................................................... 14

*United States v. Li,*
    2014 U.S. Dist. LEXIS 118874 at * 36-37 (D. Ariz. 2014) ............... 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................ 21, 22

*Welch v. Brown,*
    2016 U.S. App. LEXIS 17867 at *14 (9th Cir. 2016)........................ 30

*Whitty v. Weeden,*
    68 F.2d 127 (9th Cir. 1933) ................................................................. 18

## **OTHER AUTHORITIES**

United States Constitution
    Art. III, § 2 ..................................................................................... 11
    Amend. I.................................................................... 12, 21, 28, 32
    Amend. XIV..................................................................................... 20

Montana Constitution
    Art. III .................................................................................... 11, 12

Federal Rules of Civil Procedure
    Rule12(b)(1)..................................................................................... 11
    Rule 56(a) ........................................................................................ 9

TABLE OF AUTHORITIES—Cont.

Montana Code Annotated

    § 40-1-103.........................................................................26

    § 40-1-401(1) ...................................................................25

    § 45-1-102(a) ...................................................................27

    § 45-5-611....................................................................13, 25

    § 45-5-611(1) ...................................................................16

    § 45-5-612....................................................................17, 25

    § 45-6-612.........................................................................1

    § 45-5-611.........................................................................1

Montana Constitution,

    Art. XIII, § 7...................................................................26

# I.  SUMMARY OF ARGUMENT

This case is a pre-enforcement challenge to long-standing Montana statutes:  Montana Code Annotated §§ 45-5-611 and 45-6-612 (hereinafter collectively referred to as the "bigamy statutes").  The Plaintiffs ask this court to declare that those statutes, which the Plaintiffs refer to as "anti-polygamy laws," are unconstitutional under various theories, to enjoin their enforcement as against the Colliers and to order that a "State-issued marriage license" be issued to Nathan and Christine Collier.  Doc. 43, ¶¶ 52-56, and Prayer for Relief ¶¶ 102-05.

This case should be dismissed.  The Plaintiffs lack standing and, beyond that, facial challenges of bigamy or polygamy laws have been rejected by longstanding precedent.  The Colliers' lawsuit is admittedly based solely on a desire to live as they please with multiple marriage licenses.  There is no constitutional, fundamental right to have a licensed marriage to more than one person at one time.  They allege rampant discrimination of their polygamous arrangement, and actual and continuing threats of "violence" by the state due to their polygamy, yet offer no supporting evidence.  Finally, while their claims target statutes within the Montana criminal code (Doc. 43 at ¶¶ 35, 37, 53 and

all causes of action) they fail to address the Montana marriage code, which controls.

## II.  FACTS

### A.    History of the Collier family and this suit.

Nathan Collier had been married twice before his present marriage to Vicki.  *N. Collier Dep.* at 11:12-12-12:15.  *Declaration of Patrick M. Risken In Support Of Defendants' Motion for Summary Judgment* (hereinafter *Risken Decl. Re Summ. J.*) Ex. 1.  Vicki's first marriage, also prior to her marriage to Nathan, ended badly in 2002, and she met Nathan soon thereafter.  *V. Collier Dep.* at 8:11-25.  *Risken Decl. Re Summ. J.,* Ex. 2.  They later began dating.  *Id.*  Nathan also started dating Christine at roughly the same time.  *N. Collier Dep.* at 27:3-10; *C. Collier Dep.* at 9:18-10:12 (*Risken Decl. Re Summ. J.,* Ex. 3).  Nathan wanted to be with both Vicki and Christine.  *C. Collier Dep.* at 11:1-14.  Nathan discussed a polygamous arrangement with Christine but she refused.  Ct. Doc. 43 at ¶ 15; *C. Collier Dep.* at 11:15-12:1.  Nathan and Victoria were married in Dillon,

South Carolina, on April 26, 2000.  Ct. Doc. 43 at ¶ 12; *Defendants'*
*Statement of Undisputed Facts* (DSOF) #1.

Christine then married a Mr. Bilodeau but kept in contact with
Nathan.  *C. Collier Dep.* at 12:4-9.  Nathan supported Christine when
her marriage to Mr. Bilodeau became untenable.  *N. Collier Dep.*
at 32:1-22.  In 2006, Christine separated from Mr. Bilodeau and Nathan
was supportive even though by then he and Vicki had relocated to
Billings.  *Id.* at 28:14-20.  Nathan claims that he "never stopped loving"
Christine.  *Id.* at 28:21-29:17.  They began dating again.  *Id.*
at 28:14-20, 32:4-10.  Nathan visited Christine in Pennsylvania several
times.  *Id.* at 33:18-34:2; *C. Collier Dep.* at 115:14-25.  Vicki did not
visit.  *C. Collier Dep.* at 115:24-25.  Nathan and Christine again
discussed polygamy.  *N. Collier Dep.* at 28:21-29:3, 33:18-34:2.  During
one visit on June 1, 2007, at Ridley Park in Pennsylvania, Nathan and
Christine made a private commitment to each other.  Ct. Doc. 43, ¶ 20;
DSOF #4.  Both Nathan and Christine consider this event to be the date
of their "marriage" to one another.  DSOF #4.  That meeting was not
officiated as a wedding, and there is no official record of it. *N. Collier*
*Dep.* at 34:3-15.

