Elinor Swanson, Esq.
WARREN & SWANSON, PLLC
490 North 31st Street, Suite 101
Billings, Montana 59101
Phone: (406) 294-2300
Fax: (406) 655-4905
Email: eswanson@warrenswanson.com

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| CHRISTINE COLLIER, *et al*,<br><br>Plaintiffs,<br>v.<br><br>TIM FOX, *et al*,<br><br>Defendants. | Cause No. CV-15-83-SPW-TJC<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.     INTRODUCTION

In this case, Plaintiffs seek judicial protection of their well-established, Constitutionally-protected fundamental rights, including the right to marriage, to liberty, to life, to privacy, to property, to parent their children, and to freedom of expression. Montana's civil and criminal anti-polygamy laws unConstitutionally infringe those fundamental rights, and further violate the First and Fourteenth

Amendments in myriad ways. Due to Plaintiffs' past and ongoing violation of, Defendants' enforcement and threatened enforcement of, and Plaintiffs' objective and reasonable fear of future enforcement of Montana's criminal anti-polygamy laws, Plaintiffs have standing to challenge those laws. Montana's anti-polygamy laws are entirely unConstitutional and unsalvageable by judicial construction. Although Montana's anti-polygamy laws must be subjected to strict scrutiny analysis, they are unjustifiable by any form of Constitutional analysis.

## II.   ARGUMENT

A.   Plaintiffs Have Standing to Challenge unConstitutional Criminal Anti-Polygamy Laws

A person commits the criminal offense of polygamy[1] in Montana if, while married, the person knowingly (a) "contracts" or (b) "purports to contract" another marriage. MCA § 45-5-611. A person commits the offense of marrying a polygamist in Montana if that person (a) "contracts" or (b) "purports to contract" a

---

[1] For purposes of this lawsuit, polygamy and bigamy are interchangeable. <u>Deputy Yellowstone County Attorney Kevin Gillen's Letter to Christine and Nathan Collier</u>, Dkt. 22-1 ("polygamy and bigamy are used interchangeably throughout Montana law"; "the law of the State of Montana is that bigamy and polygamy are illegal"); <u>Defendants' Memo in Support of MSJ</u>, at 18 (asserting that the assessment of "polygamy" in <u>Reynolds v. U.S.</u>, 98 U.S. 145 (1879) controls interpretation of Montana's criminal anti-bigamy laws); <u>C. Collier Dep.</u>, at 18:12-14 ("there is no distinguishing between bigamy and polygamy under current Montana state statute"). Linguistically, based on the word roots, polygamy means multiple simultaneous marriages, whereas bigamy means two simultaneous marriages.

marriage with another knowing that the other is committing polygamy. MCA § 45-5-612.

Defendants contend that, pursuant to Montana's criminal anti-polygamy statutes, parties to a private marriage contract who publicly proclaim that they are married have nonetheless neither contracted nor purported to have contracted a marriage, unless they have also officially entered the marriage by obtaining multiple marriage licenses. Deputy Yellowstone County Attorney Kevin Gillen's Letter to Christine and Nathan Collier, Dkt. 22-1, at 1 ("as long as you are legally married . . . [you] can [not] knowingly enter into a marriage to a third party"); Defendants' Memo in Support of MSJ, at 12 ("bigamy laws involve multiple marriage licenses"), 13 ("'[P]urports' means that the parties secure a second *although void* marriage license and treat it and the second marriage as valid."). In Defendants' view, since Plaintiffs do not have multiple marriage licenses, they are not violating Montana's criminal anti-polygamy laws, and cannot reasonably fear future enforcement.

Montana court construction controls construction of Montana's anti-polygamy laws. "It is axiomatic that state courts are the final arbiters of state law." U.S. v. DeGasso, 369 F.3d 1139, 1145 (10th Cir. 2004), citing Mullaney v. Wilbur, 421 U.S. 684 (1975).

