IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHRISTINE COLLIER, also known as Christine Parkinson; VICTORIA "VICKI" COLLIER; and NATHAN COLLIER,<br><br>Plaintiffs,<br><br>v.<br><br>TIM FOX, in his official capacity as Attorney General of Montana; STEVE BULLOCK, in his official capacity as Governor of Montana; SCOTT TWITO, in his official capacity as Yellowstone County Attorney, and TERRY HALPIN in her official capacity as Clerk of the Yellowstone County District Court,<br><br>Defendants. | CV 15-83-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiffs Christine Collier, Vicki Collier, and Nathan Collier (the "Colliers") bring this action against Tim Fox, in his official capacity as Attorney General of Montana; Steve Bullock, in his official capacity as Governor of Montana; Scott Twito, in his official capacity as Yellowstone County Attorney, and Terry Halpin, in her official capacity as Clerk of the Yellowstone County

District Court.[1]  As outlined below, the Colliers allege several claims against the Defendants under the First and Fourteenth Amendments to the United States Constitution.  (Doc. 33.)

Now pending are the State Defendants' Motion for Summary Judgment (Doc. 67) ("Defendants' Motion"), in which the County Defendants join (Doc. 72), and the Colliers' Motion for Summary Judgment (Doc. 75) ("Colliers' Motion"). Having reviewed the motions, associated briefing and exhibits, and the applicable law, the Court makes the following findings and recommendations.

## I.    Pertinent Facts

The parties generally agree upon the following pertinent facts.  Nathan and Vicki[2] were legally married in Dillon, South Carolina, on April 26, 2000.  (Doc. 79 at ¶ 3.)  They have been married continuously since that date.  (Doc. 69 at ¶ 2.) Nathan also is in a committed romantic relationship with Christine, and they desire to legally marry.  (Doc. 79 at ¶ 1.)  Vicki and Christine are aware of Nathan's relationship with one another, and each consents to be married to Nathan simultaneously.  (*Id.*)  The Colliers have "committed to raise, support, nurture, and

---

[1] The Court will use the shorthand "State Defendants" when referring to defendants Fox and Bullock, "County Defendants" when referring to defendants Twito and Halpin, and "Defendants" when referring to all defendants collectively.

[2] To avoid confusion resulting from their shared last name, the Court will identify the plaintiffs by their first names when referring to them individually.

care for one another's children, including [Christine's] children from a prior marriage." (*Id*. at ¶ 4.) The Colliers have parented their eight children jointly for several years. (*Id*. at ¶ 5.) There is no evidence to suggest that either of Nathan's romantic relationships – with Vicki or with Christine – involves dishonesty, coercion, fraud, abuse, or violence. (*Id*. at ¶ 16.)

On June 30, 2015, Nathan and Christine went to the Yellowstone County Clerk of District Court Marriage License Division to apply for a marriage license; the application was denied. (*Id*. at ¶¶ 8-9.) The Yellowstone County Attorney's office subsequently sent a letter (the "Denial Letter" or "Letter") to the Colliers on July 14, 2015, formally denying the request for a marriage license. (Doc. 22-1.) The Denial Letter informed the Colliers that their request for a marriage license could not be granted because granting the license would place the Colliers in violation of Montana law, citing Mont. Code Ann. §§ 45-5-611 and 612. (*Id*.) Those statutes respectively criminalize entering into multiple marriages, and marrying a person knowing that the person is married to another. Though the Denial Letter identifies Mont. Code Ann. §§ 45-5-611 and 612 as statutes that criminalize bigamy, the Denial Letter does not threaten prosecution of the Colliers. (*Id*.)

The Colliers responded by bringing this action, challenging the validity of what they characterize as Montana's anti-polygamy statutes.

The Court will discuss additional facts below as necessary.