Thereafter, Christine and her children moved from Pennsylvania to Billings. *N. Collier Dep.* at 30:1-20, 34:16-21; *C. Collier Dep.* at 114:24-115:1. Vicki knew of Christine, but did not know her. *V. Collier Dep.* at 15:11-22, 16:6-17, 17:3-17. At first, Nathan maintained separate households for each woman. *N. Collier Dep.* at 34:19-35:4. But in 2011, Nathan, Vicki, and Christine, along with their children, began living in one house in Billings and continue to do so. *N. Collier Dep.* at 34:19-35:4. While they did separate from one another in 2010, Nathan and Vicki have never divorced. DSOF #2. Nathan and Christine want to "legitimize" their relationship through a marriage license. *N. Collier Dep.* at 39:15-40:8; *C. Collier Dep.* at 24:21-23.

Though Nathan is an excommunicated Mormon, he has rejected all forms of organized religion and considers himself to be agnostic. *N. Collier Dep.* at 24:22-25:25, 77:20-23. Neither Vicki nor Christine follow any organized religion. *V. Collier Dep.* at 49:7-23; *C. Collier Dep.* at 33:10-34:16. The desire to live a polygamous lifestyle with multiple marriage licenses is not driven by the dogma or tenets of an organized religion. *N. Collier Dep.* at 26:20-25; *C. Collier Dep.* at 33:20-34:2.

The Colliers lived a "hidden" polygamous lifestyle[1] until 2012, when they decided to "come out" to friends and family.  *N. Collier Dep.* at 51:8-21.[2]  Then they participated in a national reality television show about plural marriage.  *Id.* at 51:2-7; *V. Collier Dep.* at 45:20-25.[3]  Yet to this day they continue to misrepresent their relationships to others, as needed under the circumstances.  *See N. Collier Dep.* at 49:13-50:18, *V. Collier Dep.* at 40:20-41:6; *C. Collier Dep.* at 45:2-46:20.[4]

Since 2011 the combined family has lived peacefully within their home and neighborhood, without any government intervention. *N. Collier Dep.* at 92:5-93:2; *V. Collier Dep.* at 48:11-17; *C. Collier Dep.*

---

[1] Apparently, Christine put a personalized Montana license plate on her automobile as soon as she arrived in Billings in 2010, bearing the message "N8SWIFE." *C. Collier Dep.* at 43:20-44:9.  They have also displayed license plates bearing "POLYFAM" and "PLYGN." *N. Collier Dep.* at 51:24-52:21.

[2] Nathan, Vicki and Christine, and their children, all participated in a "sealing" ceremony in 2012, which was not religious. *N. Collier Dep.* at 51:8-21, 103:15-20, 108:2-16.  *See* www.collierwedding.com.

[3] The Colliers have even been approached for their own television program. *N. Collier Dep.* at 68:15-20; *C. Collier Dep.* at 57:1-19.

[4] The Colliers also file tax returns making various representations. See *Declaration of Patrick M. Risken Re: Tax Information FILED UNDER SEAL.*

at 69:10-17, 70:19-72:7. Nor have the Colliers ever been threatened with government intervention in their relationships. *Id.* The have absolutely no evidence of discrimination by the state. Rather, the only "threat" they claim is the mere existence of the statutes. *N. Collier Dep.* at 100:13-101:5; *C. Collier Dep.* at 47:20-49:2.

On June 26, 2015, the United States Supreme Court decided *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015), recognizing that, under the Due Process and Equal Protection clauses of the United States Constitution, same-sex couples have a fundamental right to marry. While that decision is clearly limited to the rights of "couples" to marry, the Colliers view dicta in Justice Roberts' dissent as a pathway to the right to secure as many contemporaneous marriage licenses as consenting adults desire. *N. Collier Dep.* at 72:23-73:10. Therefore, on June 30, 2015, and accompanied by a television news crew,[5] Nathan and Christine appeared at the Yellowstone County Clerk's Office to secure a marriage license. DSOF #5. Because Nathan honestly admitted that he was already married to Vicki, the application was

---

[5] *See* http://www.cbsnews.com/news/polygamous-montana-trio-applies-for-wedding-license/

denied. DSOF #6.  But their story garnered worldwide attention.[6]  This lawsuit followed soon thereafter.  Ct. Doc. 1.