Generously interpreted, Defendants contend Montana's courts would

narrowly construe Montana's criminal anti-polygamy statutes as only penalizing persons who have entered, or purported to enter, a marriage by improperly obtaining, or purporting to have properly obtained, governmental/legal recognition of their marital status, despite knowing that one or both of the parties is currently married. For the reasons outlined below, there is no reason to believe Montana's courts would narrowly construe Montana's criminal anti-polygamy laws in that manner. Such narrowing construction would not, in any case, remedy the Constitutional infirmity.

There are no Montana cases interpreting the criminal anti-polygamy laws. That said, Montana's civil marriage laws, the legislative commentary, the contextual history, other courts' analysis, the plain meaning of the statutory text, and rational logic all point to the same conclusion: Montana's criminal anti-polygamy statutes penalize contracting, or purporting to contract, a private marital relationship of the sort that would be valid pursuant to Montana's common law, but-for the fact that one or both parties to the marriage contract are married. Although the parties to such a void private contract of polygamous marriage may improperly obtain legal marital status, or purport to have such legal marital status, that evidence is likely sufficient, but is not necessary, to violate Montana criminal anti-polygamy laws.

First and foremost, unlike in Utah, Montana civil marriage laws recognize

the existence of common law marriage prior to, separate from, and in the absence of any formal government recognition of legal marital status. In Montana, persons can contract a valid common law marriage by mutual consent if: "(1) the parties were competent to enter into a marriage; (2) the parties assumed a marital relationship by mutual consent and agreement; and (3) the parties confirmed their marriage by cohabitation and public repute." In Re Estate of Ober, 62 P.3d 1114, ¶9 (Mont. 2003), citing MCA § 40-1-403. Montana thus recognizes the existence of a marriage contract, whether monogamous or polygamous in nature, even if the parties to the marriage have not obtained a marriage license or other government-recognized, formally-established legal marital status. Id. In addition, in Montana, when parties purport to be married "by cohabitation and public repute," that constitutes evidence that the parties have, in fact, contracted a marriage. Id.

Montana's civil marriage laws also recognize a distinction between entering a polygamous marriage, for example by way of improperly obtaining a marriage license, MCA § 40-1-401(1)(a) ("a marriage entered into prior to the dissolution of an earlier marriage of one of the parties" is "prohibited"), and contracting a private marital agreement intended to achieve the benefits and obligations of entering into a polygamous marriage, MCA § 40-1-401(4) ("A contractual relationship entered into for the purpose of achieving a civil relationship that is prohibited under subsection (1) is void as against public policy").

Second, the legislative commentary accompanying the statutory language of Montana criminal anti-polygamy laws also indicates that such laws penalize marriages which, but-for civil and criminal anti-polygamy laws, would otherwise be valid common law marriages. In 1895, for purposes of the criminal anti-polygamy laws, a "marriage" could be disproven by evidence that the solemnization ceremony was not performed by a *bona fide* minister or clergyman. Complete Codes and Stat. of Mont., vol. II, ch. IV. § 490 (July 1, 1895), <u>citing</u> <u>Hayes v. People</u>, 25 N.Y. 390 (1862), and associated legislative commentary. In 1908, for purposes of the criminal anti-polygamy laws, evidence that a person was generally reputed to be married was admissible as tending to show actual marriage. Rev. Codes of Mont. of 1907, vol. IV, ch. IV. §§ 8353-8356, at 591-591 (Compiled by E.C. Day, Comm., 1908), <u>citing</u> <u>People v. Beevers</u>, 99 Cal. 288 [*sic*], 33 Pac. S44 (1893), and associated legislative commentary.