## II.    Parties' Arguments

### A.    Colliers' Claims and Requested Relief

The Colliers' Second Amended Complaint (Doc. 43) contains the following seven claims under the First and Fourteenth Amendments to the United States Constitution: (1) that Mont. Code Ann. §§ 45-5-611 and 612 violate the Free Exercise Clause of the First Amendment (Doc. 43 at ¶¶ 52-66); (2) that Mont. Code Ann. §§ 45-5-611 and 612 criminalize the exercise of fundamental liberty interests protected under the Due Process Clause of the Fourteenth Amendment (*Id*. at ¶¶ 67-74); (3) that "State anti-polygamy criminal statutes, and State unequal legal treatment of polygamous marriage," violate the Establishment Clause of the First Amendment (*Id*. at 75-78); (4) that "State anti-polygamy criminal statutes, and State unequal legal treatment of polygamous marriage," violate the Free Speech Clause of the First Amendment (*Id*. at ¶¶ 79-83); (5) that Mont. Code Ann. §§ 45-5-611 and 612 violate the Equal Protection Clause of the Fourteenth Amendment (*Id*. at ¶¶ 84-96); (6) that "State anti-polygamy laws, and State unequal legal treatment of polygamous marriage," violate the right of free association under the First Amendment (*Id*. at ¶¶ 97-99); and (7) that Defendants' enforcement of Mont. Code Ann. §§ 45-5-611 and 612, acting under color of State

law, deprives the Colliers of "numerous rights secured by the First and Fourteenth Amendment," in violation of 42 U.S.C. § 1983 (*Id.* at 100-101).

As relief for the foregoing claims, the Colliers request (1) an order finding that Mont. Code Ann. §§ 45-5-611 and 612 violate the First and Fourteenth Amendments, and 42 U.S.C. § 1983 (*Id.* at ¶ 102); (2) that the Court enjoin, both preliminarily and permanently, Defendants' enforcement and application of Mont. Code Ann. §§ 45-5-611 or 612 and applicable civil laws (*Id.* at ¶¶ 103-104); (3) that Defendants issue a marriage license to Christine and Nathan (*Id.* at ¶ 105); and (4) award the Colliers attorney fees and costs (*Id.* at ¶ 108).

## B.    The Parties' Motions

The Colliers have filed a motion for summary judgment, generally arguing that Montana's criminal and civil anti-polygamy statutes are unconstitutional and violate their First and Fourteenth Amendments rights.

The State responds that the constitutionality of state anti-polygamy statutes was established in *Reynolds v. U.S.*, 98 U.S. 145 (1878), which directly controls the outcome of this case. The State maintains that the Colliers have failed to establish either the Court's authority to disregard *Reynolds* or, assuming the Court has such authority, legal justification for doing so. (*Id.* at 7-14.) The County Defendants also oppose the Collier's motion for summary judgment, and similarly argue that Montana's anti-polygamy laws do not violate the United States

Constitution.

The State Defendants have also filed a Motion for Summary Judgment, arguing, *inter alia*, that the Colliers lack standing to challenge the anti-polygamy laws at issue. (Doc. 68 at 10-16.) In this regard, Defendants argue that the Colliers' claims are purely hypothetical, because the Colliers have never been threatened with any prosecution and their claims therefore are not ripe. The County Defendants have joined in the State Defendants' motion.

## III.  Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id*. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting

evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

"Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "It is well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. A summary judgment cannot be granted if a genuine issue as to any material fact exists." *U.S. v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 1978).

## IV.    Analysis

### A.    Standing

As outlined in the Court's previous Findings and Recommendations (Doc. 23), Federal courts are courts of limited jurisdiction. Article III, § 2 of the United States Constitution empowers them to hear only "cases" and "controversies." *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 407 (1972). "A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character[.]" *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937). As a result, federal courts lack the power to issue "an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241.

The case or controversy requirement of Article III of the United States Constitution limits federal court's subject matter jurisdiction by requiring that plaintiffs have standing and that claims be ripe for adjudication. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-1122 (9th Cir. 2010). Standing "addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication." *Id.* (citing Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.1, at 57 (5th ed.2007)). "Standing is a jurisdictional requirement, and a party invoking federal jurisdiction has the burden of establishing it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Further, standing is claim- and relief-specific, such that a plaintiff must establish Article III standing for each of her claims and for each form of relief sought." *In re Carrier IQ, Inc.*, 78 F.Supp.3d 1051, 1064-1065 (N.D. Cal. 2015) (quotations omitted) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

To establish standing, the Plaintiff must show three elements. First, the plaintiff must have "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural' or 'hypothetical'[.]" *Lujan*, 504 U.S. at 560 (internal citations omitted). Second, the plaintiffs must establish "a causal connection between the injury and the conduct complained of" by proving that their injury is fairly traceable to the challenged conduct of the defendant and not the result of an

independent action of a third party not before the court.  *Id.*  Third, the plaintiffs must show that their injury will likely be redressed by a favorable decision.  *Id.* at 561.