The Colliers claim a fundamental right to "state recognition" of additional marriage licenses simply because Nathan does not want to choose between Vicki and Christine.  DSOF #7.  Nathan is not pursuing a long-held religious belief; rather, he considers himself the champion of the polygamous community.  *N. Collier Dep.* at 43:9-24, 44:9-19, 58:19-24. Vicki is already married to Nathan and did not participate in Nathan's discussions with Christine.  *V. Collier Dep.* at 14:12-21, 15:4-22, 16:6-17, 17:3-17.  Vicki is supportive when she needs to be but recognizes that "it's their fight."  *Id.* at 44:22-45:5.

## B.    Fact admissions common to all claims.

Whether considering the Colliers' standing or the individual claims themselves, the Colliers made the following admissions specific to allegations repeated throughout the *Second Amended Complaint*:

---

[6] *See*, for example, CBS News: http://www.cbsnews.com/news/polygamous-montana-trio-applies-for-wedding-license/; CNN:https://www.youtube.com/watch?v=KlM7inmG1Xo; Daily Mail (Great Britain): http://www.dailymail.co.uk/news/article-3146479/Polygamous-Montana-trio-applies-wedding-license.html

The Colliers' claims are not based on religion.  Rather, Nathan Collier believes that he should not have to choose between Vicki and Christine as his legal "wife." DSOF #7.  This admission pertains to the entire *Second Amended Complaint*.

The "contracts" that the Colliers claim to have entered as amongst themselves are merely understandings without written agreement to terms.  DSOF #8.  These admissions pertain to every Cause of Action.

The "fear" that the Colliers express is not objectively verifiable.  The Defendants have done nothing to overtly "threaten" any of the Plaintiffs.  DSOF #9.  The Colliers' "fear" of any perceived "threat" is based solely upon the existence of the bigamy statutes.  DSOF #10.  The Defendants have done nothing to "enforce" the bigamy statutes against the Colliers.  DSOF #11.  These admissions pertain directly to all Causes of Action.

The Colliers have no evidence of official "discrimination" against them or against others similarly situated.  DSOF #12.  These admissions pertain directly to all Causes of Action.

The Colliers live as a family without state or county intervention in their lives.  DSOF #13.  This includes privacy in their home, intimacy and parenting.  *Id.*  These admissions pertain to all Causes of Action.

Nathan Collier admits that polygamy carries the risk of exposing women to the danger of predatory, abusive behaviors by some men. DSOF #14.  These admissions pertain to all Causes of Action.

This case does not involve the practice of any religion.  DSOF #15.

Vicki Collier is admittedly not affected by the bigamy statutes. DSOF #16.

## III.  ARGUMENT AND AUTHORITIES

### A.    The Summary Judgment Standard.

Under Fed. R. Civ. P. 56(a), the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, or that the movant is entitled to judgment as a matter of law.  A moving party can meet its burden by either producing evidence negating an essential element of the nonmoving party's claim or showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.

*See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). *See also Nissan Fire & Marine v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

For the following reasons, Defendants are entitled to summary dismissal of the Colliers' claims.

### B. The Colliers lack standing to challenge Montana bigamy laws—Fed. R. Civ. P. 12(b)(1).

Neither Nathan nor Christine Collier have presented any evidence that they are unlawfully married under a void marriage license. Vicki is not subject to Montana's bigamy laws, since she is lawfully married to Nathan. Nathan and Christine claim to have "knowingly contracted marriage" to one another, thereby "purporting" to be married in violation of the bigamy statutes. Doc. 43 at ¶¶ 36, 38. Yet both can only point to their private meeting in a park in 2007 as a "wedding ceremony," and all "contracts" alleged are merely unwritten understandings. Therefore, while Nathan and Christine are cohabiting, state scrutiny under bigamy statutes is not triggered. *See Brown v. Buhman,* 947 F.Supp.2d 1170, 1233-34 (C.D. Utah 2013), analyzing "marry" or "purports to marry" and discussed at Section C, *infra.*

Article III of the Constitution limits federal court jurisdiction to only *actual* "cases" and "controversies."  U.S. Const., Art. III, § 2; *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "'The party invoking federal jurisdiction bears the burden of establishing' standing."  *Clapper v. Amnesty Int'l USA*, 568 U.S. ___, ___, 133 S. Ct. 1138, 1149-50 (2013).  In addition to standing, a party must show that their claims are ripe.  *Chandler v. State Farm Mut. Auto Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010).  Since standing and ripeness pertain to federal courts' subject matter jurisdiction, a challenge under Fed. R. Civ. P. 12(b)(1) is appropriate at this time.  *Chandler*, 598 F.3d at 1122; Fed R. Civ. P. 12(h)(3).

### 1.    Plaintiffs' claims are purely hypothetical.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Dreihaus,* 134 S. Ct. 2334 (2014).  An injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" to satisfy

Article III standing.  *Lujan v. Defenders of the Wildlife*, 504 U.S. 555,

560 (1992) (internal quotation marks omitted).