Third, Montana legislators drafted criminal anti-polygamy laws intending to cast a broad net, criminalizing the indicia of a polygamous marriage to the extent possible, because the private conduct pertaining to such marriages could be difficult to prove. Montana enacted criminal anti-polygamy laws because of, and in the context of, a nation-wide anti-Mormon and anti-Mormon polygamy sentiment, motivated by improper religious and racial animus. <u>Plaintiffs' Statement of</u> <u>Undisputed Facts</u>, Dkt. 76, at ¶¶17-93 (circumstantial evidence that Montana

legislators enacted anti-polygamy laws in the context of, and because of, nation-wide religious and racial animus towards polygamy); Plaintiffs' Statement of Disputed Facts, at 5-8 (direct evidence that Montana legislators shared, and were influenced by, nation-wide religious and racial animus towards polygamy).

Polygamy was not criminalized because it was violent, abusive, or fraudulent, but because it was viewed as being immoral pursuant to Christian religious doctrine, and as being uncivilized, which was code for non-white. Id. Prejudice is not valid precedent, and cases based on improper religious and/or racial animus are no longer good law. See, e.g., Romer v. Evans, 517 U.S. 620, 634 (1996) ("To the extent Davis [v. Beason, 133 U.S. 333 (1890)] held that persons advocating a certain practice may be denied the right to vote, it is no longer good law."; "*To the extent it held that* the groups designated in the statute [i.e., Mormons and *polygamists] may be deprived of the [fundamental] right* to vote *because of their status, its ruling could not stand without surviving strict scrutiny, a most doubtful outcome.*") (emphasis added).

Laws criminalizing polygamy were, and are, intimately tied to other, now-overruled, antiquated laws criminalizing similarly private, consensual adult sexual conduct, such as unmarried cohabitation, fornication, and sodomy. Supra, at 6-7; Brown v. Buhman, 947 F.Supp.2d 1170, 1181-82 (2013) (acknowledging the changed landscape of Constitutional law relating to personal choices), vacated by

Brown v. Buhman, 822 F.3d 1151 (10th Cir. 2016).

At the time Montana enacted criminal anti-polygamy laws, legislators were scrambling to rewrite polygamy statutes to ensure that parties to private polygamous marriage contracts could not escape criminal penalties. Id.; Cannon v. United States, 116 U.S. 55, 75) (cohabitation included in polygamy statute as an indicia of marriage because direct evidence of marriage was difficult to obtain); Murphy v. Ramsey, 114 U.S. 15, 41 (1885) (construing polygamous marriage as the "status" of having "more than one woman whom he recognizes as a wife,—of whose children he is the acknowledged father, and whom, with their children, he maintains as a family," even in the absence of licensure or cohabitation). Montana's criminal anti-polygamy laws reflect that legislative motivation and purpose.

Fourth, other courts' analysis of anti-polygamy provisions indicate violations can occur without actual or purported governmental recognition of marital status. Id.; State v. Holm, 137 P.3d 726, 733-36 (2006) (violation of a "purport to marry" prong of criminal anti-polygamy law can occur without a marriage license or other purportedly valid, legal marital status).

Fifth, the plain meaning of the text indicates that persons need only privately "contract," or "purport to contract," a polygamous marriage in order to violate Montana criminal anti-polygamy laws. To "purport" means "[t]o profess or claim, esp. falsely; to seem to be[.]" Black's Law Dictionary 1431 (10th ed. 2014). A

"marriage contract", "[a]lso termed *contract of marriage*", is "[a] form of mutual consent required for a matrimonial relationship to exist according to the law of the place where the consent takes place." Black's Law Dictionary 395 (10th ed. 2014). A "plural marriage" is "[a] *marriage* in which one spouse is already married to someone else; a bigamous or polygamous union[.]" Id., at 1119. The dictionary defines "marry" as "to join in marriage according to law *or* custom," or "to unite in close and permanent relation." Merriam-Webster's Collegiate Dictionary 761 (11th ed. 2003) (emphasis added). Parties may thus mutually contract a private polygamous marriage, or claim to contract such a marriage, even though it may be void and criminal in nature, and without any government-recognized, legal marital status. There is no indication in the criminal anti-polygamy statutory language that parties who contract a private polygamous marriage, or who purport to so contract, must improperly obtain some form of government-recognized legal status, or purport to have obtained such status, in order to violate those laws.