In their summary judgment motion, the State Defendants argue that the Colliers do not have standing to bring this action because they fail to show an "injury in fact."  (Doc. 68 at 11-15.)  They argue the Colliers have not shown a reasonable likelihood that the Defendants will enforce the bigamy statutes against them but rely only on the existence of the statutes alone.  (*Id*. at 13.)  Defendants also argue that the Colliers' claims are not ripe because they have never been threatened with prosecution.  (*Id*. at 15-16.)  As Defendants put it, "the Colliers admit that they have never been threatened with enforcement of the bigamy laws and rightfully so, since they are not violated them."  (*Id*. at 16.)

Before addressing the standing issue with respect to Nathan and Christine, the Court will dispense with the claims brought on behalf of Vicki.  The Colliers do not identify any manner in which Vicki has suffered or could suffer an injury in fact based on any of Montana's anti-polygamy laws.  She and Nathan are legally married and have been married at all times material to this case.  There is no evidence to suggest that Vicki is attempting to marry another person while she is married (Mont. Code Ann. § 45-5-611), or attempting to marry another person while knowing that person to be committing bigamy (Mont. Code Ann. § 45-5-

612).  Similarly, Vicki has not applied for and been denied any additional marriage license, or undertaken any other action that may implicate an anti-polygamy provision in any Montana civil statute.

The Colliers attempt to satisfy Vicki's standing requirement by generally alleging that her "economic and familial interests" have been affected by Montana's refusal to allow Nathan and Christine to marry.  (*See* Doc. 43 at ¶ 44.) But the Colliers do not establish – or make any attempt to establish – that these ill-defined, nebulous "economic and familial interests" constitute legally protected interests, as required to find standing.

In short, the Colliers have not presented any evidence to suggest that Vicki has ever attempted to violate, or has any plan to attempt to violate, any of Montana's anti-polygamy laws, or that she has suffered any invasion of a legally protected interest due to Montana's anti-polygamy laws.  Therefore, the Court finds that Vicki does not have standing, and recommends that summary judgment be granted in favor of Defendants as to all of Vicki's claims.

The Court will now consider whether Nathan and Christine have standing, first with respect to the criminal bigamy laws and then with respect to any germane civil laws.

/ / /

/ / /

### 1. Montana's Criminal Anti-Polygamy Statutes

The bulk of the Colliers' claims are directed at Montana's criminal anti-bigamy statutes, Mont. Code Ann. §§ 45-5-611 and 612, and the Colliers' alleged fear of criminal prosecution under those statutes. As noted above, § 611 criminalizes marrying while still being married to another, providing in relevant part: "[a] person commits the offense of bigamy if, while married, the person knowingly contracts or purports to contract to another marriage . . . ." Section 612 criminalizes marrying a bigamist, and states in part: "[a] person commits the offense of marrying a bigamist if the person contracts or purports to contract a marriage with another knowing that the other is committing bigamy . . . ."

It is undisputed that the Colliers have never faced prosecution for violation of either statute. Accordingly, the Colliers are raising a "pre-enforcement challenge" to these statutes. In asserting pre-enforcement challenges to a statute, plaintiffs may meet constitutional standing requirements by demonstrating "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). But when plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." *Id.* at 298-299 (internal quotation omitted). Thus, despite the relaxed standing

analysis for pre-enforcement challenges, "plaintiffs must still show an actual or imminent injury to a legally protected interest." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). Neither the mere existence of a statute nor a generalized threat of prosecution is sufficient to satisfy plaintiffs' obligation. *Thomas v. Anchorage Equal Rights Commission.*, 220 F.3d 1134, 1139 (9th Cir. 2000).

The Court considers three factors in determining the genuineness of a claimed threat of prosecution: (a) whether the plaintiffs have articulated a concrete plan to violate the law in question; (b) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (c) the history of past prosecution or enforcement under the challenged statute. *Humanitarian L. Project v. U.S. Treas. Dept.*, 578 F.3d 1133, 1142 (9th Cir. 2009).

### a.     Concrete Plan to Violate

There is no dispute that Nathan and Christine are at least attempting to violate Mont. Code Ann. §§ 45-5-611 and 612. They claim to have entered into a marital contract, and evidence suggests that they generally refer to each other as husband and wife. They have also sought, albeit unsuccessfully, a state marriage license. It is less clear, however, whether Nathan and Christine have articulated anything that could be considered a "concrete plan to violate" Mont. Code Ann. §§ 45-5-611 or 612.