First Amendment cases have "relaxed" standing requirements for

"pre-enforcement challenges," allowing parties to establish an injury by

showing that a statute poses a realistic danger of direct injury.  *Lopez v.*

*Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).  Even so, the "touchstone

for determining injury in fact is whether the plaintiff has suffered an

injury or threat of injury that is credible, not 'imaginary or

speculative.'"  *Lopez¸*630 F.3d at 786 (citations omitted).  Courts

consider whether "the pre-enforcement plaintiffs have failed to show a

reasonable likelihood that the government will enforce the challenged

law against them."  *Lopez*, 630 F.3d at 786.

The Colliers fail this test.  Initially, the Colliers contend that

Montana's bigamy laws are "anti-polygamy statutes" (Doc. 43 at ¶¶ 35,

37, 53, *passim*) in an apparent attempt to skirt a critical distinction

that is fatal to their case.  As explained in section D.2 *infra*, bigamy

laws involve multiple marriage licenses.  "Polygamy" does not

necessarily include a marriage license and can also include "private

'spiritual' marriages not licensed or otherwise sanctioned by the state"

(*Brown* at 1181); also called "religious cohabitation." *Id.* at 1197. The Colliers offer no evidence of a likelihood of enforcement simply because, as consenting adults, they choose to cohabit. Their claims involve licensing, which is strictly within the realm of the marriage code.

Further, the Colliers have not been subjected to any threat of enforcement. Their claims are based merely upon the existence of the bigamy statutes (*N. Collier Dep.* at 100:13-101:5), and yet, the existence of the statute alone is insufficient to establish a "reasonable likelihood" of enforcement, falling far short of being a "credible threat." *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (*en banc*). Beyond that, they have no evidence of enforcement, threat of enforcement, discrimination or any other "violence" to their family, which they so adamantly contend.

Nathan and Christine specifically claim to be "bigamists" because they "purport" to be married. Their understanding of this prong of Mont. Code Ann. § 45-5-611 simply means that by calling each other "husband and wife" they "purport." *N. Collier Dep.* at 103:8-10; *C. Collier Dep.* at 106:14-18. Yet "purports" means that the parties secure a second *although void* marriage license and treat it and the

second marriage as valid.[7]  *See also Allen v. State,* 87 S.E. 681, 682-83

(Ga. App. 1916), cited in *United States v. Ali,* 557 F.3d 715, 724 (6th Cir.

2009); and *State v. Clements,* 832 N.W.2d 485, ¶ 9 (S.D. 2013).  The

Colliers do not have a second, although void, marriage license.[8]

Therefore, under the leading cases on this particular application of

bigamy laws, they have no standing to claim to be in violation.

        The absence of any evidence of a "reasonable likelihood" of

prosecution and the Colliers' own admissions eliminate any "credible

threat" of prosecution.  Nathan and Christine are not "purporting" to be

married since they do not possess a state-issued marriage license.

---

        [7] For an extensive list of cases involving "purported" marriages, *see
State v. Holm,* 137 P.3d 726. ¶ 138 n.4 (2006) (Durham, C.J.,
dissenting).  All involved a second, conventional marriage that was later
deemed void.  Chief Justice Durham's "narrowing construction" of
"purports to marry" was adopted in *Brown v. Buhman,* 947 F.Supp.2d
1170, 1233-34 (C.D. Utah 2013).  Under *Brown,* if a couple does not
possess a second marriage license they cannot "purport" to be married.

        [8] Curiously, Nathan and Christine applied for and were granted a
marriage license in Clark County, Nevada, on January 15, 2011.  They
were married under that license on that date.  That marriage was
annulled in 2014. DSOF #17, 18. *See Risken Decl. Re Summ. J.,* Exs. 5, 6.

Rather, Nathan is simply married to one woman while living with two. While this may be morally repugnant to some, it does not violate Montana's bigamy laws.  Thus, the Colliers cannot show an injury in fact, and as a consequence lack standing to challenge the bigamy statutes.

### 2.    The Colliers' claims are not ripe.

The doctrine of ripeness requires courts to "dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur[.]" *Chandler*, 598 F.3d at 1122.  There are two ripeness components:  constitutional ripeness and prudential ripeness.  *Thomas*, 220 F.3d at 1138, *quoting Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993).  The Colliers fail both.

"The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas*, 220 F.3d at 1138.  As discussed above, no substantial controversy exists because the Colliers have failed to establish injury in fact. "Constitutional ripeness" does not exist.

Prudential considerations of ripeness require courts to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas,* 220 F.3d at 1141 (citations omitted). "The hardship analysis of our ripeness jurisprudence dovetails, in part, with the constitutional consideration of injury." *Id.* at 1142.

Here the hardship element is not satisfied because, as discussed above, the Colliers have not established a "credible threat" of enforcement. "[T]he absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship." *Id.* In fact, the Colliers admit that they have never been threatened with enforcement of the bigamy laws and rightfully so, since they are not violating them. DSOF# 9, 10. *See* Section C, *infra*, and *Brown v. Buhman,* 947 F.Supp.2d 1170, 1233-34 (C.D. Utah 2013, discussed therein.