Sixth, it makes no logical, rational sense to permit private polygamous marriage contracts, criminalizing such conduct only when it occurs in conjunction with a marriage license or some other form of government-recognized marital status. That interpretation is by nature somewhat circular, requiring government recognition of a marriage which, by definition, cannot validly obtain such recognition. In practice, people purport to be married, and rarely, if ever, purport to

have a marriage license or legal recognition of the marriage. Defendants and Defendants' proposed expert witness assert that various harms are associated with the "practice" of polygamy, providing a rational secular basis for criminalizing polygamy. Yet, the harms purportedly associated with polygamous practices would not be deterred by Defendants' interpretation of Montana's criminal anti-polygamy laws.

Plaintiffs Christine and Nathan Collier repeatedly admit they violate Montana's criminal anti-polygamy laws, despite fear of criminal repercussions. Plaintiffs Christine and Nathan Collier have asserted that they are competent adults of sound mind capable of consent. They contend they have privately contracted a polygamous marriage by mutual consent and agreement, and they purport to having contracted such a marriage. Plaintiffs Christine and Nathan Collier solemnized their marriage not once, but twice, the second time with a renewal of vows that was specifically polygamous in nature, as first wife Plaintiff Vicki Collier was included in the ceremony. They cohabit. They publicly purport to be married, without any disclaimer relating to lack of legal status, and, in some cases, where legal status would reasonably be presumed (although without any element of fraud or other harm). They are married by public repute.

Plaintiffs Christine and Nathan Collier admit to contracting, and to purporting to contract, a polygamous marriage. There is ample evidence that they

formed a polygamous marriage contract, even though it is legally void and unenforceable pursuant to civil law, subject to criminal penalties pursuant to criminal law, and subject to myriad forms of unequal legal treatment and deprivation of civil rights and liberties pursuant to both civil and criminal anti-polygamy laws. When private persons enter a contractual agreement of a criminal nature, such contracts, despite being void, are nonetheless punishable pursuant to criminal laws. For example, a criminal "conspiracy" entails a void contract to engage in criminal conduct. Black's Law Dictionary 375 (10th ed. 2014).

In conclusion, Plaintiffs have standing to challenge Montana's unConstitutional criminal anti-polygamy laws, due to Plaintiffs' past and ongoing violation of, Defendants' enforcement and threatened enforcement of, and Plaintiffs' objective and reasonable fear of future enforcement of those laws.

B.     Montana's Criminal Anti-Polygamy Statutes are Not Readily Susceptible to a Narrowing Construction

As described herein, even assuming arguendo that Defendants' narrowing construction of Montana's criminal anti-polygamy laws is correct, adopting that construction would be improper and unConstitutional.

Montana's criminal anti-polygamy statutes currently target harmless and Constitutionally-protected conduct, without also targeting any *particular* type(s) of harm. To improperly obtain legal marital status, or to purport that a void marriage

is legally valid, are, in and of themselves, harmless. Unless there is some additional element of fraud, defamation, or perjury, even lies are Constitutionally protected and the government must pass a strict scrutiny standard. Black's Law Dictionary 775 (10th ed. 2014)(the definition of "fraud" requires both a "misrepresentation" *and* that the misrepresentation is made "to induce another to act"); U.S. v. Alvarez, 132 S.Ct. 2537 (2012) (in the absence of defamation, perjury, or fraud, the government must meet strict scrutiny standards in order to criminalize certain false statements). Montana's criminal anti-polygamy statutes do not in any discernable way target violence, lack of consent, fraud, defamation, perjury, and/or any other type(s) of harm. As there is no discernable indication of which, if any, such harm(s) the statutes may be narrowly construed to target, the statutes are thus not readily susceptible to any narrowing construction. It is the role of Montana's legislature, not the federal judiciary, to determine which particular type(s) of harm purportedly associated with polygamy to criminalize.