The State Defendants have taken the position that Nathan's and Christine's declaration to be husband and wife, without the accompanying possession of a state-issued marriage license, is insufficient to violate the Montana bigamy statutes. Therefore, this case presents the unusual situation where the State of Montana has taken the position that the Colliers' conduct is not criminal, while the Colliers insist that it is. In light of the State Defendants' position as to the legality of the Colliers' present conduct, however, it is somewhat difficult to conclude that mere maintenance of the status quo constitutes a concrete plan to violate Mont. Code Ann. §§ 45-5-611 or 612.

Nevertheless, this Court previously concluded that the Colliers claim to have a concrete plan to violate the statutes, and the relevant facts have not changed materially since that finding. (Doc. 23 at 8.) Additionally, for reasons discussed below, the Court ultimately finds that Nathan and Christine do not have standing to challenge Mont. Code Ann. §§ 45-5-611 or 612. Therefore, the Court will assume without deciding that Nathan and Christine can satisfy the first factor in determining the genuineness of a claimed threat of prosecution.

### b.    Threat of Prosecution

Though the Colliers generally allege that they "fear that the State will imminently enforce anti-polygamy criminal statutes" against them, they do not allege that they have ever been prosecuted under Montana's criminal bigamy

statutes, nor do they identify any specific threat of prosecution. (Doc. 43 at ¶ 45.) The closest the Colliers come to identifying an actual threat of prosecution is their allegation that "Defendants enforced State anti-polygamy criminal statutes by using them to justify the State's denial of a State-issued marriage license to Christine and Nathan Collier." (*Id*. at ¶ 44.) The Colliers are referring here to the Denial Letter, which specifically states that the Clerk's Office was correct to deny the license because "while both of you are lawfully married to each other, you seek to engage in yet another state licensed marriage. That act, by either or both of you, would be considered bigamy in Montana." (Doc. 22-1.) This statement does not threaten prosecution. Instead, the Letter indicates a second marriage license could not be issued because, that would constitute a second state-sanctioned marriage, which would violate Montana's bigamy statutes.

The Colliers do not argue, and the Court does not find, that the Denial Letter threatens any actual prosecution. The Colliers offer no other concrete examples or assertions of a specific threat or intent of Defendants to prosecute them under Montana's bigamy statutes. In fact, the entity charged with enforcement of the bigamy laws – the State of Montana – has taken the position that the Colliers are not in violation of the laws. Accordingly, this factor weighs strongly against finding a genuine threat of prosecution.

/ / /

### c.    History of Enforcement

The Colliers also are unable to present a history of enforcement. Despite their avowed "fear" of prosecution, the Colliers have not identified a single instance of bigamy prosecution in Montana. This lack of past prosecution under these statutes weighs heavily against finding the Colliers face a genuine threat of prosecution. The mere existence of the challenged statutes is simply not enough to demonstrate the constitutionally required standing necessary to challenge these statutes. *See Thomas*, 220 F.3d at 1139.

### d.    Conclusion

Even after giving the Colliers the benefit of the substantial doubt that they have formulated a concrete plan to violate Mont. Code Ann. §§ 45-5-611 or 612, the Court finds that the Colliers have failed to demonstrate injury in fact because they have not shown a threat of prosecution or a history of enforcement, and therefore they do not have standing to challenge those criminal statutes. Accordingly, the Court recommends that summary judgment be granted in favor of Defendants with respect to the Colliers' challenge to Mont. Code Ann. §§ 45-5-611 and -612.

### 2.    Montana's Civil Marriage Laws

Although the Colliers repeatedly reference and challenge the criminal bigamy laws discussed above in their Second Amended Complaint (*see e.g.* Doc.

43 at ¶ 53), they do not explicitly reference any Montana civil statutes. Defendants, therefore, maintain that the Colliers' challenge does not reach Montana's civil marriage laws.