## C.    The Colliers' constitutional claims are meritless.

Mont. Code Ann. § 45-5-611(1) provides that "[a] person commits the offense of bigamy if, while married, the person knowingly contracts or purports to contract another marriage," with certain exceptions not

relevant here.  Mont. Code Ann. § 45-5-612 prohibits knowingly marrying a bigamist.  In order to attain standing, Nathan and Christine insist that they are violating these statutes because, while they do not have a second marriage license, they claim to be married to one another, alleging various "contracts" between them throughout their Second Amended Complaint.

Nathan and Christine further claim that enforcement of the bigamy statutes unconstitutionally prohibits their enjoyment of the fundamental right to marry, through threat of prosecution.[9]  As explained below, bigamy laws have long been recognized as a deterrent to morally bankrupt behavior and the damage it may cause. "Purporting to marry" is more than merely claiming a legal relationship; rather, "purporting" requires securing a second, although void, marriage license.

The Colliers are required to demonstrate that the bigamy statutes are not rationally based.  This they cannot do.

---

[9] Christine recognizes the protection against fraud afforded by bigamy statutes.  She merely seeks to expand the marriage code to include polygamous marriage and not to strike the bigamy laws. *C. Collier Dep.* at 95:16-96:13.

### 1.   Longstanding United States Supreme Court Precedent Controls This Case.

The United States Supreme Court recounted the history of rejection of polygamy in both Europe and in America in *Reynolds v. United States,* 98 U.S. 145 (1879).  "Polygamy has always been odious among the northern and western nations of Europe . . . and from the earliest history of England polygamy has been treated as an ofence [offense] against society."  *Id.* at 164.

Bigamy is a crime involving "moral turpitude."  *United States v. Li,* 2014 U.S. Dist. LEXIS 118874 at * 36-37 (D. Ariz. 2014).  It damages families, marriages, women and men, being described as a crime "in all civilized countries."  *Davis v. Beason,* 133 U.S. 333, 341 (1890) (overruled on other grounds *Romer v. Evans,* 517 U.S. 620, 634 (1996)), cited in *Whitty v. Weeden,* 68 F.2d 127, 130-31 (9th Cir. 1933).  *See also Gonzalez-Martinez v. Landon,* 203 F.2d 196, 197 (9th Cir. 1953).  "Few crimes are more pernicious to the best interests of society, and receive more general or more deserved punishment."  *Davis,* 133 U.S. at 341. Bigamy is "the abuse of the formal and solemn [marriage] contract" and is an "outrage upon public decency."  *State v. Patterson,* 24 N.C. 346,

356, 38 Am.Dec. 699 (1842), cited in *State v. Fitzgerald,* 240 Kan. 187, 726 P.2d 1344, 1346 (Kan. 1986).  The Colliers' collective consent to such an arrangement is irrelevant, since bigamy is a crime; an offense against society.

   *Reynolds v. United States* "controls the analysis of straightforward polygamy or bigamy in which there is a claim to multiple simultaneous *legal* marriages."  *Brown,* 947 F. Supp. 2d at 1203 (emphasis original). "[I]t is within the legitimate scope of the power of every civil government to determine whether polygamy or monogamy shall be the law of social life under its dominion."  *Reynolds,* 98 U.S. at 166. According to *Brown*, the complete lack of acceptance of polygamy or bigamy in the United States remains.

   The Defendants provide expert opinion explaining the many harmful effects of polygamous "families," including the subjugation and isolation of women, male dominance, jealousy among "wives," placing a "market value" on women, the risk of the neglect and stunting of development of children and the very real risk that the first state to legitimize the ability to secure multiple marriage licenses will lead to a flood of polygamists into that area, straining local social services and

job markets.  *See* Expert Report of Shoshanna Grossbard, Ph.D. (*Risken Decl. Re Summ. J.,* Ex. 7).  Dr. Grossbard's opinions remain unrebutted by the Colliers.

*Reynolds* controls this case.  Even if Justice Roberts' *Obergefell* dissent had any precedential value, it does not impact *Reynolds.*  After all, the Supreme Court is the *only* court with the authority to "reconsider" the continuing vitality of its cases.  *Bosse v. Oklahoma*, 2016 U.S. LEXIS 6030, *3 (Oct. 11, 2016) (quoting *Hohn v. United States*, 524 U.S. 236, 252-53 (1998)) ("our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.") The Supreme Court alone has the prerogative to abandon its precedent. *Id.*  It has not done so.  As Dr. Grossbard's unrebutted opinions demonstrate, the concerns expressed in *Reynolds* and *Brown* remain valid.  *See also Agostino v. Felton,* 521 U.S. 203, 237 (1997).

### 2.  There is no "fundamental right" to multiple marriage licenses:  all claims.

All of the Colliers' claims depend upon the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United

States Constitution.  *See* Ct. Doc. 43, ¶¶ 53, 67-74, 84-96.  Trailing

behind are claims made under the First Amendment.  Understanding

the specific nature of their desired relationship is critical to the analysis

of each claim.  Here, the Colliers contend that they have a "fundamental

right" to secure multiple state-issued marriage licenses.  *N. Collier Dep.*

at 86:13-25; Ct. Doc. 43, ¶¶ 44, 45.