In addition, because the civil anti-polygamy laws rendering polygamous marriages void are unConstitutional, so are any criminal laws defined by the impropriety of having, or claiming to have, legal marital status.

C.    Montana's Civil and Criminal Anti-Polygamy Laws Violate Well-Established Fundamental Rights

The Constitutionally-protected fundamental right to marry reflects the

fundamental right of competent, consenting adults to choose one another as life

partners and to become a loving family, with all of the private, home-centered,

spiritual/religious, and highly Constitutionally-protected conduct such words often

entail, also pursuant to individual choice: to have a spiritual/religious

solemnization ceremony; to cohabitate; to intermingle finances; to raise children

together; to take care of one another for better or worse and in sickness and health;

to engage in a voluntary sexual relationship; and/or to describe one another using

familial and/or marital terms; and/or to exchange contractual promises of a

profoundly spiritual/religious nature, in relation to some or all of the

aforementioned conduct. None of the above is rightfully within the purview of any

governmental legislature, given that the requirement of competency and consent

eliminates the possibility of violence or fraud; in the alternative, any legislative

infringement of such marital conduct must pass a strict scrutiny analysis.

   When competent, consenting interracial adults contested the

Constitutionality of laws prohibiting interracial marriage, local governments

similarly tried to portray those persons as seeking a new, fundamental right to

interracial marriage. Naim v. Naim, 197 Va. 80, 83-85 (1955), remanded 350 U.S.

891, affd. 197 Va. 734, app. dism. 350 U.S. 985, (holding that anti-miscegenation

statutes were Constitutional, and citing various cases motivated by blatant,

improper religious and racial bias such as Reynolds, 98 U.S. 145, Pace v. Alabama,

106 U.S. 583 (1883), which upheld the criminalization of interracial adultery or fornication, Plessy v. Ferguson, 163 U.S. 537 (1896), and State v. Gibson, 36 Ind. 389 (1871), upholding anti-miscegenation statutes because of the nature of marriage as "a public institution established by God . . . in all Christian and civilized nations"; the Naim Court pointed out that more than one-half of the states then had anti-miscegenation statutes and that, in spite of numerous attacks in state and federal courts, and no court save one had held such statutes unconstitutional), overruled by Loving v. Virginia, 388 U.S. 1, 7-8 (1967) (wherein the State argued that anti-miscegenation statutes applied equally to "whites and Negroes" because "members of each race" were "punished to the same degree").

The Supreme Court properly held, however, that competent, consenting, interracial adults simply sought judicial protection from laws that, by declaring interracial marriage contracts void, unConstitutionally deprived them of the fundamental right to marriage. Loving, 388 U.S., at 9 (mere equal application inadequate to justify the racial discrimination), 11-12 (the racial classification violated the Equal Protection Clause), 12 (the deprivation of the right to marry violated the Due Process Clause).

Similarly, when competent, consenting same-sex adults contested the Constitutionality of laws prohibiting same-sex marriage, local governments again tried to portray those persons as seeking a new, fundamental right to same-sex

marriage. <u>Baker v. Nelson</u>, 291 Minn. 310, 312, 315 (1971) (upholding laws prohibiting same-sex marriage because there was no fundamental "right to marry without regard to the sex of the parties"), <u>app. dism.</u> 409 U.S. 810 (1972) (no substantial federal question). Instead, the Supreme Court properly held that competent, consenting, same-sex adults simply sought judicial protection from laws that, by declaring same-sex marriage contracts void, unConstitutionally deprived them of the fundamental right to marriage. <u>Obergefell v. Hodges</u>, 135 S.Ct. (2015).