But in their Second Amended Complaint, the Colliers do generally allege that they seek "declaratory and injunctive relief against enforcement of Montana State's laws banning . . . polygamy, and against Montana State unequal treatment of, and discrimination against, polygamous families." (*Id.* at ¶ 56.) They also request an order requiring Defendants to "issue a State-issued marriage license to Christine and Nathan Collier" (*Id.* at ¶ 105); and they further specify in their summary judgment motion that the Defendants have deprived them of their rights by "denying them equal access to the benefits and responsibilities of government-granted licensure," citing Mont. Code Ann. § 40-1-401(1)(a). (Doc. 75-1 at 2.) That section is a civil marriage statute which defines "prohibited marriages" to include "a marriage entered into prior to the dissolution of an earlier marriage of one of the parties . . . ." Therefore, the Court finds that the Colliers have sufficiently raised a challenge to at least that civil marriage statute.

The standing analysis differs with respect to that claim, since the Colliers are not asserting a pre-enforcement challenge. The undisputed facts demonstrate that Nathan and Christine applied for a Montana marriage license with the Yellowstone County Clerk of District Court Marriage License Division and were denied due to

Nathan's existing marriage to Vicki. That action is sufficient to confer standing upon them to challenge Montana's civil statute prohibiting plural marriage. It constitutes an alleged invasion of a legally protected interest (the right to marry) which is (a) concrete and particularized and (b) actual or imminent; (2) the injury would be fairly traceable Defendants' refusal to grant the marriage license; and (3) a favorable decision from the Court could resolve their injury by ordering Defendants to provide a marriage license.

Accordingly, the Court finds that the denial of Nathan's and Christine's marriage license application provides Nathan and Christine with standing to challenge Mont. Code Ann. § 40-1-401(1)(a).

## B.     Ripeness

Defendants also argue, however, that the Colliers' claims are not ripe. (Doc. 68 at 15-16.) "The [] doctrine of ripeness is a means by which federal courts may dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010.) Defendants limit their ripeness discussion to the Colliers' challenge to the criminal bigamy statutes, and they are correct that the Colliers' claims that they have been injured by those statutes is not ripe. However, the Colliers' challenge to Mont. Code Ann. § 40-1-401(1)(a) is

ripe because Nathan and Christine already have applied for and been denied a

Montana civil marriage license.

### C. Constitutional Claims

The question of whether state statutes prohibiting polygamy violate the

United States Constitution was answered over a century ago in *Reynolds v. U.S.*, 98

U.S. 145 (1878). *Reynolds* included a constitutional challenge to a federal statute

which prohibited bigamy in a territory or other place within the exclusive

jurisdiction of the United States. The Supreme Court upheld the validity of that

statute, finding "there cannot be a doubt that, unless restricted by some form of

constitution, it is within the legitimate scope of the power of every civil

government to determine whether polygamy or monogamy shall be the law of

social life under its dominion." 98 U.S. 145, 166 (1879). The Court further found

that the statute was "constitutional and valid as prescribing a rule of action for all

those residing in the Territories, and in places over which the United States have

exclusive control." *Id.*

Although *Reynolds* is almost 140 years old, it is not antiquated and is still

valid, binding authority. Several recent decisions have relied upon *Reynolds* to

uphold the constitutionality of anti-polygamy statutes. *See e.g. State v. Fischer*,

219 Ariz. 408, 412 (Ariz. App. 2008) (rejecting First and Fourteenth Amendment

challenges to polygamy statute, finding "[t]he Supreme Court has not moved away

from its holding on the issue of polygamy, and the Court has continued to refer to *Reynolds* approvingly for the proposition that plural marriages have no claim to First Amendment protection."); *White v. Utah*, 41 Fed.Appx. 325, 326 (10th Cir. 2002) (finding a constitutional challenge to Utah's prohibition against polygamy foreclosed by Supreme Court and Tenth Circuit precedent, citing *Reynolds)*; *Mayle v. Orr*, 2017 WL 1316269, *2 (N.D. Ill. April 10, 2017) (collecting cases, and finding a First and Fourteenth Amendment challenge to an Illinois bigamy statute was foreclosed by *Reynolds* and its progeny); *see also*, *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 485 U.S. 660, 671 (1988) (citing *Reynolds* and noting "bigamy may be forbidden, even when the practice is dictated by sincere religious convictions"); and *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 68 n. 15 (1973) ("[s]tatutes making bigamy a crime surely cut into an individual's freedom to associate, but few today seriously claim such statutes violate the First Amendment or any other constitutional provision.").