These types of cases begin with an examination of American

history, legal traditions and practices. *Washington v. Glucksberg,*

521 U.S. 702, 710 (1997).  "The freedom to marry has long been

recognized as one of the vital personal rights essential to the orderly

pursuit of happiness by free men," being "fundamental to our very

existence and survival."  *Loving v. Virginia,* 388 U.S. 1, 12 (1967).  The

Colliers seek to expand that fundamental right into the right to marry

as many times as consenting adults desire, simultaneously.  American

legal history shows that this "right" does not exist in American law.

A substantive due process analysis has two primary features:

first, the Due Process Clause specially protects those fundamental

rights and liberties which are, objectively, "deeply rooted in this

Nation's history and tradition" and "implicit in the concept of ordered

liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Glucksberg* at 720-21 (internal citations omitted).  Second, a "careful description" of the asserted fundamental liberty interest is required.  *Id.*  This is the Colliers' burden.

In *Brown v. Buhman,* 947 F.Supp.2d 1170, 1194 (C.D. Utah 2013), involving polygamy, the court analyzed the second prong first in order to narrow the inquiry.  A plaintiff asserting a substantive due process right must both (1) carefully describe the right and its scope; and (2) show how the right as described fits within the Constitution's notions of ordered liberty.  *Id.*  Only if the narrowly asserted right qualifies as "fundamental" based upon this two-pronged analysis would "heightened scrutiny" of the state's interference would be appropriate. *Id.,* following *Glucksberg,* 521 U.S. at 721.  If the asserted right does not qualify as "fundamental," a "rational basis review" applies.  *Brown v. Buhman,* 947 F.Supp.2d at 1194, citing *Reno v. Flores,* 507 U.S. 292, 305 (1993).  Because the Colliers' claimed "fundamental liberty" of multiple marriage licenses does not exist, the bigamy statutes are subject to rational basis review.

Rational basis review is a "paradigm of judicial restraint," *FCC v. Beach Communications*, 508 U.S. 307, 313-14 (1993).  Drawing lines that create distinctions is peculiarly a legislative task.  *Massachusetts Bd. Of Retirement v. Murgia*, 427 U.S. 307, 314 (1976).  When reviewing either a due process or equal protection claim, in the absence of a fundamental right a statutory classification must be upheld if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification.  *See Shaw v. Oregon Public Employees' Retirement Bd.* 887 F.2d 947, 948-9 (9th Cir. 1989) (due process), and *Aleman v. Glickman,* 217 F.3d 1191, 1200-01 (9th Cir. 2000) (equal protection).  The State has no obligation to produce evidence to sustain the rationality of a statutory classification; rather, the challenger must negate every conceivable basis which might support it.  *Aleman,* 217 F.3d at 1201.[10]  Conversely, a court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the challenged provision.  *Shaw,* 887 F.2d at 948.

---

[10] The "classification" that might apply is that of an adult "competent" to marry, considering Mont. Code Ann. § 40-1-401(1). However, the Colliers do not challenge that classification or any component of the Marriage Act.

Because "marriage has always been, in our federal system, the predominant concern of state government . . . rational-basis review must be particularly deferential." *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006). As history reveals, whether termed "bigamy" or "polygamy," state recognition of the issuance of more than one marriage license to one person (in this instance, Nathan) would undermine the basic protections of marriage and family that have been recognized in civilized society for hundreds of years.

It follows that the Colliers' procedural due process allegations also fail. Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment. *Matthews v. Eldridge,* 424 U.S. 319, 332 (1976). As explained above, there very clearly is no such thing as a fundamental liberty interest in state-recognized polygamous marriage. Therefore, Yellowstone County (and through it, the State) acted appropriately when it denied Nathan and Christine's application for Nathan's second marriage license.

The Colliers have produced neither evidence nor argument capable of sustaining their challenge of the Montana bigamy statutes on equal protection and/or due process grounds.  There simply is no "fundamental right" to practice polygamy by securing multiple marriage licenses.  *Brown,* 947 F. Supp. 2d at 1195.   Since the fundamental liberty interest claimed does not exist, this Court should grant the Defendants summary judgment and dismiss the entire complaint.

> ### 3. The Montana bigamy and marriage laws are facially and operationally neutral: all claims.

Montana Code Annotated, §§ 45-5-611 and 45-5-612 are both facially and operationally neutral.  The Colliers have not, and cannot, produce any evidence which demonstrates official discrimination, or that, in practice, these statutes discriminate against any particular protected group.  The Montana bigamy statutes have absolutely nothing to do with religion, race, or any other classification.  Likewise, Montana's *marriage* laws are facially and operationally neutral.  All citizens are subject to the same definition of marriage (now regardless of sexual orientation), and there is no prohibition on the ability of two people to marry beyond those stated in Mont. Code Ann. § 40-1-401(1).