Meanwhile, various court decisions, including decisions by the Supreme Court, cast considerable doubt on the continuing vitality of any and all precedent upholding laws that criminalize polygamous marriage or deny the fundamental right to marry to polygamists. <u>Supra</u>; <u>Doe v. Duling</u>, 782 F.2d 1201 (4th Cir. 1986 (laws that criminalize noncommercial, private sexual relationships between consenting adults, such as fornication and cohabitation laws, are either no longer enforced or have been held unConstitutional); <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003) (holding that laws criminalizing noncommercial, private sexual relationships between consenting adults, such as criminal anti-sodomy laws, are unConstitutional); <u>Romer</u>, 517 U.S., at 634 (see excerpted language, <u>supra</u>, at 7). <u>See also</u> <u>Plaintiffs' Brief in Support of MSJ</u>.

The above-described pattern, which closely parallels the arguments made by

the parties in this case, makes clear that the fundamental right to marriage attaches to all competent, consenting adults, including polygamists. Even prisoners, if competent and consenting, may not be denied the fundamental right to marriage. Turner v. Safley, 482 U.S. 78 (1987). So long as interracial, same-sex, or polygamous adults are, in fact, mentally competent, and do, in fact, voluntarily consent, their fundamental right to marry therefore may not be infringed, or, in the alternative, may not be infringed unless subjected to a strict scrutiny analysis. Legislatures that deprive any category of otherwise-competent, consenting adults of the Constitutionally protected fundamental right to contract marriage should not expect to easily excuse away such deprivation.

Defendants employ the same, failed tactics used by local governments to defend laws prohibiting interracial and same-sex marriages. Defendants erroneously claim, for example, that "[a]ll citizens are subject to the same definition of marriage[.]" Defendants' Memo in Support of MSJ, Dkt. 68, at 25. In addition, Defendants erroneously claim that Plaintiffs seek a novel, fundamental right to multiple marriage licenses. Id., at 20-22, 24-25. These tactics blatantly ignore the fact that competent, consenting polygamous adults are denied the fundamental right to marry (and subjected to criminal penalties) pursuant to laws that categorically render only polygamous marriages void (and criminal), just as interracial and same-sex adults were denied the fundamental right to marry

pursuant to laws that categorically prohibited interracial and same-sex marriages, respectively, in the cases above. Defendants' arguments are particularly unconvincing given that their portrayal of Plaintiff Christine Collier's legal interests is clearly inaccurate – she seeks one, not multiple, marriage licenses. As these arguments failed in relation to interracial and same-sex marriage prohibitions, so must they also fail in relation to polygamous marriage prohibitions.

Montana's anti-polygamy laws are particularly unjustifiable (and violate the Equal Protection Clause) when the treatment of peaceful, competent, consenting polygamists is compared to other, similarly-situated populations. Void marriage contracts involving underage minors (who lack both competency and consent due to such minority) are not criminalized, despite the near-certain probability such marriages entail statutory, and criminal, child rape. Adults with a proven history of violence, i.e., prisoners, nonetheless have a fundamental right to marriage. Yet marriage contracts between consenting and competent polygamous adults are criminalized, and such adults are denied the fundamental right to marry. In light of such irrational discrepancies discriminating between polygamists and other, similarly-situated groups (including those previously and elsewhere described), Defendants cannot justify civil or criminal anti-polygamy laws.

Beyond depriving Plaintiffs of their fundamental right to marriage,

Montana's civil and criminal anti-polygamy laws additionally infringe Plaintiffs' fundamental rights to liberty, to life, to privacy, to property, to parent their children, and to freedom of expression. Woods v. Nierstheimer, 328 U.S. 211, 216 (1946) (recognizing existence of fundamental rights to life and to liberty); Maracich v. Spears, 133 S. Ct. 2191 (2013) (to privacy); Matthews v.Eldridge, 424 U.S. 319, 332 (1976) (to life and to property); Troxel v. Granville, 530 U.S. 57, 67 (2000) (to parent); Nunez by Nunez v. City of San Diego, 114 F.3d 935, 950 (9th Cir. 1997) (to freedom of expression).