The Colliers point out Chief Justice Roberts' recent dissent in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), in which the Court held that same-sex couples have a constitutionally protected right to marry. In his dissent, the Chief Justice commented that "[i]t is striking how much the majority's reasoning [in support of a fundamental right to same-sex marriage] would apply with equal force to the claim of a fundamental right to plural marriage." *Id.* at 2621 (Roberts, C.J. dissenting).

Chief Justice Roberts also added, however, that he did "not mean to equate marriage between same-sex couples with plural marriages in all respects. There may well be relevant differences that compel different legal analysis." *Id.*

Regardless, Justice Roberts' dissent is not binding precedent, and it certainly cannot be said to have overruled *Reynolds*. Mindful of this Court's place in the federal judicial hierarchy, it is bound to follow *Reynolds* unless and until the Supreme Court decides to revisit the issue. Supreme Court "decisions remain binding precedent until [that Court sees] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. U.S.*, 524 U.S. 236, 252-253 (1998).

To the extent that the Colliers allege Montana's anti-polygamy laws have infringed upon rights other than their claimed fundamental right to plural marriage – such as, *inter alia*, the rights to cohabitate, intermingle finances, raise children together, etc. (*see* Doc. 80 at 13) – the Court does not find these challenges to be persuasive. First, the Colliers have not presented any evidence that Defendants have prevented them from exercising any of these alleged fundamental rights; on the contrary, the evidence suggests that the Colliers already are engaging in all of the conduct they discuss, with the sole exception being their desire to legally marry. Given Defendants' position that the Colliers are not violating any laws in spite of the fact that they otherwise live together as a family, with all that entails,

the Court is not persuaded that Montana's anti-polygamy laws infringe upon any fundamental right incidental to marriage. Rather, Mont. Code Ann. § 40-1-401(1)(a) prohibits Nathan and Christine from procuring a legal marriage license because Nathan is already married to Vicki. Until the Supreme Court overrules *Reynolds*, that prohibition, in and of itself, is not unconstitutional.

For the foregoing reasons, the Court recommends that summary judgment be granted in favor of Defendants with respect to the Colliers' constitutional challenge to Mont. Code Ann. § 40-1-401(1)(a).

### D.     42 U.S.C. § 1983

Finally, the Colliers seek relief under 42 U.S.C. § 1983, which provides a civil right of action to redress the deprivation of rights under color of state law. "Section 1983 is not in itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 270 (1994). As discussed at length above (*see* § IV(C), *supra*), there is no constitutional right to multiple marriages, and the Colliers therefore cannot raise a prima facie claim under § 1983 for any deprivation thereof. Since the Colliers have not established that they have been deprived of any other constitutional rights, their § 1983 claim must fail.

Accordingly, the Court recommends that summary judgment be granted in favor of Defendants with respect to the Colliers' claim under 42 U.S.C. § 1983.

### E.    Other Pending Motions

Pending before the Court are two motions other than the cross-motions for summary judgment heretofore discussed. These are: (1) the Colliers' *Daubert* Motion in Limine (Doc. 73), which seeks the exclusion of an expert proposed by the State Defendants, and (2) the State Defendants' Motion to Strike Previously Undisclosed Evidence (Doc. 92), which requests that the Court strike an exhibit the Colliers appended to their Reply to Defendants' Objections to Plaintiffs' Statement of Undisputed Facts (*see* Doc. 88-1).

The Court considered each of these motions, and found that neither the expert testimony the Colliers want to exclude nor the documentary evidence the State Defendants want to exclude materially affected the outcome of the parties' cross-motions for summary judgment. If these Findings and Recommendations are adopted and summary judgment is granted in Defendants' favor, the evidentiary concerns raised by these non-dispositive motions will no longer be at issue. Accordingly, the Court recommends that these motions be denied as moot.

//

//

## V. Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that:

(1)     Defendants' Motion for Summary Judgment – Fed. R. Civ. P. 56 (Doc. 67) be **GRANTED**;

(2)     the Colliers' Motion for Summary Judgment (Doc. 75) be **DENIED**;

(3)     the Colliers' *Daubert* Motion in Limine (Doc. 73) be **DENIED** as moot; and

(4)     the State Defendants' Motion to Strike Previously Undisclosed Evidence (Doc. 92) be **DENIED** as moot.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of the United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 22nd day of February, 2018.

TIMOTHY J. CAVAN

United States Magistrate Judge