The Colliers consider the Montana "bigamy" statutes to be "anti-polygamy" statutes, and their own version of "bigamy" to be limited to multiple marriage licenses between consenting adults—a legalized form of polygamy.  While "polygamy" is found nowhere in Montana statutes, the "bigamy" that the Colliers seek to legalize is defined and prohibited within the Montana criminal code, for good reason as explained above. But challenging two criminal statutes to gain the right to a "legitimate" second marriage license avoids the only relevant analysis in this case.

Montana describes marriage as a personal relationship between two people.  Mont. Code Ann. § 40-1-103.  And, a marriage may be contracted "only as provided by the law of this state."  *Id.*[11]  Also, while partially enjoined on other grounds by *Rolando v. Fox,* 23 F. Supp. 3d 1227 (D. Mont. 2014), Montana Constitution, Article XIII, section 7 still recognizes marriage only as between two people.

---

[11] See also Mont. Code Ann. § 40-1-107 marriage license requirements; § 40-1-201(3) marriage license for "both parties;" § 40-1-311(2)(c) "both parties;" § 40-1-401(1) "prohibited marriages" all involving two people; § 40-1-404 "putative spouse; and the entirety of Mont. Code Ann. Ch. 40, Title 2 "Husband and Wife."

The Colliers' crusade to gain a right of polygamy in Montana is being waged against the wrong set of statutes.  While the criminal code, including bigamy provisions, is enacted to "forbid and prevent conduct that unjustifiably and inexcusably inflicts or threatens harm to individual or public interests," (Mont. Code Ann. § 45-1-102(a)), the civil code defining, allowing and regulating marriage contains the relevant statutes.  Even if the Colliers were successful in enjoining the bigamy statutes, an entire Title of the Montana Code Annotated would require corresponding amendment.  That effort is best left to the Montana Legislature.[12]

### 4.    Establishment and free exercise claims: First and Third Causes of Action.

The United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  This clause applies not only to official acceptance of a particular religion or religious belief, but also to official disapproval or hostility towards religion.  *Am. Family*

---

[12] The Colliers have not approached any member of the Montana Legislature about their concerns.  *N. Collier Dep.* at 55:16-56:25, 57:1-5; *C. Collier Dep.* at 39:17-40:1.

*Ass'n. v. City & County of San Francisco,* 277 F.3d 1114, 1121-22

(9th Cir. 2002).

To survive an Establishment Clause claim, the challenged statute

must first have a secular legislative purpose; second, its principal or

primary effect must be one that neither advances nor inhibits religion;

and finally, the statute must not foster an excessive government

entanglement with religion.  *Agostino,* 521 U.S. at 218 (citing *Lemon v.*

*Kurtzman*, 403 U.S. 602, 612-13 (1971)).  The secular policy against

bigamy is explained at sections D.1 and 2 above.  Montana bigamy

statutes target neither any particular religion nor religious practices,

nor do they inhibit the practice of any religion.  In fact, bigamy statutes

protect Montanans *regardless* of religion.  The Colliers cannot produce

any evidence that demonstrates otherwise.

Regarding the First Cause of Action, only beliefs rooted in

religion are protected by the Free Exercise Clause, which, by its terms,

gives special protection to the exercise of religion.  *Thomas v. Review*

*Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 713 (1981).  At a

minimum, Free Exercise Clause protections apply if the law at issue

discriminates against some or all religious beliefs, or if the law

regulates or prohibits conduct because it is undertaken for religious reasons. *Church of Lukumi Babalu Aye v. Hialeah,* 508 U.S. 520, 532 (1993). Neither situation is present here. The Montana bigamy statutes are silent regarding religion and do not in effect target a religious practice. Bigamy statutes target fraud. Public policy against polygamy strives to protect women, children and families. As applied, Nathan Collier admits that their pursuit of multiple marriage licenses is not religiously driven. DSOF #7, 15. Facially, the Colliers have no argument that could convince this Court that bigamy statutes are invalid in every situation.

The Colliers' "proof" is simply a personal desire for multiple marriage licenses,[13] but apparently only for Nathan. Regardless:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is "compelling"—permitting him, by virtue of his

_____

[13] According to Vicki Collier, the benefits of an additional marriage license for Nathan and Christine are all financial. *V. Collier Dep.* at 36:23-38:22, 39:21-40:3. See also *C. Collier Dep.* at 73:16-18, 73:21-74:13.

beliefs, 'to become a law unto himself,' *Reynolds v. United States,* 98 U.S. at 167—contradicts both constitutional tradition and common sense.

*Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 885 (1990) (internal citation omitted).  Applying *Smith,* neutral laws criminalizing bigamy—Mont. Code Ann. §§ 45-5-611 and 45-5-612—override a claim that such law places an improper limitation on the free exercise of religion, even if the Colliers were attempting to practice a religious tenet important to them.  Of course, they have admitted that they are not.