D.   Montana's Civil and Criminal Anti-Polygamy Laws Violate the First Amendment of the United States Constitution

As discussed at length elsewhere, Montana's civil and criminal anti-polygamy laws violate various clauses of the First Amendment, including the Free Exercise, Establishment, and Free Speech Clauses. Plaintiffs' Brief in Support of MSJ, Dkt. 75-1.

Defendants erroneously contend that such laws are rationally based, facially and operationally neutral, and general applicable. Defendants' Memo in Support of MSJ, Dkt. 68, at 25-27, 30. The laws classify and discriminate against polygamous persons, and do not merely incidentally burden the religious practice of polygamy, given that legislators were motivated by improper religious and racial animus. Infra. Any secular policies against the harms allegedly associated with polygamy,

if such policies exist, are not discernable from laws that universally prohibit polygamy due to improper religious and racial bias, without any mention or indication of such policies. Defendants cannot now invent secular policies from thin air, without any support in the statutory language, and in contradiction of known nonsecular and improper legislative intent.

In relation to Montana's criminal anti-polygamy laws, it is worth noting that the vast majority of case law cited by Defendants relate to civil, rather than criminal, laws; more robust Constitutional protections should, an often do, apply when citizens are threatened with imprisonment and fines rather than mere civil penalties. The "purports" clause of these criminal laws criminalize Constitutionally-protected expression, infra, not merely unprotected fraud, as Defendants claim. Further, the "purports" clauses do not criminalize that protected expression on a content-neutral basis, i.e., whenever any party to a void marriage "purports to contract" marriage; instead, such protected expression is criminalized only when it is expressed by polygamous persons and relates to marriages that are void due to their polygamous nature. Laws of that nature must pass strict scrutiny analysis. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 381, 386 (1992) (non-content-neutral prohibition of fighting words facially unConstitutional; "government may not regulate use [of otherwise unprotected speech] based on hostility—or favoritism—towards the underlying message").

### III.    CONCLUSION

There is no genuine dispute as to any material fact. Montana's civil and

criminal anti-polygamy laws are entirely unConstitutional and unsalvageable by

judicial construction, and Plaintiffs have standing to challenge the validity of those

laws. Plaintiffs therefore respectfully request the Court grant Plaintiffs' Motion for

Summary Judgment, Dkt. 75.

Dated this 22nd day of June, 2017.

Respectfully submitted,

WARREN & SWANSON, PLLC

By: /s/ Elinor Swanson_____
*Attorney for Plaintiffs*

### CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2) of the Local Rules of Procedure for the United

States District Court, for the District of Montana, the undersigned certifies that the

word count is 3999, excluding the caption and certificates of service and

compliance.

Dated this 22nd day of June, 2017.

WARREN & SWANSON, PLLC

By: /s/ Elinor Swanson_____
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

Plaintiffs hereby certify that on this 22nd day of June, 2017, a copy of the

foregoing was served upon the clerk of the court for the United States District

Court for the District of Montana and all counsel of record by the CM/ECF system,

and in addition upon the following counsel of record by electronic mail, as per

mutual party written agreement:

TIMOTHY C. FOX
Montana Attorney General
DALE  SCHOWENGERDT
Solicitor General
PATRICK M. RISKEN
MELISSA SCHLICHTING
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
*Attorney for Defendants Attorney General and Governor*

KEVIN GILLEN
MARK A. ENGLISH
Deputy Yellowstone County Attorneys
Yellowstone County Courthouse Room 701
P.O. Box 35025
Billings, MT 59107
(406) 256-2870
*Attorney for Defendants Yellowstone County*
*Attorney and Clerk of District Court*

WARREN & SWANSON, PLLC

By: /s/ Elinor Swanson
*Attorney for Plaintiffs*