That said, the exercise of polygamy as a religious tenet has long been recognized as beyond the reach of Free Exercise protection.  *See Reynolds,* 98 U.S. at166 (upholding polygamy ban despite the fact that it was practiced primarily by Mormons).  A rationally based, neutral law of general applicability does not violate the right to free exercise of religion even though the law incidentally burdens a particular religious belief or practice.  *Miller v. Reed,* 176 F.3d 1202, 1206 (9th Cir. 1999). *See also Welch v. Brown,* 2016 U.S. App. LEXIS 17867 at *14 (9th Cir. 2016), relying on *Reynolds* when denying a Free Exercise claim regarding the right to specific counseling.

To defeat the Montana bigamy statutes on religious grounds, the Colliers would have to prove that those statutes are *facially* unconstitutional.  On summary judgment the Colliers are required to submit relevant evidence and arguments that might support those blanket complaints.  Remarkably, Nathan Collier admittedly considers the polygamy widely practiced by religious fundamentalists to be "perverse."  *N. Collier Dep.* at 88:4-89:20.  He recognizes the very dangers that support bigamy laws.  DSOF #14.

### 5.    Freedom of speech and freedom of association:  Fourth and Sixth claims.

The Colliers Fourth and Sixth Causes of Action claim an unequal treatment of polygamous marriage (Doc. 43 at ¶¶ 80 and 98), violating their First Amendment rights of free speech and association, respectively.  Both claims appear to hinge on Nathan's and Christine's desire to represent themselves as "married."  The speech claim also contends that "purports" is vague, which is addressed in *State v. Holm,* 2006 UT 31 ¶ 138 n. 4 (Durham, C.J., dissenting) and adopted in *Brown,* 947 F.Supp. at 1233-34.  See Section C, *supra.*

The Free Speech claim fails since the bigamy laws are content neutral, are not specific to polygamy, do not depend on religion and do not sanction or threaten to sanction the Colliers' present cohabitation. *Am. Family Ass'n. v. City & County of San Francisco,* 277 F.3d at 1125. While dissemination or discussion of religious views and doctrines is protected by the First Amendment, *Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640, 647 (1981), there is no evidence of the Colliers being prevented from discussing any religion or religious practice with whomever they choose.  To the contrary, Nathan converses "daily" within a polygamist community (*N. Collier Dep.* at 44:10-13) and they have appeared on numerous reality television and news programs, as well as Facebook and Twitter and through interviews, promoting their views.  *C. Collier Dep.* at 31:6-7, 94:4-8, 93:8-22. [14]  The State has done nothing to block the Colliers from those activities.

---

[14] See https://www.facebook.com/plyglife.  *See also Risken Decl. Re Summ. J.,* Ex. 8, 9 and 10.

Case 1:15-cv-00083-SPW   Document 68   Filed 06/01/17   Page 41 of 43

It appears that the only "speech" that is being prevented is Nathan's and Christine's ability to represent themselves as "lawfully" married.  Yet fraud is unprotected speech.  *Illinois ex rel. Madigan v. Telemarketing Assocs.,* 538 U.S. 600, 612 (2003).  Nathan and Christine have no right to misrepresent their marital status.  The bigamy laws do not stand in that path.  Rather, since Nathan is already married to Vicki, the Montana Marriage Act renders him incompetent to marry again while the marriage to Vicki remains intact.  The Colliers have not challenged those statutes.

The Freedom of Association claim fails for the same reasons. While certain intimate human relationships "must be secured against undue intrusion by the State," protection is triggered when a "fundamental element of personal liberty" is involved.  *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).  As already demonstrated, the Colliers do not have a fundamental liberty interest in multiple simultaneous marriage licenses.

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**Page 33**

## IV.  CONCLUSION

Based upon the foregoing arguments and authorities, and the record in this case, the Defendants' summary judgment motion should be granted.

Respectfully submitted this 1st day of June, 2017.

TIMOTHY C. FOX
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

By:  ___/s/  Patrick M. Risken_____
PATRICK M. RISKEN
COUNSEL FOR DEFENDANTS
ATTORNEY GENERAL AND GOVERNOR

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing

document with the clerk of the court for the United States District Court for the

District of Montana, using cm/ecf system.

Participants in the case who are registered cm/ecf users will be served by the

cm/ecf system.

Dated:  __June 1, 2017__                  */s/ Patrick M. Risken*
                                          Patrick M. Risken


## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 11 of the Montana Rules of Appellate Procedure,

I certify that this principal brief is printed with a proportionately

spaced Century Schoolbook text typeface of 14 points; is double-spaced

except for footnotes and for quoted and indented material; and the word

count calculated by Microsoft Word for Windows is 6,215 words,

excluding certificate of service and certificate of compliance.


   */s/ Patrick M. Risken*
   PATRICK M. RISKEN
   COUNSEL FOR DEFENDANTS
   ATTORNEY GENERAL AND GOVERNOR